WEIL, GOTSHAL & MANGES LLP
Attorneys for the Debtors
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
Martin J. Bienenstock (MB 3001)
Brian S. Rosen (BR 0571)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                                            :
In re                                  :   Chapter 11
                                       :
ENRON CORP., ET AL.,                   :   Case No. 01-16034 (____)
                                       :
                                       :   Jointly Administered
                      Debtors.         :
------------------------------------------------------------x
```

**APPLICATION OF THE DEBTORS PURSUANT TO § 328(a)
OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO EMPLOY
WEIL, GOTSHAL & MANGES LLP AS ATTORNEYS FOR THE DEBTORS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Enron Corp. and certain of its affiliated debtor entities (collectively, the "Debtors"), as debtors and debtors in possession, file this Application and respectfully submit as follows:

**JURISDICTION**

1. This Court has jurisdiction to consider this Application pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**BACKGROUND**

2. On December 2, 2001 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code

("Bankruptcy Code"). The Debtors continue to be authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. The Debtors and their approximately 3,500 other direct and indirect subsidiaries (collectively, the "Enron Companies"), building upon knowledge gained in over 70 years of experience in the energy business, have grown into a worldwide leader in products and services related to the sale and delivery of natural gas, electricity and communications to wholesale and retail customers. As of the Petition Date, the Enron Companies employed approximately 25,000 individuals throughout the world and were recently ranked seventh on the Fortune 500 list of the largest U.S. corporations.

4. For the fiscal year ended December 31, 2000, the Enron Companies generated $101 billion in annual revenues on a consolidated basis. As set forth in the Enron Companies' Form 10-Q filed on October 31, 2001 (the "10-Q") for the quarter ending on September 30, 2001, the Enron Companies' consolidated books and records reflected assets totaling approximately $61 billion and liabilities totaling approximately $49 billion.[1]

5. The Enron Companies divide their business operations into four primary business units: Enron Wholesale Services, Enron Retail Services, Enron Transportation Services, and Enron Global Services. These business units provide the following services:

    a. Enron Wholesale Services encompasses the global wholesale businesses related to natural gas, power, metals,

---

[1] As indicated in the 10-Q, the numbers set forth above are unaudited.

      coal, crude and liquids, weather, forest products and steel. This business unit also includes EnronOnline™, the world's largest e-commerce site for global commodity transactions.

  b. Enron Retail Services extends Enron's energy expertise and capabilities to end-use retail customers in the industrial and commercial business sectors to manage their energy requirements and reduce their total energy costs.

  c. Enron Transportation Services operates one of the largest gas transmission systems in the United States spanning approximately 25,000 miles with a peak capacity of 10.1 billion cubic feet per day.

  d. Enron Global Services includes energy-related assets throughout the world that are not included in the Wholesale, Retail and Transportation business units, including, but not limited to, assets in the United States, Brazil, Europe, and India.

6. On October 16, 2001, Enron Corp. issued a press release announcing its results for the three months ended September 30, 2001 (the "Third Quarter Earnings Release"). Although the release disclosed that Enron Corp.'s total recurring net income increased to $393 million dollars, as compared to $292 million dollars for the comparable period the prior year, the release also disclosed non-recurring charges totaling $1.01 billion dollars (after tax). In addition, in connection with the early termination of certain structured finance arrangements, it was also publicly reported that Enron's shareholders' equity had been reduced by approximately $1.2 billion.

7. During the period from October 15, 2001 up to and including Enron Corp.'s execution of an Agreement and Plan of Merger, by and among Dynegy, Inc. ("Dynegy") and certain of its subsidiaries (the "Merger Agreement") on November 9, 2001, there was a sharp decrease in the price of Enron Corp.'s common stock. During the same period, Enron's creditors and trading counterparties continued to

question the Enron Companies' financial credibility and each of the three primary rating agencies, Standard & Poor's, Moody's and Fitch, had continuous discussions with Dynegy and Enron regarding the impact of the proposed merger on Enron's financial condition.

8. On November 9, 2001, in an effort to improve their liquidity and restore shareholder, customer and vendor confidence, the Debtors and certain of their affiliates entered into the Merger Agreement, whereby the Debtors agreed to merge with and into Dynegy. Under the terms of the Merger Agreement, Dynegy agreed to acquire the Debtors for approximately $9,000,000,000 in Dynegy stock and assume approximately $13,000,000,000 in debt. Concurrently therewith, the Debtors, the Northern Natural Gas Company, an indirect subsidiary of Enron Corp. ("Northern Natural"), and Dynegy entered into a Subscription Agreement whereby Dynegy purchased $1,500,000,000 of preferred stock of Northern Natural.

9. Soon after entering into the Merger Agreement, a number of events occurred involving Dynegy that are the subject of litigation. Ultimately, Dynegy advised the Debtors that it was terminating the Merger and then on the morning of November 28, 2001, Standard & Poor's, Moody's, and Fitch each downgraded Enron's credit rating to speculative or "junk" status.

### RETENTION OF WEIL, GOTSHAL & MANGES LLP

10. The Debtors have employed Weil, Gotshal & Manges LLP ("WG&M") as their attorneys in connection with the commencement and prosecution of their chapter 11 cases. Pursuant to section 328(a) of the Bankruptcy Code, the Debtors request that the Court approve the employment of WG&M, under a general retainer, as their attorneys to perform the legal services that will be necessary during these chapter 11

cases at WG&M's hourly rates in effect from time to time and pursuant to WG&M's normal policies for reimbursement of disbursements.  Pursuant to section 328(a), the Debtors can retain WG&M pursuant to any reasonable terms and conditions.  The Debtors believe the hourly rates and disbursement policies WG&M charges and implements on a daily basis in a competitive national market for legal services are inherently reasonable and agree to pay WG&M according to those terms.  The Debtors have been informed that members of, counsel to and associates of WG&M who will be employed in these chapter 11 cases, are members in good standing of the courts in which they are admitted to practice.  Contemporaneously herewith, those WG&M attorneys who are not already admitted to practice before this Court are seeking admission <u>pro hac vice</u>.

11. The Debtors have selected WG&M as their attorneys because of the firm's knowledge of the Debtors' business and financial affairs and its extensive general experience and knowledge, and in particular, its recognized expertise in the field of debtors' protections and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.  In connection herewith, WG&M has become familiar with the Debtors' business, affairs and capital structure.  Accordingly, WG&M has the necessary background to deal effectively with many of the potential legal issues and problems that may arise in the context of the Debtors' chapter 11 cases.  The Debtors believe that WG&M is both well-qualified and uniquely able to represent them in these chapter 11 cases in a most efficient and timely manner.

12. The employment of WG&M under a general retainer is appropriate and necessary to enable the Debtors to execute faithfully their duties as debtors and

debtors in possession and to implement the restructuring and reorganization of the Debtors. Subject to further order of this Court, it is proposed that WG&M be employed to:

    a.    take all necessary action to protect and preserve the Debtors' estates, including the prosecution of actions on the Debtors' behalf, the defense of any actions commenced against the Debtors, the negotiation of disputes in which the Debtors are involved, and the preparation of objections to claims filed against the Debtors' estates;

    b.    prepare on behalf of the Debtors, as debtors in possession, all necessary motions, applications, answers, orders, reports, and papers in connection with the administration of the Debtors' estates;

    c.    assist the Debtors in obtaining confirmation of their chapter 11 plan of reorganization; and

    d.    perform all other necessary legal services in connection with these chapter 11 cases.

13. It is necessary for the Debtors to employ attorneys under a general retainer to render the foregoing professional services.

14. Additionally, based upon the size and complexity of the Debtors' chapter 11 cases, and the immense corporate structure of Enron Corp. and its affiliates, the Debtors intend to employ the law firm of Togut, Segal & Segal as co-counsel to WG&M. The Debtors shall use their best efforts to ensure that there is no duplication of effort between such firms.

15. WG&M has stated its desire and willingness to act in these cases and to render the necessary professional services as attorneys for the Debtors.

16. To the best of the Debtors' knowledge, the members, counsel and associates of WG&M do not have any connection with, or any interest adverse to, the Debtors, their creditors or any other party in interest, or their respective attorneys and

accountants, except as may be set forth in the annexed affidavit of Brian S. Rosen, a member of WG&M (the "Rosen Affidavit"). In that regard, and to the extent that, with respect to a specific issue, a perceived conflict may exist (e.g., PG&E Corporation), such matter shall be handled by the law firm of Togut, Segal & Segal, the Debtors' proposed co-counsel.

17. Notwithstanding the foregoing, the Debtors hereby disclose to the Court, in connection with the representation of all the Debtors by WG&M, that there are interrelationships among them. These interrelationships, however, reflect that the Debtors' affairs are substantially intertwined and that the Debtors' interests are substantially identical. Hence, the Debtors do not believe that their relationships to each other and to their non-debtor affiliates pose any conflict of interest in these chapter 11 cases because of the general unity of interest at all levels. Accordingly, the Debtors submit that WG&M's representation of all the Debtors is permissible under section 327 of the Bankruptcy Code and is in the best interest of all creditors of these estates.

18. WG&M's hourly rates range from $410 to $700 for members and counsel, $200 to $450 for associates and $50 to $175 for paraprofessionals in its United States offices. WG&M adjusts its rates from time to time. WG&M charges for reimbursement of out-of-pocket expenses including secretarial overtime, travel, copying ($0.20 per page), outgoing facsimiles ($1.00 per page), document processing, court fees, transcript fees, long distance phone calls, postage, messengers, overtime meals and transportation. WG&M charges its actual costs, or estimates of actual costs where discrete invoices are not rendered.

19. The Debtors firmly believe that WG&M is most qualified to represent their interests and the interests of their estates. If the Debtors were required to retain counsel other than WG&M in connection with the prosecution of their chapter 11 cases, the Debtors, their estates and all parties in interest would be unduly prejudiced by the time and expense necessarily attendant to such counsel's familiarization with the intricacies of the Debtors' business, operations and capital structure.

20. Within the year prior to the commencement of the Debtors' chapter 11 cases, WG&M has received from the Debtors approximately $3.4 million for professional services performed and for reimbursement of related expenses relating to a variety of matters, including corporate affairs, the potential restructuring of the Debtors' financial obligations and, if necessary, the commencement of these chapter 11 cases, including advance retainers, aggregating approximately $7.4 million. These fees and expenses have been paid by the Debtors in the ordinary course of business and through partial application of an advance retainer. Accordingly, as of the Petition Date, WG&M maintains an advance retainer for services to be performed and reimbursement of related expenses in the prosecution of these chapter 11 cases of approximately $4 million, which will be applied to such allowances of compensation and reimbursement of expenses for WG&M as may be granted by the Court.

21. The Debtors understand that WG&M hereafter intends to apply to the Court for allowances of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the local rules of the United States Bankruptcy

Court for the District of Delaware (the "Bankruptcy Local Rules") and orders of this Court for all services performed and expenses incurred after the Petition Date.

22. The Debtors, subject to the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules and further orders of the Court, propose to pay WG&M its customary hourly rates for services rendered that are in effect from time to time, as set forth in the Rosen Affidavit, and to reimburse WG&M according to its customary reimbursement policies, and submit that such rates are reasonable.

23. To the extent that affiliates of the Debtors subsequently commence chapter 11 cases, the Debtors request that the relief requested herein apply to such debtors and their respective estates. WG&M agrees to file additional disclosures as necessary pursuant to sections 327(e) and 328(a) of the Bankruptcy Code with regard to such debtors and their respective estates.

### **NOTICE**

24. As of the filing of this Motion, no trustee, examiner or creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been given via facsimile, hand delivery, or overnight mail to the United States Trustee, each of the Debtors' twenty largest unsecured non-insider creditors, the Securities and Exchange Commission, the United States Attorney's Office, the United States Attorney General, the Internal Revenue Service, and the Debtors' proposed debtor in possession lenders Because of the exigencies of the circumstances and the irreparable harm to the Debtors, their estates, and all parties in interest that will ensue if the relief requested herein is not granted, the Debtors submit that no other notice need be given.

25. Pursuant to Local Bankruptcy Rule for the Southern District of New York 9013-1(b), because there are no novel issues of law presented herein, the

Debtors respectfully request that the Court waive the requirement that the Debtors file a memorandum of law in support of this Motion.

26. No previous motion for the relief sought herein has been made to this or any other Court.

WHEREFORE the Debtors respectfully request that the Court enter an order granting the relief requested herein and such other and further relief as is just.

Dated: December 3, 2001
New York, New York

By: /s/ Mark E. Haedicke
On behalf of Enron Corp. and its
Affiliated Debtor Entities,
as Debtors in Possession

**AFFIDAVIT OF BRIAN S. ROSEN IN SUPPORT OF APPLICATION OF THE
DEBTORS PURSUANT TO § 328(A) OF THE BANKRUPTCY CODE FOR
AUTHORIZATION TO EMPLOY WEIL, GOTSHAL & MANGES LLP AS ATTORNEYS
FOR THE DEBTORS**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
: 
**In re**                                                                 :       **Chapter 11**
:
**ENRON CORP., ET AL.,**                                   :       **Case No. 01-16034 (____)**
:
:       **Jointly Administered**
**Debtors.**                                   :
--------------------------------------------------------------- x

# ORDER PURSUANT TO BANKRUPTCY CODE SECTION 328(a) AUTHORIZING EMPLOYMENT OF WEIL, GOTSHAL & MANGES LLP AS ATTORNEYS FOR THE DEBTORS IN ACCORDANCE WITH ITS NORMAL HOURLY RATES AND DISBURSEMENT POLICIES

Upon consideration of the application, dated December 3, 2001, ("Application"), filed by Enron Corp. and certain of its affiliated debtor entities (collectively, the "Debtors"), as debtors and debtors in possession, seeking authorization to employ Weil, Gotshal & Manges LLP ("WG&M") as their attorneys under a general retainer in accordance with its normal hourly rates and disbursement policies, as is more fully set forth in the Application; and upon the affidavit of Brian S. Rosen, a member of the firm of WG&M (the "Rosen Affidavit"), which is annexed to the Application; and it appearing that certain WG&M attorneys are contemporaneously requesting admission pro hac vice to practice before this Court in these chapter 11 cases; and the Court being satisfied, based on the representations made in the Application and the Rosen Affidavit, that WG&M represents or holds no interest adverse to the Debtors or to their estates as to the matters upon which it is to be engaged and is disinterested under section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and that the employment of WG&M is necessary and would be in the best interests of the Debtors

HO1:\240347\07\55GB07!.DOC\43889.0003

and their estates; and it appearing that the Court has jurisdiction to consider the Application; and it appearing that the relief requested in the Application is in the best interest of the Debtors, their estates and creditors; and it appearing that due notice of the Application has been given and no further notice need be given; and upon the proceedings before the Court; and good and sufficient cause appearing;

IT IS HEREBY ORDERED THAT:

1. The Application is granted.

2. Pursuant to section 328(a) of the Bankruptcy Code, the Debtors are authorized to employ and retain WG&M as their attorneys under a general retainer effective as of the commencement of this case in accordance with its normal hourly rates in effect from time to time and its disbursement policies.

3. WG&M shall be compensated in accordance with the substantive standards set forth in Bankruptcy Code section 328(a) and shall file applications in compliance with the Bankruptcy Code, applicable Federal Rules of Bankruptcy Procedure, local rules of the Court, and such other procedures as may be fixed by order of this Court.

4. To the extent that any of affiliates of the Debtors commence chapter 11 cases which are jointly administered with these chapter 11 cases, the retention of WG&M and other provisions of this Order shall apply to such debtors and their respective estates.

Dated: New York, New York
      December \_\_\_, 2001

_____
UNITED STATES BANKRUPTCY JUDGE