

# The Blackstone Group

December 3, 2001

Mr. Kenneth L. Lay
Chairman & Chief Executive Officer
Enron Corp.
1400 Smith Street
Houston, TX 77002

Dear Ken:

This letter confirms the understanding and agreement (the "Agreement") between The Blackstone Group L.P. ("Blackstone") and Enron Corp. (together with subsidiaries, "Enron" or the "Company") regarding the retention of Blackstone by Enron effective as of November 27, 2001 (the "Effective Date") as its financial advisor for the purposes set forth herein.

Under this Agreement, Blackstone will provide various financial advisory services to Enron. Such services will include but not be limited to services in connection with (a) a sale, merger, joint venture, sale of a majority or minority interest, lease arrangement or any similar transaction involving the Company's wholesale trading operations (a "Trading Transaction"); (b) the possible sale, merger or other disposition of the Company or all or substantially all of its assets (a "Merger Transaction"); (c) a Restructuring (defined below) of the liabilities of the Company; (d) the possible issuance by the Company of debt or equity securities (a "Financing"); and (e) the arrangement of debtor-in-possession ("DIP") financing. Blackstone will assist Enron in analyzing, structuring, negotiating, and effecting all of the transactions specified in the preceding sentence, pursuant to the terms and conditions of this Agreement. As used in this Agreement, the term "Restructuring" shall mean, collectively, any restructuring, reorganization (whether or not pursuant to Chapter 11 of the United States Bankruptcy Code) and/or recapitalization of existing or potential debt obligations, preferred stock or other claims of the Company including without limitation senior debt, junior debt, trade claims, general unsecured claims, contingent obligations and preferred stock (collectively, the "Obligations"), or any amendments to the terms or conditions of any of the Obligations.

The financial advisory services to be rendered by Blackstone include the following:

(a)     Assist in the evaluation of the Company's businesses and prospects;

(b)     Assist in the development of the Company's long-term business plan;

(c) Assist in the development of financial data and presentations to the Company's Board of Directors, various creditors, any official committees formed in a Chapter 11 proceeding, and other third parties;

(d) Analyze the Company's financial liquidity and evaluate alternatives to improve such liquidity;

(e) Analyze various restructuring scenarios and the potential impact of these scenarios on the value of the Company and the recoveries of those stakeholders impacted by the Restructuring;

(f) Provide strategic advice with regard to restructuring or refinancing the Company's Obligations;

(g) Evaluate the Company's debt capacity and alternative capital structures;

(h) Participate in negotiations among the Company and its creditors, suppliers, lessors and other interested parties with respect to any of the transactions contemplated in this Agreement;

(i) Value securities offered by the Company in connection with a Restructuring;

(j) Advise the Company and negotiate with lenders with respect to potential waivers or amendments of various credit facilities;

(k) Assist in the arranging of Financings (including a DIP Financing), including identifying potential sources of capital, assisting in the due diligence process, and negotiating the terms of any proposed Financing, as requested;

(l) Assist the Company in evaluating and executing both a Trading Transaction and a Merger Transaction, including identifying potential buyers or parties in interest, assisting in the due diligence process, and negotiating the terms of any proposed Trading Transaction or Merger Transaction, as requested;

(m) Provide testimony in any Chapter 11 case concerning any of the subjects encompassed by the other financial advisory services, if appropriate and as required;

(n) Assist and advise the Company concerning the terms, conditions and impact of any proposed Trading Transaction or Merger Transaction; and

(o) Provide such other advisory services as are customarily provided in connection with the analysis and negotiation of any of the transactions contemplated in this Agreement, as requested and mutually agreed.

Enron Corp.
December 3, 2001

    Notwithstanding anything contained in this agreement to the contrary, Blackstone shall have no responsibility for designing or implementing any initiatives to improve the Company's operations, profitability, cash management or liquidity. Blackstone makes no representations or warranties about the Company's ability to (i) successfully improve its operations, (ii) maintain or secure sufficient liquidity to operate its business, or (iii) successfully complete a Restructuring. Blackstone is retained under this Agreement solely to provide advice and services regarding the transactions contemplated in this Agreement. Blackstone's engagement does not encompass providing "crisis management".

    The Company agrees to pay the following fees ("Fees") to Blackstone for its financial advisory services:

(i) a monthly advisory fee (the "Monthly Fee") in the amount of $350,000, due and payable on the first day of each month during our engagement, with the first Monthly Fee to be due upon the execution of this Agreement;

(ii) upon the consummation of a Trading Transaction, a transaction fee equal to 1% of the aggregate value of the Consideration paid in the Trading Transaction, but in no event less than $10,000,000, due upon the closing of the Trading Transaction;

(iii) upon the consummation of a Merger Transaction, a transaction fee equal to $35,000,000, due upon the consummation of the Merger Transaction, provided, however, that in no event shall the fees payable to Blackstone pursuant to paragraph (ii) above and this paragraph exceed $35,000,000 in the aggregate;

(iv) upon the consummation of a divestiture of specific assets or subsidiaries (a "Divestiture Transaction") in circumstances where Blackstone has agreed to serve as the Company's financial advisor as outlined below in this Agreement, a transaction fee due upon the closing of the Divestiture Transaction equal to 1.0% of the aggregate Consideration paid in the Divestiture Transaction;

(v) a Debt Financing fee (the "Debt Financing Fee") of 0.5% of the total facility size of any Debt Financing arranged by Blackstone, specifically including without limitation a DIP financing provided by institutions other than J. P. Morgan Chase & Co. and Citigroup, Inc., due upon receipt of a binding commitment letter for such a facility. In the event a Debt Financing takes the form of a committed facility that is not initially fully drawn, the Financing Fee shall be calculated based on the committed amount;

(vi) an Equity Financing fee (the "Equity Financing Fee") upon the raising of new equity arranged by Blackstone, equal to 3.0% of the gross proceeds to the Company due upon the closing of a Financing;

Enron Corp.
December 3, 2001

Enron Corp.
December 3, 2001

      (vii)   upon the completion of any Restructuring of any Obligations, an additional fee (the "Restructuring Fee") equal to 0.25% of the face amount of the restructured Obligations, 50% due upon the execution of a binding commitment for such restructuring and 50% due upon consummation of such restructuring; provided, however, that if a Restructuring is completed through an out-of-court transaction or a pre-arranged/pre-packaged Chapter 11 filing, the Restructuring Fee shall be calculated, and 50% shall be due and payable when (i) a memorandum of understanding, voting agreement or other similar documentation shall have been executed by the Company or (ii) the Board of Directors of the Company shall have otherwise approved such a transaction, and the remaining 50% shall be due upon consummation of such transaction; and if a Restructuring is completed through a regular Chapter 11 filing, the Restructuring Fee shall be payable upon the effective date of the plan of reorganization; provided, further, that the total Restructuring Fees payable pursuant to this paragraph shall not exceed $35,000,000, subject to the following sentence. Upon completion of the final Restructuring, if the cumulative fees payable pursuant to this paragraph are less than $35,000,000, the Company will remit to Blackstone the difference between amounts paid to Blackstone and $35,000,000; provided, however, that in no event shall the fees payable to Blackstone pursuant to paragraph (iii) above and this paragraph (vii) exceed $35,000,000 in the aggregate; and

      (viii)   reimbursement of all reasonable out-of-pocket expenses incurred during this engagement, including but not limited to travel and lodging, direct identifiable data processing and communication charges, courier services, working meals, reasonable fees and expenses of Blackstone's counsel and other necessary expenditures, due upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses.

The Initial Fee received by Blackstone, as defined in the pre-petition engagement letter dated November 24, 2001, executed by the Company and Blackstone, shall be credited against any fees payable pursuant to paragraphs (ii) through (vii) above.

In this Agreement, Consideration means the gross value of all cash, securities and other properties paid or payable, directly or indirectly, in one transaction or in a series or combination of transactions, in connection with a Trading Transaction or Divestiture Transaction or a transaction related thereto (including, without limitation, amounts paid (A) pursuant to covenants not to compete, employment contracts, employee benefit plans or other similar arrangements and (B) to holders of any warrants, stock purchase rights, convertible securities or similar rights and to holders of any options or stock appreciation rights, whether or not vested). Consideration shall also include the fair market value of any long-term liabilities or preferred stock (including indebtedness for borrowed money and the amount set forth for any pension liabilities and guarantees) indirectly or directly assumed or acquired, or otherwise repaid or retired, in connection with or in anticipation of the Trading Transaction or Divestiture Transaction. If the

Enron Corp.
December 3, 2001

Trading Transaction or Divestiture Transaction takes the form of a purchase of assets, Consideration shall also include (i) the value of any current assets not purchased, minus (ii) the value of any current liabilities not assumed. If the Trading Transaction takes the form of the sale of a majority or minority interest in the wholesale trading operations (in whatever form such transaction is effected), Consideration shall also include the fair market value of the majority or minority interest in such operations that is retained by the Company. Consideration shall also include the aggregate amount of any extraordinary dividend or distribution from the date hereof until the closing of the Trading Transaction or Divestiture Transaction. If the Consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such Consideration is paid.

Fees on amounts paid into escrow will be payable upon the establishment of such escrow. If the Consideration in connection with any transaction may be increased by payments related to future events, the portion of Blackstone's fees relating to such contingent payments will be calculated and payable if and when such contingent payments are made.

In this Agreement, the value of any securities (whether debt or equity) or other property paid or payable as part of the Consideration shall be determined as follows: (1) the value of securities that are freely tradable in an established public market will be determined on the basis of the last market closing price prior to the public announcement of the Divestiture Transaction; and (2) the value of the securities that are not freely tradable or have no established public market or, if the Consideration utilized consists of property other than securities, the value of such other property shall be the fair market value thereof as mutually agreed by the parties hereto.

With respect to any Divestiture Transaction related to specific assets or subsidiaries pursued by the Company after the Effective Date, the Company shall give Blackstone the right to serve as financial advisor to the Company in connection with such transaction, except to the extent any engagement letters executed by the Company with other financial advisors prior to the Effective Date (including without limitation J. P. Morgan Chase & Co. and Salomon Smith Barney Inc.) otherwise specifically provide, and provided further, such financial advisors are retained subsequent to a Chapter 11 filing to continue to provide services in connection with the proposed transaction. Unless Blackstone should opt not to accept any such divestiture engagement, Blackstone shall serve as the Company's financial advisor for such Divestiture Transaction and shall receive the fee specified in paragraph (iv) above; provided, however, that if the Company wishes to retain a co-advisor for any such Divestiture Transaction, Blackstone and such co-advisor shall serve as co-advisors for such assignment and each firm shall receive 50% of the total transaction fees, subject to a minimum fee for Blackstone of 0.5% of the aggregate Consideration paid in such Divestiture Transaction.

This Agreement is not intended to conflict with the engagement letters previously executed by the Company and J. P. Morgan Chase & Co., Salomon Smith Barney Inc., or any

Enron Corp.
December 3, 2001

other firm, and Fees payable by the Company pursuant to those letters. Notwithstanding that however, the Company agrees to pay the Fees to which Blackstone is entitled hereunder for any transactions or events even if Fees are payable to J. P. Morgan Chase & Co., Salomon Smith Barney Inc. and/or any other firm in respect of the same transactions or events.

The Company shall use its best efforts to promptly apply to the bankruptcy court having jurisdiction over the Chapter 11 case or cases (the "Bankruptcy Court") for the approval pursuant to sections 327 and 328 of the Bankruptcy Code of (A) this Agreement and (B) Blackstone's retention by the Company under the terms of this Agreement and subject to the standard of review provided in section 328(a) of the Bankruptcy Code and not subject to any other standard of review under section 330 of the Bankruptcy Code. The Company shall supply Blackstone with a draft of such application and any proposed order authorizing Blackstone's retention sufficiently in advance of the filing of such application and proposed order to enable Blackstone and its counsel to review and comment thereon. Blackstone shall have no obligation to provide any services under this Agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless Blackstone's retention under the terms of this Agreement is approved under section 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which order is acceptable to Blackstone in all respects. Blackstone acknowledges that in the event that the Bankruptcy Court approves its retention by the Company, Blackstone's fees and expenses shall be subject to the jurisdiction and approval of the Bankruptcy Court under section 328(a) of the Bankruptcy Code and any applicable fee and expense guideline orders, provided, however, that to the extent time records are required, Blackstone will keep them in one-half hour increments. In the event that the Company becomes a debtor under the Bankruptcy Code and Blackstone's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of Blackstone hereunder as promptly as practicable in accordance with the terms hereof. Prior to commencing a Chapter 11 case, the Company shall pay all invoiced amounts to Blackstone in immediately available funds by wire transfer.

With respect to Blackstone's retention under sections 327 and 328 of the Bankruptcy Code, the Company acknowledges and agrees that Blackstone's restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or all of which may be required by the Company during the term of Blackstone's engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit to the Company of Blackstone's services hereunder could not be measured merely by reference to the number of hours to be expended by Blackstone's professionals in the performance of such services. The Company also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of Blackstone and its professionals hereunder over the life of the engagement, and in light of the fact that such commitment may foreclose other opportunities for Blackstone and that the actual time and commitment required of Blackstone and its professionals to perform its services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the

Enron Corp.
December 3, 2001

firm. In addition, given the numerous issues which Blackstone may be required to address in the performance of its services hereunder, Blackstone's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for Blackstone's services for engagements of this nature in an out-of-court context, the Company agrees that all of the fee arrangements specified herein are reasonable under the standards set forth in 11 U.S.C. Section 328(a).

Except as contemplated by the terms hereof or as required by applicable law or legal process, Blackstone shall keep confidential all material non-public information provided to it by or at the request of the Company, and shall not disclose such information to any third party or to any of its employees or advisors except to those persons who have a need to know such information in connection with Blackstone's performance of its responsibilities hereunder and who are advised of the confidential nature of the information and who agree to keep such information confidential.

The Company will furnish or cause to be furnished to Blackstone such information as Blackstone believes is appropriate to its assignment (all such information so furnished being the "Information"). The Company recognizes and confirms that Blackstone (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having independently verified the same, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information, (c) is entitled to rely upon the Information without independent verification, and (d) will not make an appraisal of any assets in connection with its assignment.

In the event that the Information belonging to the Company is stored electronically on Blackstone's computer systems, Blackstone shall not be liable for any damages resulting from unauthorized access, misuse or alteration of such information by persons not acting on its behalf, provided that Blackstone exercises the same degree of care in protecting the confidentiality of, and in preventing unauthorized access to, the Company's information that it exercises with regard to its own most sensitive proprietary information.

Except as required by applicable law, any advice to be provided by Blackstone under this Agreement shall not be disclosed publicly or made available to third parties (other than the Company's other professional advisors or, if appropriate in the Company's judgement, in any filings in a Chapter 11 proceeding) without the prior written consent of Blackstone. All services, advice and information and reports provided by Blackstone to the Company in connection with this assignment shall be for the sole benefit of the Company and shall not be relied upon by any other person.

The Company acknowledges and agrees that Blackstone has been retained to act solely as financial advisor to the Company and does not in such capacity act as a fiduciary for the Company or any other person. Blackstone shall act as an independent contractor, and any duties

Enron Corp.
December 3, 2001

of Blackstone arising out of its engagement pursuant to this Agreement shall be owed solely to the Company. Because Blackstone will be acting on the Company's behalf in this capacity, it is customary for us to receive indemnification. A copy of our standard form of indemnification agreement is attached to this Agreement as Attachment A.

In the event that as a result of or in connection with Blackstone's engagement for the Company, Blackstone becomes involved in any legal proceeding or investigation or is required by government regulation, subpoena, or other legal process to produce documents, or to make its current or former personnel available as witnesses at deposition or trial, the Company will reimburse Blackstone for the reasonable fees and expenses of its counsel incurred in responding to such a request. Nothing in this paragraph shall affect in any way the Company's obligations pursuant to the separate indemnification agreement attached hereto.

Blackstone's engagement hereunder may be terminated upon 30 days written notice without cause by either the Company or Blackstone; termination for cause by either party will occur forthwith. Notwithstanding the foregoing, (a) the provisions relating to the payment of fees and expenses accrued through the date of termination, the status of Blackstone as an independent contractor, and the limitation as to whom Blackstone shall owe any duties will survive any such termination, (b) any such termination shall not affect the Company's obligations under the indemnification agreement attached as Attachment A and (c) if this Agreement is terminated without cause by the Company, Blackstone shall be entitled to each of the fees for the Transactions specified in paragraphs (ii) and (iii) above and in paragraph (iv) above for Divestiture Transactions as to which Blackstone has opted to serve as the Company's financial advisor prior to the date of such termination, as well as the Debt Financing Fee, the Equity Financing Fee and the Restructuring Fee in the event that any such transactions are consummated at any time prior to the expiration of thirty-six full months following the termination of this Agreement.

Notwithstanding anything to the contrary provided elsewhere herein, none of the provisions of this Agreement shall in any way limit the activities of the private equity businesses of Blackstone and its affiliates in their businesses distinct from the restructuring and mergers and acquisitions advisory businesses of Blackstone provided that the Information is not shared with representatives of Blackstone and its affiliates who are not involved in the restructuring or mergers and acquisitions advisory businesses of Blackstone and that appropriate "Chinese wall" measures are taken to insure confidentiality. Notwithstanding the immediately preceding sentence, neither Blackstone nor any of its affiliates shall purchase, advise any third-party regarding a purchase or otherwise participate in the purchase of the Company's or any of its subsidiaries' stock, assets, claims or securities without the prior written consent of the Company.

This Agreement (including the attached indemnification agreement) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect such

Enron Corp.
December 3, 2001

provision in any other respect, which will remain in full force and effect. No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that state.

The Company hereby agrees that any action or proceeding brought by the Company against Blackstone based hereon or arising out of Blackstone's engagement hereunder, shall be brought and maintained by the Company exclusively in the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York, provided, if the Company commences a Chapter 11 case, all legal proceedings pertaining to this engagement arising after such case is commenced may be brought in the Bankruptcy Court handling such case. The Company irrevocably submits to the jurisdiction of the courts of the State of New York located in the City and County of New York and the United States District Court for the Southern District of New York and appellate courts from any thereof for the purpose of any action or proceeding based hereon or arising out of Blackstone's engagement hereunder and irrevocably agrees to be bound by any judgment rendered thereby in connection with such action or proceedings. The Company hereby irrevocably waives, to the fullest extent permitted by law, any objection it may have or hereafter may have to the laying of venue of any such action or proceeding brought in any such court referred to above and any claim that such action or proceeding has been brought in an inconvenient forum and agrees not to plead or claim the same.

Enron Corp.
December 3, 2001

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Blackstone the duplicate copy of this Agreement and the indemnification agreement attached hereto as Attachment A.

Very truly yours,

THE BLACKSTONE GROUP L.P.

By: _____

Name: STEVEN ZELIN
Title: SR. MANAGING DIRECTOR

Accepted and Agreed to as
of the date first written above:

ENRON CORP.

By: _____

Name: Raymond M. Bowen, Jr
Title: Executive Vice President, Finance and Treasurer

# The  Group

ATTACHMENT A

December 3, 2001

The Blackstone Group L.P.
345 Park Avenue
New York, NY  10154

## INDEMNIFICATION AGREEMENT

Gentlemen:

This letter will confirm that Enron Corp. (the "Company") has engaged The Blackstone Group L.P. ("Blackstone") to advise and assist the Company in connection with the matters referred to in our letter of agreement dated as of November 27, 2001 (the "Engagement Letter"). In consideration of your agreement to act on our behalf in connection with such matters, the Company agrees to indemnify and hold harmless you and your affiliates and your and their respective partners (both general and limited), members, officers, directors, employees and agents and each other person, if any, controlling you or any of your affiliates (you and each such other person being an "Indemnified Party") from and against any losses, claims, damages, expenses and liabilities whatsoever, whether they be joint or several, related to, arising out of or in connection with the engagement (the "Engagement") under the Engagement Letter and will reimburse each Indemnified Party for all expenses (including reasonable fees, expenses and disbursements of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding related to, arising out of or in connection with the Engagement or this agreement, whether or not pending or threatened, whether or not any Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by the Company. The Company will not, however, be liable under the foregoing indemnification provision for any losses, claims, damages or liabilities (or expenses relating thereto) that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the bad faith, gross negligence or willful misconduct of Blackstone. The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its owners, parents, affiliates, security holders or creditors for or in connection with the Engagement except for any such liability for losses, claims, damages or liabilities incurred by the Company that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the bad faith, gross negligence or willful misconduct of Blackstone.

If the indemnification provided for in the preceding paragraph is for any reason unavailable to an Indemnified Party in respect of any losses, claims, damages or liabilities referred to herein, then, in lieu of indemnifying such Indemnified Party hereunder, the Company shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages or liabilities (and expenses relating thereto) (i) in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by you, on the one hand, and the Company, on the other hand, from the Engagement or (ii) if and only if the allocation provided by clause (i) above is for any reason not available, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (i) but also the relative fault of each of you and the Company, as well as any other relevant equitable considerations; provided, however, to the extent permitted by applicable law, in no event shall your aggregate contribution to the amount paid or payable exceed the aggregate amount of fees actually received by you under the Engagement Letter. For the purposes of this agreement, the relative benefits to the Company and you of the Engagement shall be deemed to be in the same proportion as (a) the total value its security holders and its creditors in the transaction or transactions that are subject to the Engagement, whether or not any such transaction is consummated, bears to (b) the fees paid or to be paid to Blackstone under the Engagement Letter.

Neither party to this agreement will, without the prior written consent of the other party (which consent will not be unreasonably withheld), settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (a "Judgment"), whether or not the Company or any Indemnified Party is an actual or potential party to such claim, action, suit or proceeding. In the event that the Company seeks to settle or compromise or consent to the entry of any Judgment, the Company agrees that such settlement, compromise or consent shall include an unconditional release of Blackstone and each other Indemnified Party hereunder from all liability arising out of such claim, action, suit or proceeding.

Promptly after receipt by an Indemnified Party of notice of any complaint or the commencement of any action or proceeding with respect to which indemnification is being sought hereunder, such person will notify the Company in writing of such complaint or of the commencement of such action or proceeding, but failure to so notify the Company will not relieve the Company from any liability which it may have hereunder or otherwise, except to the extent that such failure materially prejudices its rights. If the Company so elects or is requested by such Indemnified Party, the Company will assume the defense of such action or proceeding, including the employment of counsel reasonably satisfactory to Blackstone and the payment of the fees and disbursements of such counsel.

In the event, however, such Indemnified Party reasonably determines in its judgment that having common counsel would present such counsel with a conflict of interest or if the Company fails to assume the defense of the action or proceeding in a timely manner, then such Indemnified Party may employ separate counsel reasonably satisfactory to the Company to represent or

defend it in any such action or proceeding and the Company will pay the reasonable fees and disbursements of such counsel; provided, however, that the Company will not be required to pay the fees and disbursements of more than one separate counsel for all Indemnified Parties in any jurisdiction in any single action or proceeding. In any action or proceeding the defense of which the Company assumes, the Indemnified Party will have the right to participate in such litigation and to retain its own counsel at such Indemnified Party's own expense.

The foregoing reimbursement, indemnity and contribution obligations of the Company under this agreement shall be in addition to any rights that an Indemnified Party may have at common law or otherwise, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company and such Indemnified Party.

The provisions of this agreement shall apply to the Engagement and any written modification of the Engagement and shall remain in full force and effect regardless of any termination or the completion of your services under the Engagement Letter.

This agreement and the Engagement Letter shall be governed by and construed in accordance with the laws of the state of New York applicable to contracts executed in and to be performed in that state.

Very truly yours,

ENRON CORP.

By: *Raymond M. Bowen, Jr.*
Name: Raymond M. Bowen, Jr.
Title: Executive Vice President, Finance and Treasurer

Accepted and Agreed
to as of the date first
written above:

THE BLACKSTONE GROUP L.P.

By: *[signature]*