**BILZIN SUMBERG DUNN BAENA PRICE & AXELROD LLP**
Scott L. Baena (Fla. Bar. No. 186445)
Mindy A. Mora (Fla. Bar No. 678910 and NY Bar No. MM 8305)
200 South Biscayne Boulevard
2500 First Union Financial Center
Miami, Florida 33131
(305) 374-7580

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| _____ ) | Chapter 11 |
| ) | |
| In re: ) | Case No. 01-16034 (AJG) |
| ) | Jointly Administered |
| ENRON CORP., et al. ) | |
| ) | |
|     Debtors. ) | Objections Due By: February 20, 2002 |
| ) | |
| ) | Hearing Date: February 27, 2002 at 10:30 a.m. |
| _____ ) | |

**MEMORANDUM IN SUPPORT OF MOTION OF SEVERED ENRON EMPLOYEES
COALITION FOR ENTRY OF AN ORDER
DIRECTING THE APPOINTMENT OF AN OFFICIAL
COMMITTEE OF SEVERED EMPLOYEES PURSUANT TO 11 U.S.C. § 1102(a)(2)**

      The Severed Enron Employees Coalition, for and on behalf of certain described persons (collectively, the "Movants"), hereby files this Memorandum in Support of the Motion of the Severed Enron Employees Coalition for the Entry of an Order Directing the United States Trustee (the "UST") to Appoint an Official Committee of Severed Employees Pursuant to 11 U.S.C. § 1102(a)(2) (the "Motion") in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). In support of the Motion , the Movants respectfully state as follows:

**INTRODUCTION**

Among the many casualties of this case are the 5,000 or so employees of the Debtors who, in addition to losing their retirement savings, lost their jobs, too. As a group, the severed Enron employees (the "Severed Employees") likely represent the largest single-interest constituency of the Debtors' estates which, by lack of resources and lack of proximity to the Court, require special consideration to ensure that their collective interests and rights are not merely preserved but also effectively promoted.

As the Court observed in its Memorandum Decision Regarding Movants' Request to Transfer Venue to the Southern District of Texas dated January 11, 2002[1], issues concerning Severed Employees' 401(k) claims, responsibility for the collapse of the Debtors and the resulting financial devastation reeked upon its employees, and related bankruptcy and non-bankruptcy matters, "are best addressed by a former employee representation approach." Memorandum Decision at 34 (footnote omitted).

In the wake of revelations concerning the Debtors' true financial condition, a number of class action lawsuits were brought against the Debtors, their officers and directors, their former professionals and others on behalf of shareholders and employees alleging, inter alia, violations of securities laws, ERISA, and numerous other laws and duties (the "Pending Litigation"). At least nine class action lawsuits concerning the Debtors' 401(k) Plan have been consolidated in the United States District Court for the Southern District of Texas into Tittle v. Enron, et al., Civil Action No. H-01-3913.

Although surely well-intentioned and well-founded, the Pending Litigation, which implicates the interests of Severed Employees was the product of a vigilant plaintiffs' bar and but a handful of employees of the Debtors. While, as a matter of applicable non-bankruptcy law, Severed Employees may have been represented by the putative class representatives in the

---

[1] Herein referred to as "Memorandum Decision."

Pending Litigation, as former employees and as Enron shareholders[2], such representation is holistic at best and certainly does not resonate the voices of the hundreds, nay thousands, of employees purportedly engulfed by the asserted claims.

Almost immediately after the commencement of the wholesale termination of the Debtors' employees, an informal network of Severed Employees materialized. Aided by modern means of communication, including the internet, this loose confederation quickly evolved from a support group to a well-defined and chartered coalition of severed employees, dubbed the Severed Enron Employees Coalition ("SEEC"), with a mission statement (See Exhibit A hereto) and a democratic system of governance, including a Steering Committee empowered to act on its behalf. While at first blush, the whole notion may seem "amateurish" to the cynic, the goals of the SEEC actually embody and promote the objectives of the Bankruptcy Code of ensuring that all interests are adequately represented and that appointed committees are fairly representative and not solely controlled by attorneys seeking to promote their own interests, whether as class counsel or as counsel for a committee.

The SEEC rejected the Pending Litigation if, for no other reason, it entailed plaintiffs' counsel selecting their clients rather than the putative clients engaging counsel of their choice. Consequently, the membership of the SEEC challenges any contention that any of the Pending Litigation vitiates the right of each Severed Employee to opt-out of such class action litigation under Rule 23(b)(3) of the Federal Rules of Civil Procedure.[3] To that end, on January 24, 2002, the SEEC on behalf of its members, through their chosen counsel, filed a class action complaint in the United States District Court for the Southern District of Texas against the 401(k) Plan trustee, numerous Enron officers and directors, Arthur Anderson, L.L.P. and others, for breach of

---

[2] The precipitous decline in the value of Enron stock has had a cataclysmic effect on Severed Employees. While institutional investors have likewise suffered significant losses, it does not appear that their Enron stock predominated their investment portfolios as it did for most Severed Employees.

[3] *See, Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 979 (5th Cir. 2000)("The fundamental flaw in the certification of each claim was that, for most of the class, damages will be the only meaningful relief obtained. Most of the class has an interest in individualized damages determinations that Rule 23(b)(2) does not protect. These class members . . . must be certified under 23(b)(3), if at all").

fiduciary duty and ERISA violations. Presumably, that action will be consolidated into the pending Tittle consolidated action.

The United States Trustee exercised great foresight when she appointed a former employee to serve on the Official Committee of Unsecured Creditors (the "Official Committee"); however, it is preposterous to expect that a lone former employee can attain any meaningful stature on a committee of fifteen which is predominated by banks, bondholders, insurance companies and trade creditors (many of whom are individually represented by their own counsel) whose constituencies' interests may not only be different but actually collide with those of Severed Employees. Moreover, the working relationships that the other members have forged through past bankruptcy and business experiences, and the likelihood that the sole former employee representative is likely viewed by other committee members as sui generis, forebodes that the interests of Severed Employees are likely to be paid little or no attention by the Official Committee. Further, the sole former employee representative has no effective means of either determining the interests and positions of Severed Employees or communicating with a broader cross-section of the community of Severed Employees for their input. Worse yet, the existing former employee representative may have an irreconcilable conflict of interest of his own.[4]

Upon information and belief, the United States Trustee has been inundated with requests for the formation of an official committee of Severed Employees; the SEEC has itself made such a request.[5] We have no reason to disbelieve that the United States Trustee has been thoughtfully considering those requests and weighing the advantages and disadvantages of a separate committee, the membership of such a committee if one is formed, and whether any limitations should be imposed upon the role of such a committee in this case. However, as the Court itself observed in another context, the "learning curve" in this case is steepening at a fairly alarming

---

[4] The former employee representative, Michael Patrick Moran, was an in-house attorney for Enron. Principles of attorney-client privilege seriously impair and disable Mr. Moran from fully discharging his fiduciary duties to Severed Employees and the Official Committee, not to mention that matters on which Mr. Moran gave legal advice may become the subjects of scrutiny.

[5] Upon information and belief, some of those requests have emanated from class action counsel and not from affected Severed Employees themselves.

rate. Clearly, any further significant delays -- albeit well-intentioned -- in the appointment of a separate committee engenders an unreasonable risk of prejudice.[6] Although this case is bound to be pending for quite some time, case management and case strategies are frequently imprinted at the earliest stages of a chapter 11 case.

By the Motion, the Movants request the entry of an order directing the appointment of an official committee of Severed Employees <u>now</u> in order to ensure the adequate representation of such claimants who currently are not adequately represented by the Official Committee in these chapter 11 cases.[7] These chapter 11 cases have the potential to tear the fabric of the employee retirement system as it currently exists in corporate America. Undoubtedly and by no choice of their own, the Severed Employees are at the forefront of a battle likely to rage in the courts and congressional halls throughout the Nation. As such, the Severed Employees are entitled to full and complete representation and not a minimal, inconsequential role on a committee in these chapter 11 cases comprised of claimants who cannot adequately represent their interests.

The instant Motion differs in one material respect from the Motion of the Attorney General of Texas for the Appointment of an Official Committee of Former and Retired Employees Pursuant to 11 U.S.C. §1102(a). Specifically, the Attorney General's Motion seeks to expand the membership of the requested additional committee to include retired employees, as well as Severed Employees. The Movants do not represent the interests of retired employees. Thus, the Movants do not express a position on that aspect of the Attorney General's motion or on the application of Section 1102(a), as opposed to Section 1114, of the Bankruptcy Code to the issue of the right of retirees to official committee representation.

---

[6] The Movants have endeavored to discuss these matters with the United States Trustee on numerous occasions with limited success. Nonetheless, although impatient for the United States Trustee's decision on the appointment of a Former Employees committee, the Movants would have been content to allow the United States Trustee a further short period of time to conclude her deliberations on the subject. However, on January 29, 2002, the Attorney General of Texas filed his motion for the appointment of an official committee of former and retired employees pursuant to 11 U.S.C. §1102(a), leaving the Movants no choice but to file the Motion.

[7] Needless to say, the SEEC seeks the appointment of its own representatives or designees to an official committee for Severed Employees.

\73190\14075\ # 546331v3

5

## The Bankruptcy Cases

1.      Commencing on December 2, 2001 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      The Debtors and their approximately 3,500 other direct and indirect subsidiaries (collectively, the "Enron Companies"), building upon knowledge gained in over 70 years of experience in the energy business, ostensibly grew into a worldwide leader in products and services related to the sale and delivery of natural gas, electricity and communications to wholesale and retail customers.

3.      The Enron Companies divide their business operations into four primary business units: Enron Wholesale Services, Enron Retail Services, Enron Transportation Services, and Enron Global Services. The units comprise wholesale and retail commodities trading, gas pipeline businesses, and other global services, including engineering, operation, and construction of power facilities.

4.      For the fiscal year ended December 31, 2000, the Enron Companies generated $101 billion in annual revenues on a consolidated basis. Based on information set forth in the Form 10-Q filed on October 31, 2001 (the "10-Q") for the quarter ending on September 30, 2001, the Enron Companies' consolidated books and records reflected assets totaling approximately $61 billion and liabilities totaling approximately $49 billion.[8]

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicate for the relief requested

---

[8]      As indicated in the 10-Q, the numbers set forth above are unaudited.

herein is § 1102(a)(1) [9] of the Bankruptcy Code.  A timely request for the relief sought herein has been made upon the United States Trustee, to no avail.

### The Official Committee

6. On December 12, 2001, the United States Trustee appointed the Official Committee.  The Official Committee is comprised of fifteen members, six of whom are located in New York City, three of whom are located in Texas, and one member in each of Ohio, Canada, Minnesota, Maryland and California.

7. The Official Committee is made up of five banks, three indenture trustees, two investment management companies, three trade creditors, one insurance company and one former employee.  Each member of the Official Committee, other than the former employee, is purportedly a creditor of the Debtors as a result of its business dealings with the Debtors.

### The Claims of Severed Employees

8. As of the Petition Date, the Enron Companies employed approximately 25,000 full and part time employees worldwide (approximately 7,000 hourly wage employees and approximately 18,000 salaried employees).  See Memorandum Decision at 16.  On December 3, 2001, the Enron Companies fired approximately 4,200, or sixty percent (60%), of their employees in Houston, Texas and have since fired an additional 200 of their Houston employees.  The number of severed employees is, unfortunately, bound to grow.  Id.  Approximately 12,000 of the Enron Companies' employees participated in its defined contribution plan established under 26 U.S.C. 401(k) (the "401(k) Plan").  Id.  As this Court correctly pointed out, "those persons whose retirement funds are in the Debtors' 401(k) Plan are among the Debtors' creditors."  Id.[10]

---

[9]  In pertinent part, 11 U.S.C. § 1102(a)(2) provides that "[o]n request of a party in interest, the court may order the appointment of additional committees of creditors . . . if necessary to assure adequate representation of creditors. . . .  The United States Trustee shall appoint any such committee."

[10]  The Movants are aware that on December 3, 2001, and December 14, 2001, the Court entered its Orders authorizing the Debtors "in their discretion and in the exercise of their business judgment," to make payments and honor in-transit pre-petition payments of salary, vacation pay, sick leave, and other accrued benefits to employees "entitled, as of the Petition Date," thereto.  Ostensibly, such Orders permit the

## LEGAL BASIS AND ARGUMENT

9. Pursuant to 11 U.S.C. § 1102(a)(2), upon request of a party in interest, bankruptcy courts have the authority and discretion to appoint additional committees in chapter 11 cases when such appointments are necessary to assure adequate representation of creditors. See 11 U.S.C. § 1102(a); In re McLean Industries, Inc., 70 B.R. 852, 856-857 (Bankr. S.D.N.Y. 1987)(finding that bankruptcy courts have *de novo* power to order the appointment of additional committees and "if representation is not adequate, it would appear that committee representation is necessary since Congress, in repealing §1102(c), ended the court's ability to afford alternative relief through change of committee membership"); In re Drexel Burnham Lambert Group, Inc., 118 B.R. 209, 211 (Bankr. S.D.N.Y. 1990)(finding that inadequate representation is to be addressed by bankruptcy courts through the creation of another committee); See also In re Dow Corning Corp., 194 B.R. 121, 129 (Bankr. E.D. Mich. 1996) rev'd in part on other grounds, 212 B.R. 258 (E.D. Mich. 1997)(finding that bankruptcy courts have *de novo* power to order the United States Trustee to appoint one or more additional committees); In re Sharon Steel Corp., 100 B.R. 767, 773 (W.D. Pa. 1989)(a party seeking the appointment of an additional committee may apply directly to the court for such relief and need not make an initial request to the trustee).

10. There is no statutory test or definition for "adequate representation." Therefore, when determining whether adequate representation exists, bankruptcy courts must look at the special needs of each particular case. See McLean, 70 B.R. at 861 (finding that adequate representation must be viewed in light of the nature of the case and the composition of the committee); See also In re Beker Industries Corp., 55 B.R. 945, 948 (Bankr. S.D.N.Y. 1985); In re Wang Laboratories, Inc., 149 B.R. 1, 2 (Bankr. E.D. Mass. 1992); In re Edison Brothers Stores, Inc., 1996 WL 534853, 3 (D. Del.)(unpublished decision). However, in "mega-cases" such as these chapter 11 cases, "in which there are significant groups of creditors or equity

---

Debtors to make such payments to Severed Employees; however, the Movants are unaware of any meaningful efforts to do so such as the establishment of a claims allowance process. The Movants believe that the appointment of an official committee of Severed Employees will greatly facilitate the establishment of fair and reasonable procedures for the payment of such claims.

\73190\14075\ # 546331v3

8

security holders with conflicting claims which are likely to be affected by the plan of reorganization, the court should authorize the appointment of additional committees. Such committees should be composed of creditors or equity security holders representative of classes as a whole as opposed to dissident factions of particular classes." See Beker Industries, 55 B.R. at 948,949 (quoting 5 L. King, Collier on Bankruptcy, ¶ 1102.2 at 1102-18 (15th Ed. 1984).

11. Over the years, general guidelines have been developed to assist courts in determining whether there is a need for additional committees. See, e.g., Dow Corning 194 B.R. at 141, rev'd in part on other grounds, 212 B.R. 258 (E.D. Mich. 1997). By the guidelines, courts are encouraged to examine each particular case using a two-part inquiry: First, is the appointment of an additional committee necessary to ensure adequate representation? If so, should the court exercise its discretion to make the appointment? Id.; Wang, 149 B.R. at 2; In re Trans World Airlines, Inc., 1992 WL 168152, 2 (Bankr. D. Del)(unpublished opinion).

### I. Appointment of a Severed Employee's Committee is Necessary to Assure Adequate Representation

12. Although there is no statutory definition for adequate representation, courts have concluded that adequate representation exists as long as the diverse interests of the various creditor groups: (i) are represented on, and have participated in, the committees constituted by the United States Trustee; and (ii) have a meaningful voice on such committees in relation to their posture in the case. See Dow Corning, 194 B.R. at 141, rev'd in part on other grounds, 212 B.R. 258 (E.D. Mich. 1997); Trans World Airlines, 1992 WL 168152 at 3 (unpublished opinion citing Sharon Steel, 100 B.R. at 777-78 (Bankr. W.D. Penn. 1989)).

13. Courts are directed to consider the following non-exclusive guidelines in determining whether adequate representation exists: (i) the nature of the case (i.e., whether the case is sufficiently large and complex to indicate the need for additional committees); (ii) the composition of the committee (i.e., whether the present committee is representative of the unsecured creditors in the case); and (iii) the ability of the committee to properly function (i.e.,

whether conflicts of interest on the committee effectively disenfranchise particular groups of creditors). See Dow Corning, 194 B.R. at 142, rev'd in part on other grounds, 212 B.R. 258 (E.D. Mich. 1997); In re Hills Stores, Co., 137 B.R. 4 (Bankr. S.D.N.Y. 1992); McLean, 70 B.R. at 860; Sharon Steel, 100 B.R. at 779.

### A. The Complexity of the Debtors' Cases Necessitates the Relief Requested

14. As for the size and complexity of the bankruptcy case, in large cases, where there are significant groups of creditors with conflicting claims which are likely to be affected by the debtor's plan of reorganization, courts should authorize the appointment of additional committees. See Beker, 55 B.R. at 948 (debtor's case was found to be sufficiently large and complex to warrant the appointment of official committees representing debenture and equity holders where debtor listed $411 million in assets and $260 million in liabilities; and where the equity and debenture interests were widely held); see also, Dow Corning, 194 B.R. at 144, rev'd in part on other grounds, 212 B.R. 258 (E.D. Mich. 1997)(court appointed an official committee representing physician claimants where there were approximately 1,000 insured physicians who were defendants in over 7,800 lawsuits arising from implementation of debtor's products); Hills Stores, 137 B.R. at 4 (finding that "a case which is sufficiently large and complex may strongly indicate the need for additional committees representing different interests").

15. Indisputably, these chapter 11 cases are the largest and likely, the most complex and controversial bankruptcy cases ever filed. The sheer number of Debtors and non-debtor subsidiaries and affiliates, combined with the prospect of cross-border protocols for the ancillary proceedings of foreign Debtors, the number and diversity of claims, the overwhelmingly complicated financing structures and the resonant undertones of active fraud and gross mismanagement, make these cases extraordinarily difficult to wade through and respectfully, commands the appointment of a committee to ensure adequate representation of Severed Employees.

## B. The Official Committee is not Representative of the Severed Employee Claimants in the Debtors' Cases

16. The second factor, the composition of the existing committees, focuses the Court's attention on whether the existing Official Committee is representative. See Dow Corning, 194 B.R. at 144, rev'd in part on other grounds, 212 B.R. 258 (E.D. Mich. 1997); See also, Drexel, 118 B.R. 209, 212 (finding that the standard of adequate representation lies in the nature of the case and the composition of the committee).

17. As stated, the Official Committee has but one former employee member. In contrast, the Official Committee consists of fourteen other members whose claims against the Debtors emanate from money lent, goods sold or services rendered to the Debtors. Virtually all of the constituencies represented by those other members continue to do business in some form with the Debtors. By any standard, Severed Employees are severely under represented. The number of Severed Employees already exceeds 4,000, the aggregate dollar amount of their claims promises to be in the billions of dollars, and axiomatically, there is no prospect for future employment by the Debtors.

## C. Inherent Conflicts of Interest Between Severed Employee Claimants and The Remainder of the Members of the Official Committee Necessitate the Relief Requested

18. The final factor to be considered when analyzing adequate representation is the ability of existing committees to properly function. See Dow Corning, 194 B.R. at 142, rev'd in part on other grounds, 212 B.R. 258 (E.D. Mich. 1997); see also McLean, 70 B.R. at 860. As one court in this District has stated in analyzing the functionality of a committee, "[i]t would seem to require no citation, however, to reason that a committee in a case involving conflicts among creditors should not be dominated by one or more particular faction." McLean, 70 B.R. at 862.

19. Although a committee may reach consensus on all issues, it still may not adequately represent the interests of a particular group of creditors if "the committee is so dominated by one group of creditors that a separate group has virtually no say in the decision-

\73190\14075\ #546331v3

11

making process." Dow Corning, 194 B.R. at 142. The primary objective of any chapter 11 case is to achieve a confirmed plan of reorganization. Clearly, one of the most important aspects of any committee's role in a chapter 11 case is to negotiate the terms of a debtor's plan of reorganization. See In re Johns-Manville Corp., 68 B.R. 155, 161 (Bankr. S.D.N.Y. 1996)("[T]he power to exercise a voice in [the] formulation [of a plan] is clearly a desideratum under the program laid down by the bankruptcy code")(quoting In re Johns-Manville, 801 F.2d at 62). Therefore, although internal conflicts among committee members are not out of the ordinary, such conflicts may necessitate the addition of a separate committee if they impair the ability of the committee to reach a consensus on issues effecting a debtor's plan of reorganization. See McLean, 70 B.R. at 861.

20. Certainly, the Official Committee is dominated by creditors whose interests are altogether different, if not divergent, from those of the Severed Employees. At a minimum, the claims of Severed Employees are substantially intertwined with the Debtors' equity structure since Severed Employees were participants in the Debtors' 401(k) Plan and over 60% of the 401(k) Plan's assets were invested in Enron stock. Perforce, the reorganization objectives of garden-variety unsecured creditors and Severed Employees are at odds. The cancellation of equity interests would be catastrophic for Severed Employees while the occasioned loss would be a mere rounding error for the institutional members of the Official Committee.

## II. This Court Should Exercise Its Discretion and Appoint a Severed Employees Committee

21. The second step in the analysis of whether to appoint an additional committee permits the application of the Court's discretion. See 11 U.S.C. § 1102(a)(2)(stating that the court "*may* order the appointment of additional committees of creditors. . . ." *emphasis added*);

Dow Corning, 194 B.R. at 142; Wang, 149 B.R. at 2; Trans World Airlines, Inc., 1992 WL 168152 at 2.

22.     Like the first step, certain non-exclusive guidelines for the exercise of the Court's discretion have evolved, including consideration of: (i) the costs associated with appointment; (ii) the timeliness of the application; and (iii) the presence of other avenues for creditor participation.  See Dow Corning, 194 B.R. at 142; Hills Stores, 137 B.R. at 8.  However, as mentioned above, consideration of these guidelines is completely discretionary and should not prevent the appointment of an additional committee if otherwise justified by the facts of a particular case.  Id.

### A. The Costs Associated With Appointing a Severed Employees Committee Does not Outweigh the Need for Adequate Representation

23.     In most cases, the appointment of additional committees may create added expenses for the estate since such appointments are usually followed by applications to retain attorneys and other professionals.  See Beker, 55 B.R. at 949.  However, these added costs are not of themselves sufficient to deprive creditors of an additional committee where one is otherwise appropriate.  Hills Stores, 137 B.R. at 6; see also, McLean, 70 B.R. at 860 (finding that costs alone cannot and should not deprive creditors of adequate representation).  Thus, when considering this guideline, the courts ought balance the cost of an additional committee against the value of the representation to be provided.  Wang, 149 B.R. at 3.

24.     The Movants are acutely sensitive to the proliferation of the administrative costs of these estates.  However, given the uniqueness of the Severed Employee claims and the public policy favoring the formation of an official committee of Severed Employees, the Movants submit that the costs of an additional committee are more than amply offset by the added benefits of an additional committee.

25.     Moreover, it would be grossly unfair to require Severed Employees to fund activities in these cases out of their own pockets for the benefit of the estate generally, while capable adversaries are empowered and emboldened by estate funding of their activities.  After

all, these people have already lost their jobs and their retirement security. Furthermore, Severed Employees may feel compelled to take an active role in these cases as a result of their apprehensions founded upon the absence of an official committee, virtually assuring a ground-swell of pleadings, papers and inevitable ex parte communications from lay persons without the benefit of counsel. The time and expense, let alone the administrative burden which will be placed on the Court and the office of the United States Trustee, may well result in incalculable cost to the Court and the estates which greatly exceeds the cost of an official committee serving Severed Employees, as well as serving as an efficient clearing house for exchanges with Severed Employees.

### B. The Relief Requested is Timely

26. Another guideline for the Court to consider in assessing whether to exercise its discretion to appoint a separate committee is whether the request to appoint such committee is timely.

27. In evaluating this guideline, courts should primarily be concerned with whether the request would delay confirmation of the debtor's plan. See Hills Stores, 137 B.R. at 7; Dow, 194 B.R. at 143 (finding that courts are especially skeptical of motions filed after the debtor has filed a plan of reorganization).

28. Inasmuch as these chapter 11 cases are undoubtedly many months, if not years, away from reaching plan stages, the establishment of a Severed Employee Committee would be propitious.

### C. Severed Employees Have No Other Avenue to Insure Adequate Representation

29. The last discretionary guideline of the analysis involves a balancing of the need for adequate representation against the availability of other avenues for creditor participation. See Dow, 194 B.R. at 143.

30. Again, without repeating each of the foregoing arguments, given the complexity of these chapter 11 cases and the diversity of claims confronting the Debtors, absent an official

committee, it is unlikely that the Severed Employees will have the opportunity to meaningfully participate in the reorganization of the Debtors.

## CONCLUSION

In summary, it is difficult to conceive of any legitimate or appropriate basis to deny the Motion. As one of the largest -- if not the largest -- constituencies of the Debtors' estates, which suffers from a lack of personal resources and sophistication in the bankruptcy process, Severed Employees stand to lose the most in what promises to be one of the most challenging bankruptcy cases in history absent the appointment of a separate committee to represent their interests.

The existing representation of Severed Employees on the Official Committee is not only suspect but also of dubious significance. At best, the current representation is testimony to the right of Severed Employees to be represented by a committee; at worse, it pays lip service to traditional principles of adequate representation.

Moreover, the appointment of a separate Severed Employees committee will institutionalize judicial efficiencies by providing a mechanism for communication and the promotion of the interests of Severed Employees.

WHEREFORE, the Movants respectfully request entry of an Order granting the Motion and directing the appointment of an official committee of Severed Employees.

BILZIN SUMBERG DUNN BAENA
PRICE & AXELROD LLP


_____/s/ Scott L. Baena_____
Scott L. Baena, Fla. Bar No. 186445
Mindy A. Mora Fla. Bar No. 678910
      NY Bar No. MM 8305
2500 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2336
(305) 374-7580



Counsel for Movants

Dated: January 29, 2002

\73190\14075\ # 546331v3

16