Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005
Luc A. Despins (LD 5141)
Susheel Kirpalani (SK 8926)
Mathew B. West (MW 9117)
(212) 530-5000

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Martin J. Bienenstock (MB 3001)
Lawrence J. Baer (LB 9924)
(212) 310-8000

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
                              :

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 01-16034 (AJG) |
| ENRON CORP., et al., | Jointly Administered |
| | |
| Debtors. | |

-----------------------------------------------------x

**JOINT RESPONSE OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
AND THE DEBTORS IN FURTHER SUPPORT OF JOINT MOTION, UNDER
11 U.S.C. §§ 105(a), 502(c) AND 503(b)(1), FOR ESTIMATION OF
OPT-OUT SEVERANCE CLAIMS, AND IN OPPOSITION
TO ADMINISTRATIVE EXPENSE PRIORITY OF SUCH CLAIMS**

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors of Enron Corp. et al. (the

"Creditors' Committee") and Enron Corp. and its affiliated debtor entities, as debtors and debtors

in possession (collectively, "Enron" or the "Debtors"), jointly submit this response in further

support of their Joint Motion, Under 11 U.S.C. §§ 105(a), 502(c) and 503(b)(1), for (I)

Estimation of Certain Former Employees' Claims Arising from Termination of Employment and

(II) Approval of Form and Manner of Notice and Procedures for Disputing Estimation, dated

June 14, 2002 (the "Joint Estimation Motion"), and specifically in opposition to those Eligible

Former Employees[1] who have timely opted out of the Settlement.

## I.

## PRELIMINARY STATEMENT AND UPDATE

1.     As of the Opt-Out Deadline of August 2, 2002, the Creditors' Committee

and the Debtors had received Opt-Out Forms from 60 Opt-Out Claimants[2] (out of 4,170 Eligible

Former Employees), each as identified below and as described in the affidavit of Robert Jones,

dated August 8, 2002 (the "Jones Aff."), filed contemporaneously herewith.  In addition, as of

the Opt-Out Deadline, 3,553 Eligible Former Employees had affirmatively "opted in" to the

Settlement by submitting an Immediate Partial Payment and Waiver  Form.  See Jones Aff. ¶ 3.

2.     By order entered on June 24, 2002, the Court approved the procedural

aspects of the Joint Estimation Motion (the "Estimation Procedures Order").  The Joint

Estimation Motion and Estimation Procedures Order were designed to provide a mechanism for

resolving, without unduly delaying the administration of these cases, any administrative expense

claims arising from termination of employment asserted by Eligible Former Employees who did

not wish to participate in the Settlement.[3]  Alternatively, all Eligible Former Employees who did

not affirmatively opt out of the Settlement by the Opt-Out Deadline, or who affirmatively opted

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Joint Estimation Motion.

[2]     Six of the Opt-Out Claimants have subsequently indicated that they inadvertently submitted the wrong form and actually wished to be included in the Settlement.  Thus, this response is directed only to the remaining 54 Opt-Out Claimants who timely excluded themselves from the Settlement.  See Jones Aff. ¶ 17.

[3]     The Settlement consists of two potential payout components.  Initially, any Settlement participant would receive a Severance Award, calculated by reference to the pre-petition Enron Corp. Severance Pay Plan (the "Enron Severance Plan"), up to a maximum of $13,500, inclusive of any severance amounts previously paid by Enron (approximately $5,678).  In addition, participants in the Settlement would potentially receive an additional distribution of their *pro rata* share of certain avoidance action recoveries, if successful.

into the Settlement, would be considered part of the settlement class approved by the Court pursuant to the Joint Settlement Motion.[4]

3.    The Estimation Procedures Order required the Debtors to serve a Court-approved notice and form of response (the "Estimation Response Form" and, together with the notice, the "Notice Package") on all Eligible Former Employees.[5] The Estimation Procedures Order further provided that any Opt-Out Claimant asserting an Opt-Out Severance Claim or Other Termination Claims must submit an Estimation Response Form, signed and verified, together with all Evidentiary Support, *so as to be received* by the Debtors and the Creditors' Committee by no later than the Response Deadline, which was August 2, 2002.

4.    Pursuant to the Estimation Procedures Order, all Opt-Out Claimants were required to assert in the Estimation Response Forms all Other Termination Claims (i.e., claims arising from termination of employment other than for severance) they believed they had. Due to the number of Opt-Out Claimants and the pressing need only to resolve the *administrative expense priority* of any Opt-Out *Severance* Claims prior to the final hearing on the Settlement, the Creditors' Committee and the Debtors hereby exercise their right, pursuant to the Estimation Procedures Order, to postpone determination of any Other Termination Claims that were timely asserted by the Response Deadline and thereby preserved. *Thus, at the Estimation Hearing on August 12, 2002, only the administrative expense priority of claims for severance (whether*

---

[4]    The Court granted certain relief sought by the Joint Settlement Motion by order dated June 24, 2002 (the "Preliminary Approval Order"), including the establishment of a settlement class under Fed. R. Bankr. P. 9019(b). The Preliminary Approval Order also provisionally approved the Settlement subject to a final fairness hearing on the Joint Settlement Motion, which is currently scheduled to be heard on August 12, 2002, at 2:00 p.m.

[5]    Evidence of timely service of the Notice Packages is being filed with the Court contemporaneously herewith. See Jones Aff. ¶ 2.

*under the Enron Severance Plan or individual employment agreements) will be subject to*

*estimation.*[6]

## II.

## OVERVIEW OF OPT-OUT SEVERANCE CLAIMS SUBJECT TO ESTIMATION

5.    **Categories of Similar Opt-Out Severance Claims.**  The Creditors'

Committee and the Debtors have reviewed all timely submitted Estimation Response Forms to

determine whether the Opt-Out Severance Claims submitted by the Opt-Out Claimants may be

fairly categorized as similar for purposes of estimating the unliquidated administrative expense

priority of such claims.  The Creditors' Committee and the Debtors submit that 42 of the 54 Opt-

Out Claimants fall into one of the following estimation categories, each as described in the Jones

Aff.:

> (A)    Nine former employees who assert severance claims solely under the pre-
> petition Enron Severance Plan (the "ESP Claimants"), most of whom were
> discharged "substantially contemporaneous" (i.e., on or before December
> 5, 2001) with Enron's December 2, 2001 bankruptcy filing;

> (B)    Twenty former employees who assert severance (involuntary termination)
> claims under individual employment agreements (the "Contract
> Claimants"), all of whom were discharged "substantially
> contemporaneous" with Enron's bankruptcy filing;[7]

> (C)    Nine former employees discharged pre-petition (the "Pre-Petition
> Claimants"); and

---

[6]    The Creditors' Committee and the Debtors each reserves the right to contest the amount and
allowance of any Other Termination Claims to the extent preserved by Opt-Out Claimants in the
Estimation Response Forms when and if such claims are submitted to the Court as part of a proof of
claim, motion, or otherwise.  In addition, the Creditors' Committee and the Debtors each reserves the
right to contest the amount and allowance of any and all pre-petition claims (including any portion of
claims not granted priority in this proceeding) when and if such claims are submitted as part of a proof of
claim.

[7]    Certain of the Contract Claimants also assert claims under the pre-petition Enron Severance Plan.
Pursuant to Enron's employment agreements, Contract Claimants are either ineligible for, or are required
to offset, any benefits due under the Enron Severance Plan.

(D)     Four former employees whose claims are properly against non-Debtor entities (the "Non-Debtor Claimants").

6.     **Remaining Opt-Out Severance Claims**. Four Opt-Out Claimants who have asserted claims under individual employment agreements do not fall into any of the foregoing categories and are dissimilar for purposes of estimating administrative expense priority (the "Remaining Claimants"). The Creditors' Committee and the Debtors seek to estimate the unliquidated administrative expense priority of the Opt-Out Severance Claims asserted by three of the Remaining Claimants on individualized grounds depending on the circumstances of their discharge or other grounds, as more fully described in Section III.E below.

7.     **Untimely Opt-Out Claims**. Eight Eligible Former Employees opted-out of the Settlement but did not timely submit verified Estimation Response Forms so as to be received by the Response Deadline, as required by the Estimation Procedures Order (the "Untimely Claimants"). The unliquidated administrative expense priority of any Opt-Out Claims that may be asserted by the Untimely Claimants is, pursuant to the Estimation Procedures Order, to be estimated at the amounts already distributed as Prior Payments. See Section III.F, below.

8.     **Resolving the Face Amount of Opt-Out Severance Claims**. According to Enron's books and records, several of the Opt-Out Claimants overstate even the face amount of the claims for severance as calculated under the Enron Severance Plan and/or individual employment agreements. In some instances, it is unclear from the Estimation Response Form how the severance claim has been calculated. *Enron's calculations are set forth in the summaries annexed as exhibits to the Jones Aff.* A worksheet illustrating Enron's calculation is being prepared for each disputed Opt-Out Severance Claim in the event any Opt-Out Claimant with a disputed calculation wishes to contest Enron's calculation at the Estimation Hearing. In other instances, the Opt-Out Claimants asserted amounts purportedly due as severance that are

merely unpaid expected compensation. *As set forth in the summaries annexed to the Jones Aff., such amounts are not properly included as termination claims because they are not termination claims under the terms of the relevant employment agreements. The Court is not being asked to estimate the non-termination claims.*

## III.

### PROPOSED ESTIMATION OF ADMINISTRATIVE EXPENSE PRIORITY OF SIMILARLY SITUATED OPT-OUT SEVERANCE CLAIMS BY CATEGORY OF OPT-OUT CLAIMANTS

**A.    ESP CLAIMANTS:  ADMINISTRATIVE EXPENSE CLAIMS SHOULD BE ESTIMATED AT 0% OF FACE AMOUNT[8]**

9.    The following individuals comprise the ESP Claimants:  Geoffrey R. Allen, Candace Easter, Sandeep Kohli, John Lennard, Luiz T. A. Maurer, Raymond Pizarro, Anand Ramakotti, Larry A. Soderquist and Florence Zoes.  See Fed. Rule Evid. 1006 summary of Estimation Response Forms submitted by ESP Claimants annexed to the Jones Aff. as Exhibit A. The primary factor the Court should consider in estimating the administrative expense claims of the ESP Claimants is that the Enron Severance Plan terminated, automatically by its own terms, upon Enron's bankruptcy filing.  Even if the ESP Claimants could establish that they reasonably relied on a summary of the Enron Severance Plan, and were not specifically made aware of the automatic termination provision of the Enron Severance Plan, the ESP Claimants still could not establish any entitlement to an administrative expense claim.

---

[8]    Although estimation of Opt-Out Severance Claims at zero would mean that the $5,678 in Prior Payments is not being offset against any allowed administrative expense claim, the position of the Creditors' Committee and the Debtors is that such Opt-Out Claimants should be entitled to retain the Prior Payments.  In the event that the Court estimates the administrative expense priority of any Opt-Out Severance Claims at greater than zero, however, such administrative expense claim must be offset by the amount of the Prior Payments received.

### 1. Enron Severance Plan Terminated Upon Enron's Bankruptcy

10. *By its express terms*, the Enron Severance Plan terminated on December 2, 2001, when Enron filed for protection under chapter 11 of the Bankruptcy Code. The terms of Enron Severance Plan document (the "Enron Plan Document")[9] unequivocally provided that the Enron Severance Plan could be terminated at any time by Enron, including by Enron's filing for bankruptcy.[10] The Enron Plan Document provided that Enron could "amend or terminate [the Enron Severance Plan] at any time without prior notice." (See Enron Plan Document, § 6.1). Furthermore, the Enron Plan Document contained a specific provision that the Enron Severance Plan "shall be terminated" upon "Bankruptcy, insolvency or winding-up of the Company." (See id. § 8.1.) Because the Enron Severance Plan terminated upon the Petition Date, the ESP Claimants' severance claims based on the Enron Severance Plan must fail.

11. Certain of the ESP Claimants have asserted that the termination provisions in the Enron Plan Document were ineffective because (i) it was not specifically cross-referenced in the corresponding Enron summary plan description (the " Enron SPD"),[11] and (ii) even if the

---

[9] Relevant excerpts from the Enron Plan Document are annexed hereto as Exhibit A.

[10] Unfunded "welfare benefit plans," like the Enron Severance Plan, are governed by the Employee Retirement Income Security Act of 1974 (as amended, "ERISA"). Every ERISA welfare benefit plan must be established and maintained pursuant to a written instrument. ERISA Section 402(a)(1). As with the Enron Severance Plan, the fundamental written instrument of an ERISA welfare benefit plan is a plan document that sets forth the actual terms of the plan. Virtually all welfare benefit plan documents now contain a "reservation of rights" clause allowing the employer to amend or terminate the plan or any benefit provision of the plan at any time and for any reason. This provision establishes the employer's intent not to vest benefits and emphasizes that there is no "entitlement" to benefits in any way. See, e.g., Devlin v. Transportation Communications Int'l Union, 173 F.3d 94, 103 (2d Cir. 1999) (affirming the district court's finding that "[p]laintiffs' claim to vested welfare benefits is contradicted by the [Plan sponsor's] unambiguous reservation in the Plan documents of its right to amend the Plan.") (internal quotations omitted).

[11] The administrator of an ERISA plan is required to furnish plan participants and beneficiaries with a "plain English" summary of the plan (the "Summary Plan Description" or "SPD"). ERISA Section 102. Relevant excerpts of the Enron SPD are annexed hereto as Exhibit B.

Enron Plan Document "overruled" the Enron SPD, the automatic termination provisions are invalid because Enron did not take specific action to terminate the Enron Severance Plan, as allegedly required. Neither of these arguments has any merit.

12. Courts have recognized that Congress intended that an employer should have the flexibility to modify or terminate ERISA welfare benefit plans. See, e.g., Moore v. Metropolitan Life Ins. Co., 856 F.2d 488, 491 (2d Cir. 1988) ("With regard to an employer's right to change [welfare] plans, Congress evidenced its recognition of the need for flexibility in rejecting the automatic vesting of welfare plans."). No less authority than the Supreme Court has instructed that "ERISA does not create any substantive entitlement to employer-provided . . . welfare benefits. Employers or other plan sponsors are generally free under ERISA, *for any reason at any time, to adopt, modify or terminate welfare plans*." Curtiss-Wright v. Schoonejongen, 514 U.S. 73, 78 (1995) (emphasis added).

13. Indeed, provisions entitling employers to change or terminate benefit plans at any time are generally enforceable. See, e.g., In re Chateauguay Corp., 945 F.2d 1205 (2d Cir. 1991); In re Doskocil Cos., 130 B.R. 870 (Bankr. D. Kan. 1994); Cf. In re Ames Department Stores, Inc., 76 F.3d 66 (2d Cir. 1996).

14. Moreover, an SPD is by definition only a summary and is not required to contain every term in the underlying plan document. Rather, ERISA requires only that an SPD be "sufficiently accurate and comprehensive to reasonably apprise . . . participants and beneficiaries of their rights and obligations under the plan." ERISA Section 102. As the Supreme Court explained in Curtiss-Wright, the purpose of this requirement is only "to communicate to beneficiaries the essential information about the plan." 514 U.S. at 83.[12]

---

[12] In response to criticism that recent amendments to ERISA regarding SPD disclosure are too restrictive, the Department of Labor (the "DOL") advised that it "does not view the [Section 102] as

8

15.     Although the SPD must contain information regarding the

"circumstances which may result on disqualification, ineligibility, or denial or loss of benefits,"

ERISA Section 102, an SPD need not repeat every plan provision to be "sufficiently accurate

and comprehensive" under ERISA.  See Moriarity v. United Tech. Corp. Represented

Employees Ret. Plan, 158 F.3d 157, 161 (2d Cir. 1998) (the fact that SPD did not specifically

state that disability benefits were available only to active employees did not entitle a former

employee who became disabled after retiring to a benefit).  Moreover, where an SPD is silent

on a point central to a benefits claim, and the underlying plan document is explicit, the

underlying plan document will be given effect unless the SPD can reasonably be read to the

contrary.  Id.  The mere omission in an SPD will not justify relief under ERISA, particularly

where the SPD contains an unambiguous reservation of rights.  See Abbruscato v. Empire Blue

Cross & Blue Shield, 274 F.3d 90, 99 (2d Cir. 2001) ("Because the same document that

potentially provided the 'lifetime' benefits also clearly informed employees that these benefits

were subject to modification, we conclude that the language contained in the 1987 SPD is not

susceptible to an interpretation that promises vested lifetime insurance benefits.").[13]

---

requiring an exhaustive listing or description of every circumstance that might result in the elimination of
benefits or termination of the plan.  Rather SPDs should include a clear, understandable *summary of the
sponsor's authority* under the plan, as well as the limitations thereon, *to eliminate benefits or terminate
the plan*."  Preamble to DOL Final and Interim Regs., Amendments to Summary Plan Description
Regulations, Fed. Reg., Vol. 65, No. 225, p. 70226 (emphasis added).

[13]     In addition, a technical violation of ERISA's disclosure requirements does not entitle employees
to recover on an ERISA claim:

> An employer's procedural violations of ERISA entitle employees to monetary
> relief only in exceptional cases.  Most courts that have considered the issue have
> held that the employer must have acted in bad faith, actively concealed the
> benefit plan, or otherwise prejudiced their employees by inducing their reliance
> on a faulty plan summary before recovery for procedural violations is warranted.

Kreutzer v. A.O. Smith Corp., 951 F.2d 739, 743 (7th Cir. 1991) (citations omitted).  The same view is
stated in Veilleux v. Atochem North America, Inc., 929 F.2d 74, 76 (2d Cir. 1991) in which the Second
Circuit found that there was a disclosure violation in an employer's SPD but denied relief because the

16.     Applying these principles, the Enron SPD clearly met ERISA's disclosure requirements. Although the Enron SPD did not specifically enumerate every circumstance under which the Enron Severance Plan would terminate, *the very first page of the Enron SPD*, entitled "Benefit Plans and Related Programs, Policies and Practices," provided, in pertinent part:

> The "summary plan descriptions" (SPDs) of your benefits are based on legal documents, insurance contracts, and trust agreements. *If there are any differences between this book and the official documents, the documents will govern.* Language used in this book . . . **does not guarantee** that benefit or cost-sharing levels will **remain unchanged** in the future.
> * * *
> The company reserves the right, **without prior notice**, to amend, alter, and/or **terminate** policies, benefit plans, and programs **at any time**.

Enron SPD, at 178-180 (italics in original) (remaining emphasis added).

17.     This plainly worded reservation of rights clause in the Enron SPD negates the claim that the Enron SPD vested severance benefits in the Eligible Former Employees. See Veilleux, 929 F.2d at 76; American Fed'n of Grain Millers v. International Multifoods Corp., 116 F.3d 976, 982 (2d Cir. 1997) ("The SPD could not reasonably be interpreted as promising vested benefits . . . [and] if an employer has not promised vested benefits in a SPD, and the employer expressly reserves the right to terminate the plan in the SPD, benefits promised in the SPD are not vested."). Because the Enron SPD contained

---

violation was "non-prejudicial." In reaching this conclusion, the court found it significant that because the benefits under the terms of the severance plan in question were discretionary with the plan administrator, the former employees could not show that they would have been awarded benefits. Therefore, the former employees had not demonstrated any "cognizable prejudice from [the employer's] failure to fully comply with ERISA's disclosure requirements." Id. The court also found that the employees had no "vested" right to receive benefits because the employer had explicitly reserved the right to amend or terminate the severance plan at any time. Id.

abundant provisional and conditional terms,[14] in addition to the reservation of rights disclosure, the ESP Claimants could have no reasonable expectation of being "entitled" to any amount of severance pay. See Moriarity, 158 F.3d at 161 (omission in SPD did not entitle former employee to benefits where "an average plan participant reading this SPD *could not credibly* come away believing that . . . *he was entitled* to . . . benefits.") (emphasis added).

### 2. Nothing Prevents an ERISA Welfare Plan from Automatically Terminating Upon Bankruptcy

18.    The ESP Claimants do not provide any authority to support their assertion that the automatic termination Section 8.1(b) of the Enron Severance Plan is somehow invalid. Indeed, in the unanimous Curtiss-Wright decision, the employer amended a welfare benefit plan (there, a retiree healthcare plan) to provide for automatic termination of benefits upon the closing of a facility. See 514 U.S. at 75. In that case, following the amendment, a facility was closed, benefits automatically terminated, and the retirees sued to have the benefits restored. Id. at 76. The Supreme Court remanded the case for a determination of the issue of whether the plan was validly amended in accordance with its terms, id. at 78-86, and on remand the lower court upheld the amendment, *thereby sustaining the automatic termination provision*. Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 127-30 (3d Cir. 1998). If plan terms providing for automatic termination upon the occurrence of a specified event were invalid *per se*, as the ESP Claimants seem to suggest, the Supreme Court would never have had to reach the issue of the validity of the amendment procedures.

---

[14]    The Enron SPD explained on a half-dozen occasions that an employee "may" receive a severance award "up to" a certain amount. (See, e.g., Enron SPD, at 178-180.) Such use of permissive terms cannot, as a matter of law, support any reasonable reliance argument asserted by any ESP Claimants.

19.     Manifestly, the unenforceability of *ipso facto* clauses is in the Bankruptcy Code to prevent chapter 11 estates from suffering forfeitures, and not for the benefit of creditors.

20.     ESP Claimants have also argued that the automatic termination of the Enron Severance Plan is subject to, and must comply with, the amendment procedures that are contained in the Enron Severance Plan. This argument misses the difference between the termination of a plan and an amendment of a plan to include a new provision. There is nothing in ERISA that equates the *termination* of a plan with the *amendment* of a plan. Moreover, the termination of the Enron Severance Plan occurred pursuant to a self-executing provision. Finally, even if the termination of the Enron Severance Plan had to be treated as an amendment -- which would require some formal corporate action -- the formal corporate actions taken by Enron to authorize and commence the bankruptcy filing would meet any requirement for action by appropriate corporate officers.[15]

21.     In sum, the fact that the Enron SPD did not delineate every possible circumstance for termination did not render the automatic bankruptcy termination provision in the Enron Severance Plan ineffective, as the terms of the Enron Severance Plan did not conflict with the terms of the Enron SPD. Inasmuch as the Enron SPD contained an unambiguous reservation of Enron's right to terminate the Enron Severance Plan without any notice, the Enron SPD's lack of the specific bankruptcy termination provision could not have created a reasonable belief that severance benefits were somehow guaranteed or vested.

---

[15]     The formal corporate steps taken to commence the bankruptcy filing also quashes any argument that the Enron Plan Document is ambiguous as to the meaning of "bankruptcy, insolvency or winding-up." Whatever ambiguity may be asserted to exist, there can be no doubt that the corporate filing of a voluntary petition under the Bankruptcy Code clearly fits within the circumstances required to trigger the automatic termination provision.

22.     Furthermore, the statement on the first page of the Enron SPD that

Enron could terminate the Enron Severance Plan at any time discloses Enron's broad authority

and necessarily encompasses the Enron Plan Document's provisions regarding bankruptcy

termination. Thus, the termination of the Enron Severance Plan complied with the terms of the

Plan Document and the disclosure requirements of ERISA.

### 3.   At Best, Any Claim for "Accrued" Benefits Would Have Accrued Pre-Petition

23.     Despite ERISA's general framework for welfare plans, and the

unambiguous "reservation of rights" provisions in both the Enron Plan Document and Enron

SPD, certain ESP Claimants suggest that Section 8.2 of the Enron Plan Document entitles them

to a vested benefit under the Enron Severance Plan. This argument must fail, as Section 8.2

states only that "upon termination of the Severance Plan, accrual of benefits shall cease."

Pointing to inartfully drafted language, without more, does not convert a discretionary and

optional unfunded welfare plan into a vested entitlement.

24.     For the reasons discussed above, ERISA does not mandate any vesting

of benefits under unfunded welfare benefit plans. Consistent with this general framework,

nothing in the Enron Plan Document provides for "vesting" or "entitlement" to severance

benefits. Instead, both eligibility for, and the granting of, benefits depend upon threshold

determinations to be made by Enron. Thus, under Section 3 of the Enron Plan Document,

Enron must first have made a threshold "determination" as to whether to "issue [severance]

benefits" at all. The fact that Enron has not made such a determination in this instance is

entirely consistent with ERISA and, in particular, the provisions of Section 3.

25.     In sum, it is not a plausible interpretation to suggest that Section 8.2,

when read in the context of the entire Enron Plan Document as an ERISA welfare plan,

provides an entitlement to a vested benefit. The *only* plausible and internally consistent interpretation is that benefits will cease to be paid if the Enron Severance Plan terminated. Moreover, even if the ESP Claimants were ultimately to prevail on this point, any benefits they allegedly "accrued" would have "accrued" prior to termination of the Severance Plan. Thus, any such claims would be relegated to the status of pre-petition unsecured claims.[16]

26. *Based on the unequivocal terms of the controlling Enron Plan Document, and there being no authority to the contrary, the Creditors' Committee and the Debtors submit that the likelihood of success on establishing administrative expense claims for severance under the Enron Severance Plan is 0%. In the event the Court estimates the administrative expense claims of the ESP Claimants as having a value greater than 0%, the Debtors and the Creditors' Committee submit that the estimated value of such claims could in no event exceed the $5,678 of severance pay already distributed post-petition as Prior Payments.*

> **4. Nearly All ESP Claimants were Terminated Substantially Contemporaneous with Bankruptcy Filing -- No Beneficial Services were Conferred on the Post-Petition Debtors**

27. Alternatively, in the event that the Court estimates the administrative expense claims for severance asserted by ESP Claimants at greater than $5,678 for any individual claimant, such claims should be further reduced by estimating the likelihood of success of demonstrating administrative expense priority on these truly unique facts. See argument in Section III.B., below, incorporated herein by reference.

---

[16] The same pre-petition status would be accorded to any claims of misrepresentation or failure to disclose information in the Enron SPD. Any such wrong -- which itself is unsubstantiated -- would have been caused by the pre-petition Debtor when the Enron SPD was created and distributed. Such an alleged wrong could not possibly create an administrative expense priority claim under any theory.

**B.  CONTRACT CLAIMANTS:  ADMINISTRATIVE EXPENSE
   CLAIMS SHOULD BE ESTIMATED AT 10% OF FACE AMOUNT**

28.     The following individuals comprise the Contract Claimants:  Dennis Boylan, Rebecca C. Carter, Mark Courtney, David Cox, Keith Dodson, Daryl L. Flaming, Charles K. Garland, Mary Jo Johnson, Richard B. Jones, Chris Kravas, John Leeland Lee, David G. Mally, Michael Miller, Wael Midani, Frederick Paiste, Robert E. Pechar, Mark J. Russ, Daniel N. Sorak, Traci L. Warner and Richard L. Zdunkewicz.  (See Fed. R. Evid. 1006 summary of Estimation Response Forms submitted by Contract Claimants annexed to the Jones Aff. as Exhibit B.)

### 1.  Burden of Showing Benefit to Enron's Estate Remains on Contract Claimants -- Section 503(b)(1) Not Automatic

29.     Each of the Contract Claimants asserts an Opt-Out Severance Claim (or involuntary termination claim) under a pre-petition executory contract that has not been assumed by the Debtors.  Absent an executory contract that is assumed under section 365 of the Bankruptcy Code, the Contract Claimants must, like any other administrative claimant coming before this Court, meet the threshold requirements of section 503(b) of the Bankruptcy Code.  Section 503(b) of the Bankruptcy Code and its predecessor elevate only "actual, necessary costs and expenses of preserving the estate."  Section 503(b) of the Bankruptcy Code provides, in pertinent part:

> After notice and a hearing, there shall be allowed administrative expenses . . . including --
>
> (1)(A) the actual, necessary costs and expenses of *preserving the estate*, including wages, salaries, or commissions for *services rendered after the commencement of the case*[.]

11 U.S.C. § 503(b)(1)(A) (2002) (emphasis added).

30.     Every court that has considered the issue -- including the Second Circuit

-- has held that a creditor seeking administrative expense priority has the burden of proving

that it provided a valuable benefit to the estate.  E.g., Trustees of Amalgamated Ins. Fund v.

McFarlin's, Inc., 789 F.2d 98, 100-01 (2d Cir. 1986).

> Congress granted priority to administrative expenses in order to facilitate the
> efforts of the trustee or debtor in possession to rehabilitate the business for
> the benefit of all of the estate's creditors.  Congress reasoned that unless the
> debts incurred by the debtor in possession could be given priority over the
> debts which forced the estate into bankruptcy in the first place, persons
> would not do business with the debtor in possession, which would inhibit
> rehabilitation of the business and harm the creditors.

McFarlin's, 789 F.2d 98, 100-01.

31.     It is a bedrock principle that an administrative expense will be allowed

"only to the extent that the *consideration supporting the claimant's right* to payment *was both*

*supplied* to *and beneficial* to the debtor-in-possession in the operation of the business."  Id. at

101 (emphasis added) (quoting In re Mammoth Mart, Inc., 536 F.2d 950, 954 (1st Cir. 1976)

and reconciling Straus-Duparquet, Inc. v. Local Union No. 3 Int'l Brotherhood of Elec.

Workers, 386 F.2d 649 (2d Cir. 1967)) (also citing In re Jartran, Inc., 732 F.2d 584, 587 (7th

Cir. 1984)); see also In re Freedomland, Inc., 480 F.2d 184, 189 (2d Cir. 1973)); American

A&B Coal Corp. v. Leonardo Arrivabene, S.A., 280 F.2d 119, 124 (2d Cir. 1960); In re Baths

Int'l Inc., 31 B.R. 143, 145 (Bankr. S.D.N.Y. 1983)).  As the Second Circuit cautioned, "[a]

debt is *not entitled to priority* simply because the right to payment arises after the debtor in

possession has *begun managing the estate*."  McFarlin's, 789 F.2d 101; see also In re Phones

For All, Inc., 249 B.R. 426, 430 (Bankr. S.D. Tex. 2000) ("Whether or not severance benefits

fit within the statutory requirement of wages or salaries, § 503(b)(1)(A) also requires that to

qualify as an administrative expense, the *payment of the severance compensation must benefit*

*Phones for All's estate and its creditors.*") (analyzing Second Circuit line of cases), aff'd, 262

B.R. 914 (N.D. Tex. 2001), aff'd, 288 F.3d 730 (5th Cir. 2002).

### 2. Straus-Duparquet Did Not Override Section 64a/503(b) Principles -- It *Applied* Them

32.     In Straus-Duparquet, Inc. v. Local Union No. 3 Int'l Brotherhood of

Elec. Workers, 386 F.2d 649 (2d Cir. 1967), the facts were "very simple" and "not

controverted." Id. at 649.  The claimants were union members under a collective bargaining

agreement ("CBA") who had *undeniably provided employment services* "during the Chapter

XI proceeding," id. at 650, had benefited the estate, and had then been terminated.  Following

termination, the union demanded that the debtor honor certain contractual obligations due to its

members upon termination postpetition.  "The only issue [was] whether the claims [were]

entitled to priority under section 64a(1) of the Bankruptcy Act, 11 U.S.C. § 104(a)(1), as

expenses of administration of the bankrupt." Id. at 650.

33.     While Straus-Duparquet's holding that severance accrues at termination

may remain good law under the Bankruptcy Code, it does not overrule the Bankruptcy Code's

requirement that nothing can accrue under a contract unless it is assumed with court approval,

which did not happen here.

34.     Given Straus-Duparquet's continued vitality following the enactment of

section 503(b), it would be anomalous if Straus-Duparquet stood for the proposition that

administrative expenses can be paid *even where there has been no consideration* provided to

the estate.  Of course, it does not.[17]  Although Straus-Duparquet is a very brief decision, it

---

[17]     The threshold issue of benefit to the estate is distinct from the issue of how to measure the cost
borne by the estate for receiving such benefit.  See Phones For All, 249 B.R. at 430 ("Whether or not
severance benefits fit within the statutory requirement of wages or salaries, § 503(b)(1)(A) also requires
that to qualify as an administrative expense, the payment of the severance compensation must benefit
Phones for All's estate and its creditors.") (analyzing Second Circuit line of cases).

follows to the letter the universal principles enunciated above. First, citing section 64a(1) of the former Bankruptcy Act, the Second Circuit framed the issue as whether the employee obligations were "expenses of administration of [the] bankrupt." 386 F.2d at 650. Next, the court specifically found that the claimants had been terminated "as an incident of the administration of the bankrupt's estate." Id. at 651. Thus, *it was undisputed* in Straus-Duparquet that valuable services were conferred to the estate and that such services were "incident" to the administration of the estate. If the Court applied these principles here, the Contract Claimants would *not* be entitled to administrative expense claims for severance.

35.    Indeed, virtually every case in the administrative expense claim arena turns on whether the claim is properly "a cost of doing business during the bankruptcy proceeding." McFarlin's, 789 F.2d at 104. Administrative priority status presupposes that there was consideration provided "incident" to the doing of business postpetition. See Straus-Duparquet, 386 F.2d at 651. *Based on the indisputable record before the Court here, there can be no doubt that the Contract Claimants were terminated substantially contemporaneous with the bankruptcy and without providing any benefit to the administration of the estate.* Unlike the employees in Straus-Duparquet and its progeny, the Contract Claimants did *not* sustain the administration of Enron's estates. To the contrary, the administration *had just begun when the employees were terminated*. The most the Contract Claimants have argued is that their "right to payment" for severance benefits must be an administrative expense because the claim matured (albeit barely) post-petition. But such argument is insufficient as a matter of law under section 503(b) of the Bankruptcy Code -- even in this Circuit. See McFarlin's, 789 F.2d at 101 (claim "not entitled to priority simply

because the right to payment arises after the debtor in possession has begun managing the estate").

### 3. No Case Has Elevated Severance Claims For Employees Terminated Substantially Contemporaneous With Bankruptcy Filing

36.     To be clear, the Creditors' Committee and the Debtors do not argue that Straus-Duparquet was overruled by the Bankruptcy Code and should now be cast aside. The Second Circuit's cases, until revisited *en banc*, stand today for the proposition that courts cannot pro-rate the benefits conferred pre- and post-petition in calculating severance -- rather, if the debtor uses the valuable services of its employees in order to administer the bankruptcy estate, then it needs to honor its severance obligations *in toto*.[18] But, under the Bankruptcy Code, there are no severance obligations to honor unless the contract is assumed with court approval which did not happen here.

37.     Moreover, on the facts relating to the Contract Claimants, even the most favorable reading of the Second Circuit's severance cases do not establish priority for termination claims asserted when the reasons for not discharging employees *on or before* the

---

[18]     It also bears emphasizing that each of the Second Circuit's decisions in Straus-Duparquet and its progeny, including Unishops and W.T. Grant, were decided in the context of executory contracts (including CBAs) under the former Bankruptcy Act. Thus, these cases can be easily distinguished because under prior law courts had held that executory contracts could essentially be deemed assumed by the debtor in possession simply by performance without rejection. See, e.g., In re Klein Sleep, 78 F.3d 18, 28-29 (2d Cir. 1996) (under former Bankruptcy Act "it was well-established in this Circuit that administrative priority was available . . . if the estate received demonstrable benefits under the contract") (citing American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A., 280 F.2d 119, 124 (2d Cir. 1960). In this regard, the detailed evaluation of benefits conferred pre- versus postpetition was far less significant where employees were terminated after providing demonstrable benefits under a contract. See In re Unishops, Inc., 553 F.2d 305, 308 (2d Cir. 1977) ("we believe *the debtor received benefits under the executory contract* and, hence, the claimant is entitled to priority") (emphasis added); In re W.T. Grant Co., 620 F.2d 319, 321 (2d Cir. 1980) (citing Unishops and holding that "*Grant received benefits under the contracts* by permitting the workers to continue in its employ after it entered Chapter XI") (emphasis added).

Petition Date had nothing to do with needing or using these employees' services to administer the estate.[19]

38.     Nevertheless, recognizing the potential risk -- however small -- that a court may read Straus-Duparquet and its progeny as having created a "bright-line" rule that even one hour of being employed post-petition -- or 1 to 3 days -- is enough to establish administrative expense priority for severance claims, even without court approval of the assumption of the contract, *the Court should adopt only a modest likelihood of success and estimate the Opt-Out Severance Claims at 10% of the face amount.* The Contract Claimants were not terminated "incident to the administration" of Enron's bankruptcy -- they were terminated incident to the filing itself which was sudden, unexpected, and on a weekend.

## C.     PRE-PETITION CLAIMANTS: ADMINISTRATIVE EXPENSE CLAIMS SHOULD BE ESTIMATED AT 0% OF FACE AMOUNT

39.     According to the Estimation Response Forms and Enron's books and records, the following individuals comprise the Pre-Petition Claimants, all of whom were discharged by Enron prior to the Petition Date of December 2, 2001: Janice Avery, Mark G. Cooper, Richard C. DePew, Michael Lucchesi, Michael F. Moulckers, Michael Oehrle, Mark E. Peterson, Lee H. Sheldon and David Michael Yeck. (See Fed. R. Evid. 1006 summary of Estimation Response Forms submitted by Pre-Petition Claimants, annexed to the Jones Aff. as Exhibit C.) The Creditors' Committee and the Debtors submit that there is simply no legal basis for according administrative expense priority status to Opt-Out Severance Claims that fully matured pre-petition.

---

[19]     Enron commenced termination as soon as the Debtors opened for business after the bankruptcy filing. See Jones Aff. ¶ 4.

40. Moreover, there can be no argument that any of the Pre-Petition Claimants provided *any* services to Enron's post-petition estates. Thus, the administrative expense priority of Opt-Out Severance Claims asserted by the Pre-Petition Claimants should be estimated at 0% of the face amount of such claims.

## D. NON-DEBTOR CLAIMANTS: ADMINISTRATIVE EXPENSE CLAIMS SHOULD BE ESTIMATED AT 0% OF FACE AMOUNT

41. The following individuals comprise the Non-Debtor Claimants: Jeff Kinneman; John McClain; John Sherriff; Ronald N. Slump II. (See Fed. R. Evid. 1006 summary of Estimation Response Forms submitted by Non-Debtor Claimants annexed to the Jones Aff. as Exhibit D.) According to Enron's books and records, the Non-Debtor Claimants were employed by, or provided services to, European entities that are not Debtors in these chapter 11 cases, but which may be in administration proceedings in the United Kingdom. Accordingly, no chapter 11 administrative expense claims could properly be asserted by these individuals against the Debtors and the Court should estimate their administrative expense claims at 0% of the face amount. The specifics of the Non-Debtor Claimants' respective discharge are reflected on Exhibit D to the Jones Aff.

## E. REMAINING CLAIMANTS: ADMINISTRATIVE EXPENSE CLAIMS SHOULD BE ESTIMATED AT 0% OR 15% DEPENDING ON PARTICULAR CIRCUMSTANCES OF DISCHARGE

42. The following individuals comprise the Remaining Claimants. Michael Bellini, Steven Merris, Jill T. Zivley and Mark Frevert.[20] (See Fed. Rule Evid. 1006 summary of Estimation Response Forms submitted by Remaining Claimants annexed to the Jones Aff. as Exhibit E.) Because of the particular circumstances of each of the Remaining Claimants'

---

[20] For the reasons discussed below, see ¶ 43 n.22 and accompanying text, the Creditors' Committee and the Debtors hereby withdraw the request to estimate the claim of Mark Frevert.

discharge from Enron, these individuals should be estimated separately, as opposed to as part of a broader category of claims. Further details about the Remaining Claimants' respective discharge are provided on Exhibit E to the Jones Aff.

43. Michael Bellini, prior to the Petition Date, provided his employer with notice of his intent to resign as part of the Enron Metals Voluntary Separation Program. Mr. Bellini's Separation and Release Agreement provided that, in exchange for his voluntary departure in December 2001, he would receive a termination or separation payment. Further, the Creditors' Committee and the Debtors submit that Mr. Bellini did not provide services incident to the administration of the estate. *Thus, the Court should simply estimate the administrative expense priority of this unassumed pre-petition contract claim at 0% of the face amount of the claim.*

44. Steven Morris and Jill T. Zivley are similar Remaining Claimants inasmuch as both were members of the Enron trading group. The trading function of this group was halted pre-petition and, as a result, this group generally was engaged in business activity; however, these Remaining Claimants were not discharged until post-petition. The entire trading group in which these individuals worked was terminated on December 7, 2001 -- just two days after the near-Petition Date reduction in force. Although the Creditors' Committee and the Debtors believe that it may be justifiable to request these Remaining Claimants be estimated in the same manner and amount as the Contract Claimants, they technically were not discharged within 1 to 3 days of the bankruptcy filing -- arguably after the "substantially contemporaneous" period. *For these reasons, the Court should estimate these Remaining Claimants at 15% of the face amount of the claims.*

## F.   UNTIMELY CLAIMANTS: ADMINISTRATIVE EXPENSE CLAIMS SHOULD BE ESTIMATED AT AMOUNT OF PRIOR PAYMENTS

45.     The Estimation Procedures Order unequivocally provided that the "failure of any Opt-Out Claimant to complete, sign, date and return a Response Form so as to be received on or before the Response Deadline would result in a determination by the Court that the aggregate of such Opt-Out Claimant's Opt-Out Severance Claim and Other Termination Claims is estimated for allowance purposes at the amount of Prior Payments already received by such Opt-Out Claimant." (Estimation Procedures Order, ¶ 1.)  The Notice Package that was sent to all the Eligible Former Employees informed those who opted-out of the Settlement that "the Debtors and the Creditors' Committee will request that the Court estimate any Opt-Out Severance Claim *and* any and all Other Termination Claims that you may claim you have in the amount of Prior Payments you have already received." (Estimation Notice, ¶ 7(e)).

46.     The burden of proving a claim in bankruptcy is on the claimant.  Failure to provide a verified Estimation Response Form by the Response Deadline contravened the terms of the Estimation Procedures Order, and the administrative expense priority of any such Opt-Out Claims should be estimated at the amount of the Prior Payments.[21]  *Pursuant to the Estimation Procedures Order, of all Untimely Claimants are to be "estimated for allowance purposes at the amount of Prior Payments already received."*

---

[21]     Submitting an Opt-Out Form has nothing to do with the Joint Estimation Motion.  Rather, such action simply excluded the Opt-Out Claimant from participating in the Settlement.  It certainly does not demonstrate entitlement to any claims, or the priority of such claims.

# IV.

## ESTIMATION SHOULD ONLY FIX, *NOT* ALLOW, ADMINISTRATIVE EXPENSE CLAIMS OF OPT-OUT CLAIMANTS WHO RECEIVED POTENTIALLY VOIDABLE TRANSFERS

47.     Seven of the Opt-Out Claimants (the "Potential Voidable Transfer Recipients") are listed in the Debtors' Statement of Financial Affairs as "insiders" who received substantial payments during the one-year preference period. See Statement of Financial Affairs, excerpt annexed to the Jones Aff. as Exhibit G. In addition to Mark Frevert,[22] the following individuals comprise the Potential Voidable Transfer Receipients: Rebecca Carter ($477,557),[23] David Cox ($1,101,393), Keith D. Dodson ($319,941), Charles K. Garland ($900,585), Mark Pickering ($1,386,690) and John Sherriff ($4,335,388).

48.     Pursuant to section 502(d) of the Bankruptcy Code, the Court "shall disallow any claim" asserted by a person who is the recipient of a voidable transfer. See 11 U.S.C. § 502(d). Given that neither the Debtors, the Creditors' Committee, nor the Enron Corp. Examiner has had an opportunity to fully investigate claims the estates may have against the Potential Voidable Transfer Recipients, the Court should estimate, but *not* allow, the Opt-Out Severance Claims of the six individuals in this category. Pursuant to section 105(a) of the Bankruptcy Code, the Court should estimate the unliquidated administrative expense claims solely for purposes of *fixing* the amount of such claims pending a further opportunity for the

---

[22]     As noted above, the Creditors' Committee and the Debtors are withdrawing their request to estimate one such Opt-Out Claimant, Mark Frevert. Mr. Frevert is not an appropriate candidate for estimation until more is known about his role at Enron. He was Vice Chairman whose employment and termination package was substantially increased shortly before the filing and whose duties remained unclear until terminated by Ken Lay in December 2001. He is second only to Mr. Lay in terms of largest preferential insider payments ($17,275,530).

[23]     Ms. Carter is the wife of former insider Jeffrey Skilling, the former CEO of Enron who may be subject to further investigation about his role at Enron. Mr. Skilling should not benefit by any addition to his community property marital estate by allowance of Ms. Carter's claim.

estate fiduciaries to investigate and, if appropriate, commence avoidance actions and seek to disallow such administrative expense claims (if greater than the Prior Payments) under sections 502(d). No undue prejudice should befall any of the Potential Voidable Transfer Recipients, inasmuch as they retain their ability to exercise any rights to file a motion or take other steps in the future.

V.

## ARM'S-LENGTH SETTLEMENT IS REASONABLE BENCHMARK TO CONSIDER IN ESTIMATING OPT-OUT SEVERANCE CLAIMS

49.     As more fully described in the Joint Estimation Motion, the Court has wide discretion in determining the method of estimation under section 502(c) of the Bankruptcy Code. See Joint Estimation Motion, ¶¶ 24, 26-29. In addition to the summary trial and evidentiary procedures approved by the Estimation Procedures Order, the Court may look to reasonably reliable external benchmarks, such as an arm's length settlement, of similar legal and factual issues. See Adams v. Cumberland Farms, Inc., No. 95-1736, 1996 WL 228567 (1st Cir. May 76, 1996) (unpublished).

50.     The Stipulation of Settlement resolved, pending final court approval, the identical legal issues on identical facts as nearly all of the Opt-Out Claimants. Moreover, the Stipulation of Settlement was negotiated after several rounds of vigorous briefing and extensive oral argument by similarly situated claimants, an estate fiduciary advocating on their behalf, and supporting national labor organizations. The Creditors' Committee and the Debtors submit, therefore, that the Court should look to the Settlement as a reliable indicator of the value of the Opt-Out Claims to ensure that the proposed estimation is reasonable in the aggregate. In this regard, it is significant that the Settlement participants include not only former employees asserting claims under the Enron Severance Plan, but also approximately

100 former employees whose severance (or involuntary termination) claims arise under unassumed employment agreements similar to those of the Contract Claimants.

51.    It is equally noteworthy that the recent legislation entitled "The Employee Abuse Prevention Act" (S. 2798/H.R. 5521) appears to have borrowed the $13,500 Settlement cap in a related employee bankruptcy reform context. <u>See</u> Press Release on Durbin/Delahunt bill, dated August 1, 2002, annexed hereto as Exhibit C. The proposed legislation proposes, among other things, to increase the priority of employee claims under section 507(a) of the Bankruptcy Code from $4,650 to $13,500 for unpaid employee obligations. While the proposed national legislation does not expressly deal with the issue of post-petition administrative claims for severance, it bears mentioning for this limited purpose that in every other Circuit outside of the Second Circuit, there would be no uncertainty whatsoever that the Opt-Out Severance Claims were pre-petition claims. Thus, if the legislation were passed, severance claims routinely denied administrative priority under section 503(b)(1) would nevertheless be entitled to priority in all circuits under section 507(a) up to a reasonable cap of $13,500.

## VI.
### <u>CONCLUSION</u>

52.    WHEREFORE the Creditors' Committee and the Debtors jointly request that the Court estimate (I) for purposes of allowance, the administrative expense priority, pursuant to sections 105(a), 502(c) and 503(b)(1), of all Opt-Out Severance Claims asserted by ESP Claimants, Contract Claimants, Pre-Petition Claimants and Non-Debtor Claimants, in the amounts respectively set forth on Exhibits A, B, C and D to the Jones Aff., (II) for purposes of allowance, the administrative expense priority of all Opt-Out Severance Claims asserted by the Remaining Claimants at 0% or 15%, as set forth above, (III) for purposes of fixing, but not

allowing, the administrative expense priority of any Opt-Out Severance Claims asserted by a

Potential Voidable Transfer Recipient, and (d) grant the Creditors' Committee and the Debtors

such other and further relief as is just.

Dated: New York, New York
      August 8, 2002

By:       /s/ Susheel Kirpalani
            Luc A. Despins (LD 5141)
            Susheel Kirpalani (SK 8926)
            Mathew B. West (MW 9117)
            MILBANK, TWEED, HADLEY &
            M$^c$CLOY LLP
            1 Chase Manhattan Plaza
            New York, New York 10005
            Telephone: (212) 530-5000
            Facsimile: (212) 310-8007

            ATTORNEYS FOR THE OFFICIAL
            COMMITTEE OF UNSECURED
            CREDITOR

By:       /s/ Martin J. Bienenstock
            Martin J. Bienenstock (MB 3001)
            Lawrence J. Baer (LB 9924)
            WEIL GOTSHAL & MANGES LLP
            767 Fifth Avenue
            New York, New York 10153
            Telephone: (212) 310-8000
            Facsimile: (212) 310-8007

            ATTORNEYS FOR DEBTORS AND
            DEBTORS IN POSSESSION