NUTTER MCCLENNEN & FISH LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
Telephone: (617) 439-2000
Facsimile: (617) 310-9000
Peter Nils Baylor (PB 5248)

ATTORNEYS FOR STATE STREET BANK AND TRUST COMPANY
  AS THE INDEPENDENT FIDUCIARY

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
                                                            :
In re                                                       :         **Chapter 11**
                                                            :
ENRON CORP., et al.                                         :         **Case No. 01-16034 (AJG)**
                                                            :
                                                            :         **Jointly Administered**
                                    Debtors.                :
-----------------------------------------------------------x

MOTION BY STATE STREET BANK AND TRUST COMPANY,
AS THE INDEPENDENT FIDUCIARY OF CERTAIN OF THE
DEBTOR'S EMPLOYEE-BENEFIT PLANS, FOR ALLOWANCE
AND IMMEDIATE PAYMENT OF ADMINISTRATIVE
EXPENSE CLAIM

State Street Bank and Trust Company (hereinafter "State Street"),[1] as the Court-

approved Independent Fiduciary of the Enron Corp. Savings Plan (the "Savings Plan"), the

---

[1] State Street serves pursuant to that certain Fiduciary Services Agreement dated March 14, 2002, as amended by that certain Amendment No. 1 to Fiduciary Services Agreement dated April 17, 2002 (as so amended, the "FSA"), and approved, as so amended, by this Court's April 19, 2002 Order Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 2002 Authorizing the Appointment of State Street Bank and Trust Company Pursuant to that Certain Fiduciary Services Agreement, As Amended (the "FSA Approval Order").

Enron Corp. Employee Stock Ownership Plan (the "ESOP"),[2] and the Enron Corp. Cash

Balance Plan (the "Cash Balance Plan")[3] by its counsel, hereby moves the Court for an order

(i) allowing the contractual annual fee of and certain expenses incurred by State Street pursuant

to the Court-approved FSA to be paid as administrative expenses of the estate of Enron Corp.

("Enron" or the "Debtor") pursuant to 11 U.S.C. § 503(b)(1)(A)[4]; (ii) authorizing and

directing immediate payment of State Street's annual fee for the period March 14, 2002

through March 13, 2003 in the amount of $1,500,000.00; (iii) authorizing and directing

immediate payment of $2,296,575.00 in premiums associated with obtaining special fiduciary

insurance coverage for the two periods March 14, 2002 through April 18, 2003 and April 18,

2003 to April 18, 2004; and (iv) granting such other and further relief as is just and proper,

and states as follows.

Jurisdiction

This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

I.        Summary of Motion

State Street hereby seeks allowance and payment of its contractual annual fee and of

certain expenses incurred in connection with services provided pursuant to the Court-approved,

---

[2] The ESOP was merged into the Savings Plan effective September 1, 2002.

[3] Each of the foregoing a "Benefit Plan"; collectively, the "Benefit Plans."  All of the Benefit Plans are governed by the Employee Retirement Income Security Act ("ERISA") of 1974, as amended, 29 U.S.C. §§ 1001 et seq. (2003).

[4] This Motion seeks approval and payment of the fee and the expenses specified herein pursuant to 11 U.S.C. § 503(b)(1)(A).  State Street expressly reserves its rights to seek payment at a later time of fees and expenses (including attorneys' fees and expenses) under any one or more of §§ 503(b)(1)(A), §§ 503(b)(3)(D) and 503(b)(4).

post-petition FSA as administrative expenses of the Debtor's estate pursuant to 11 U.S.C. § 503(b). The issue of whether the fees and expenses of the Court-appointed independent fiduciary of the Benefit Plans are administrative expenses of the estate was not resolved by the Court's orders of April 19, 2002 and March 21, 2003.

As discussed more fully in Section II.B., State Street's performance of its fiduciary responsibility under the post-petition FSA provides both (a) tangible, concrete and quantifiable benefits to the Debtor's estate, as well as (b) other "difficult to measure" and "intangible,"[5] yet cognizable, benefits to the Debtor's estate. The tangible, concrete and quantifiable benefits to the estate include, but are not limited to:

- $1.7 million obtained from the sale of Enron common stock held by the ESOP that otherwise may have become the basis for a post-petition claim against Enron for failure to minimize loss to the ESOP participants.

- $5.8 million obtained from the sale of Enron Oil & Gas stock held in the Savings Plan that otherwise may have become the basis for a post-petition claim against Enron as described in Section II.B.2 below.

Benefits to the estate of a more "difficult to measure" and "intangible" nature resulting from State Street's appointment and activities include, but are not limited to:

- By taking the place of the Administrative Committee, State Street as the independent fiduciary eliminated post-petition causes of action against the Debtor for failure to comply with the non-conflict provisions of ERISA.

---

[5] *In re Atlanta Retail, Inc.*, 287 B.R. 849, 851-55 (Bankr. N.D.Ga. 2002) (discussed below in Section II.A.2).

- State Street has performed duties that otherwise would have had to be performed by outside consultants valued at (i) $150,000- $200,000 on behalf of the Cash Balance Plan, (ii) approximately $100,000 for the Savings Plan; and (iii) $75,000 relating to the merger of the ESOP and the Savings Plan.

- State Street's activities serve to maximize the value of the Cash Balance Plan's assets, thereby minimizing Enron's legal obligation to contribute to this defined-benefit plan on an on-going basis or to contribute a larger lump-sum payment upon the Cash Balance Plan's proposed standard termination.

- State Street's other activities in regard to the Cash Balance Plan, principally in overseeing the selection of the annuity provider in connection with such Plan's termination, will reduce the likelihood of post-petition claims associated with the termination of this Benefit Plan.

- By acting as the independent fiduciary for the Cash Balance Plan, State Street eliminated the allocable portion of total compensation paid by the Debtor to its employees on the Administrative Committee.

- State Street reduced annual expenses of the Savings Plan and the Savings Plan Trust by $440,000 by eliminating duplicative investment options and moving an investment option to a class of mutual fund shares carrying lower fees and expenses. This work would normally have been performed by Enron's Administrative Committee. State Street's undertaking and completion of it reduces the potential for any post-petition claims associated with the administration of this Benefit Plan.

- State Street reviewed and updated the Savings Plan's investment policy to be consistent with the changes to the investment options referred to above and was responsible for implementing these changes and coordinating the work of the trustee and recordkeeper, thus ensuring compliance with ERISA and the Internal Revenue Code. This work would normally have been performed by Enron's Administrative Committee. State Street's undertaking and completion of it reduces the potential for any post-petition claims associated with the administration of the Savings Plan.

For the reasons set forth below, State Street respectfully submits that the services it provides, and has provided, pursuant to the Court-approved post-petition FSA, benefit the Chapter 11 estate, both directly and indirectly, and thus constitute an actual and necessary cost and expense of preserving the Chapter 11 estate.

## II.    Discussion

A.    Statutory Predicate

11 U.S.C. § 503 provides, in pertinent part, that: "(b) after notice and hearing, there shall be allowed, administrative expenses, other than claims allowed under Section 502(f) of this title, including: (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case …."

Claims arising under 11 U.S.C. § 503(b)(1)(A) are equitable in nature and are thus considered in light of the amount of post-petition benefit the claimant provides to the estate and not solely or necessarily according to the contract terms underlying the claims, *In re CM Holdings, Inc.*, 264 B.R. 141, 149 (Bankr. D.Del. 2000).  The Bankruptcy Court has broad

discretion in awarding administrative expenses *TRST N.Y. v. B.B.Ballew Sales co., Inc. (In re Ballew Sales Co., Inc.)*, 1996 U.S. Dist. LEXIS 14208 at \*7 (S.D.N.Y. Sept. 26, 1996); *Local 144 Hosp. Welfare Fund v. Baptist Med. Ctr., Inc.* (*In re Baptist Med. Ctr., Inc.*), 52 B.R. 417, 421 (E.D.N.Y. 1985), *aff'd*, 781 F.2d 973 (2d Cir. 1986).

The Second Circuit has held that a claim is entitled to administrative claim status "to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business." *Frito-Lay, Inc. v. LTV Steel Co., Inc.* (*In re Chateaugay Corp.*), 10 F.3d 944, 956 (2d Cir. 1993) (*quoting*, *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) (*quoting*, *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976)); *In re Enron Corp.*, 279 B.R. 695, 699 (Bankr. S.D.N.Y. 2002). Stated another way, a claim for "administrative expense" status requires (i) a post-petition transaction between the claimant and the debtor's estate, and (ii) benefit to the estate from such transaction. *In re New York Trap Rock Com.*, 137 B.R. 568, 572 (Bankr. S.D.N.Y. 1992).

1.     Post-Petition Transaction

A transaction is a post-petition transaction if the post-petition debtor-in-possession induces a claimant to incur post-petition expenses or to perform post-petition services. *In re New York Trap Rock Com.*, 137 B.R. at 573.

Enron filed its Chapter 11 petition December 2, 2001. The original Fiduciary Services Agreement was initially entered into by Enron and State Street on March 14, 2002, and was amended, thus becoming the FSA, on April 17, 2002. Thus, as a *chronological* matter, the FSA is obviously a post-petition transaction. As a *legal* matter also, it is a post-petition

transaction. Indeed, the Court's FSA Approval Order specifically stated in decretal paragraph 4 that the FSA was "a valid and binding post-petition obligation of Enron."[6]  Furthermore, while the events that initially disqualified the Administrative Committee may have occurred pre-petition, the violation of ERISA from the non-performance of the duties formerly discharged by the Administrative Committee was a continuing post-petition violation of Enron's fiduciary obligations under ERISA to the Benefit Plans.  See Sections II.B.1 and II.C.2 below.  The post-petition cost of Enron's getting itself back into compliance with ERISA, and maintaining that compliance, should be accorded administrative-expense status.

> The bankruptcy court properly characterized the state of the law by noting that courts have afforded post-petition costs of compliance with the [National Labor Relations Act] first priority status as "administrative expenses."

*In re Brinke Transportation Corp., et al.*, 1989 LEXIS 17577 at *16 (D.N.J. 1989).

State Street submits there is no reason to accord ERISA less dignity (with respect to 11 U.S.C. § 503(b)(1)(A)) than the NLRA.  With respect, therefore, to both the calendar and the applicable law, State Street's claims arise from a post-petition transaction.

That leaves the issue of "benefit to the estate."

### 2. "Benefit to the Estate"

"Benefit to the estate" is not an express requirement of, and the phrase nowhere appears in, § 503(b)(1)(A), but it is a well-established judicial gloss that "for a debt to qualify as a necessary preservation expense, the debt must [have arisen from a transaction with the estate] and  . . . must have benefited the estate in some demonstrable way."  4 *Collier on Bankruptcy* (rev. 15th ed. 2003) (hereinafter "*Collier*") ¶ 503.06[3][b] at 503-26 (footnote

---

[6] FSA Approval Order at 3.

omitted).    A party is not debarred from receiving payment as an "administrative expense" merely because it has a "reasonable and self-interested expectation of receiving compensation from the estate."  *Id*. at 503-27.

A benefit can be "demonstrable" and concrete even if it is partially intangible.  In the case of *In re Atlanta Retail, Inc.*, 287 B.R. 849, 851-55 (Bankr. N.D.Ga. 2002), for example, the court  held that the non-debtor party's claim for services rendered pursuant to a post-petition contract for a cross-promotion advertising project was entitled to administrative expense status.   While the debtor party to the contract, at the end of the day, made only a $14,000 profit on cameras sold to its non-debtor contractual partner, the non-debtor partner sought and obtained administrative-expense status for the $118,071.00 owed to it by the debtor. *Id.* at 859-60.   The court said the "concrete" benefit needed for administrative expense status was provided by both a "direct and concrete benefit of $14,000" and "a concrete, substantial and direct"—even though it was also "difficult to measure" and "intangible"— benefit in the form of the non-debtor's marketing and advertising efforts on behalf of the debtor. *Id.*

B.    State Street's Services to the Estate

State Street's performance of its fiduciary responsibility under the post-petition FSA, like the post-petition contract in the *Atlanta Retail*, has provided both (a) tangible, concrete and quantifiable benefits to the Debtor's estate, as well as (b) difficult-to-measure and intangible, yet still concrete, benefits to the Debtor's estate.

1.    Complying with Applicable Law

Prior to the post-petition appointment of State Street as independent fiduciary, Enron, through the Administrative Committee, was not in compliance with its obligations and duties under ERISA.[7]  As a result, the U.S. Department of Labor sought and obtained an agreement with Enron to have an independent fiduciary appointed for the Benefit Plans.  With the appointment of State Street as independent fiduciary for the Benefit Plans, the Debtor is now in compliance with ERISA with respect to its responsibilities going forward.

Accordingly, the estate benefited by the appointment of State Street because the Debtor was no longer subject to suit for the post-petition violations of ERISA that were cured by State Street's appointment.  The Bankruptcy Code does not excuse a debtor-in-possession from compliance with applicable Federal[8] and State[9] laws and regulations.

2.    Disposal of Enron Securities

State Street has provided tangible and quantifiable benefits to the estate by maximizing the recovery on Enron securities held by the Benefit Plans, thereby reducing post-petition

---

[7]  These violations include failure to monitor the actions or inactions of fiduciaries, failure to exercise oversight of such fiduciaries, and failure to replace conflicted fiduciaries who were incapable of fulfilling their fiduciary duties mandated by ERISA.  Courts have held that the selection of a named fiduciary carries with it the duty to monitor the actions or inactions of such fiduciaries, *see, e.g.*, *Liss v. Smith*, 991 F. Supp. 278 (S.D.N.Y. 1998); *Martin v. Feilen*, 965 F.2d 660 (8th Cir. 1992), and therefore the implicit requirement to replace fiduciaries who are conflicted from performing their responsibilities under the benefit plan.  Failure to exercise this oversight responsibility can result in co-fiduciary liability under ERISA § 405(a)(2) and (3), *Martin v. Harline*, 15 E.B.C. 1138 (D. Utah 1992).  Members of the Administrative Committees were named defendants in the *Tittle* class action, *Tittle, et al. v. Enron Corp., et al.,* No. H-01-3913 (S.D.Tex. filed Nov. 13, 2001) and in the DOL suit filed on June 26, 2003.

[8]  The automatic stay of 11 U.S.C. § 362(a) does not stay a governmental unit from enforcing its police and regulatory power, 11 U.S.C. § 362(b)(4).

[9]  A debtor-in-possession is expressly made subject to applicable State laws by 28 U.S.C. §959(b).

claims against the estate for failure to deal prudently with assets of dubious value.[10]  State Street realized $1.7 million for the Plans by selling Enron common stock (the "Enron Common") held by the ESOP and the Enron Savings Plan.

State Street developed a trading program to maximize the value of the Enron Common to the Benefit Plans while minimizing the negative impact that such a sell-off would otherwise have had on the then-existing market for the Enron Common.  By selling the Enron Common for $1.7 million, State Street has reduced claims against the Debtor by at least that amount.[11]

State Street also realized $5.8 million for the Plans by selling Enron Oil & Gas ("EOG") stock within the Savings Plan, thereby reducing potential post-petition indemnification claims against fiduciaries, including Enron through the Administrative Committee, for allowing continued investment in a non-diversified single stock fund of a company no longer related to Enron, and, therefore, subject to the diversification requirements of ERISA.[12]

---

[10] *See* the treatment (i.e., "No distribution") proposed for the holders of the Debtor's Equity Interests (Classes 363-65) in the Disclosure Statement for Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code dated July 11, 2003, at 69.

[11] By contrast, Enron, through the Administrative Committee, failed even to consider whether to sell Enron Common held by the ESOP and the Enron Savings Plan both during the pre-petition and post-petition even though the company's officials were stating that the stock was worthless.  This exposed the company to suit under ERISA for breaches of fiduciary duty.

[12] Although ERISA § 404(a)(2) excepts the acquisition and holding of "employer securities" (such as the Enron Common) from the diversification requirement of ERISA (and the ERISA prudence requirement to the extent that it requires diversification), there is no similar exception for the acquisition of a single class of securities that are not employer securities, even if such securities were employer securities prior to the divestiture of the employer from the controlled group of Enron (as was the case with the EOG stock).

3.     Services Provided to the Benefit Plans that benefit Enron

State Street's in-house expertise and personnel enable it to perform as part of its engagement, many responsibilities that minimize Enron's post-petition obligations and permit Enron to comply with applicable Federal law.

a.     Cash Balance Plan

By properly managing the assets of the Cash Balance Plan, State Street has minimized Enron's post-petition contribution obligations to this defined-benefit plan. Until a defined benefit plan, such as the Cash Balance Plan, is terminated, an employer like Enron is required to make contributions to such plan based upon the actuarial calculation of the amount required to fulfill the current and future benefits to be paid by such plan.[13] Simply put, the higher the value of the assets, the less Enron has to contribute post-petition whether or not the Cash Balance Plan is continued or terminated.

Further, the Debtor has proposed annuitizing benefits under the Cash Balance Plan and ultimately terminating the Cash Balance Plan in a "standard termination" within the meaning of ERISA. To effectuate a standard termination, all benefit liabilities under the Cash Balance Plan must be fully funded. If the Cash Balance Plan is terminated without fully funding all benefit liabilities in a standard termination, the Debtor is subject to post-petition liability to the Pension Benefit Guaranty Corporation for the unfunded amounts. Here, State Street's services will help reduce Enron's exposure for post-petition termination liability expense by actively

---

[13] Defined benefit plans are funded by the employer based on these calculations. The frequency of the funding depends on various factors, such as the amount of the required contribution and the amounts contributed in the past. Funding may be required as frequently as every quarter.

participating in the selection of annuity providers, participating in the negotiation of the annuity purchase price and the administrative charges of the annuity providers, and maximizing asset values to fund the purchase of annuity contracts. Again, even though the exact dollar amount of benefit Enron receives from State Street's services is hard to quantify, State Street provides a recognizable benefit in this regard.

In connection with State Street's management of the Cash Balance Plan, State Street assumed the duties previously assigned to the members of the Administrative Committee. State Street also performed a comprehensive review of the Cash Balance Plan, the Cash Balance Plan's investment managers, the investment policy and the allocation of assets. Such a review by a third-party non-fiduciary consultant advising Enron would normally cost between $150,000 and $200,000. State Street reviewed all investment management contracts and the investment performance of the Cash Balance Plan's investment management contracts and the investment performance of the Cash Balance Plan's investments (and continues to perform these services on an ongoing basis). This process includes quarterly questionnaires to each manager, periodic meetings with investment managers, reviewing individual manager portfolio characteristics, performance attribution, reviewing the holdings and transaction activity by manager, and reviewing performance analysis performed by third party consultant. These expenses would be paid by Enron as Benefit Plan sponsor, either directly to the service provider, or indirectly by way of employer contribution because the available assets of the Cash Balance Plan would be reduced by any amount paid by such Plan to the service provider.

The Debtor's estate will also benefit from State Street's fiduciary services with respect to Enron's proposed termination of the Cash Balance Plan because the potential for post-

petition claims associated with the termination will be substantially reduced. State Street's fiduciary services, including but not limited to the professional management of the Cash Balance Plan's assets, overseeing the transition of such Plan's assets prior to termination, and actively participating in the selection of annuity providers will help ensure the payment of benefits to the Cash Balance Plan participants, and thus reduce the likelihood of any claim against the estate in connection with such a termination. In selecting the annuity provider, State Street draws upon its in-house expertise in evaluating the various providers and may further reduce expenses that would otherwise be borne by Enron. To the extent State Street participates in the selection of the annuity provider, Enron significantly reduces its exposure to post-petition liability with respect to that process because State Street will review the providers to make sure that the selected provider is appropriate for its role.

b.     Savings Plan

State Street performed fiduciary services for the Savings Plan valued at approximately $100,000 that otherwise would have had to be paid to consultants. As described below, State Street performed a review of the Savings Plan's investment options, investment policy and the self-directed brokerage feature. State Street reduced annual expenses of the Savings Plan and the Savings Plan Trust by $440,000 by eliminating four duplicative investment options, adding two additional investment options and moving an investment option to a class of mutual fund shares carrying lower fees and expenses. These steps reduced possible post-petition liability of the Debtor's estate for failure to monitor the actions of the fiduciaries, and they also bolstered employee confidence that the remaining Savings Plan investments were being properly and adequately reviewed.

State Street interviewed and evaluated all of the investment managers retained by the Savings Plan and performed an analysis of investment performance of those investment managers compared to other managers and against appropriate benchmarks, fees, investment styles and the asset mix of the investment options available. After performing this due diligence, State Street selected the appropriate investment options for the Savings Plan, streamlining the existing offerings of investment options to the participants, adding investment options where appropriate, and modifying share classes within the same fund to reduce the fees charged to the Plan. State Street also reviewed and updated the Savings Plan's investment policy to be consistent with the changes to the investment options and to reflect accurately the ongoing investment policy of the Savings Plan. State Street was responsible for implementing the investment changes to the Savings Plan by coordinating the work of the trustee and recordkeeper and reviewed all of the participant communications regarding these changes. State Street continues to monitor the performance of the Savings Plan investment managers and to review the appropriateness of the investment options offered to plan participants, a responsibility the Administrative Committee had not been fulfilling.

State Street also performed a review of the self-directed brokerage option in the Savings Plan under which participants can buy or sell individual securities and mutual funds through a brokerage arrangement. State Street analyzed the feature and the fees charged to Savings Plan participants for its use. Further, State Street analyzed the revenue-sharing arrangements for the investment options of the Savings Plan to determine if more favorable arrangements would be feasible. Revenue sharing arrangements reduce the amount the Savings Plan would otherwise

pay for recordkeeping. All of these actions serve to reduce the overall expenses of the Savings Plan and therefore enable the Debtor to provide a larger benefit to the participants.

Wilmington Trust, the current trustee of the Savings Plan, notified the Debtor that it intended to increase its annual fees by approximately $120,000. State Street assisted the Debtor in its effort to dissuade Wilmington Trust from increasing these fees at this time by providing market data through a sample trustee fee quote.

<blockquote>c. <u>Merger of ESOP into Savings Plan</u></blockquote>

State Street reduced annual administrative expenses by $75,000 by assisting in implementing the merger of the ESOP and the Savings Plan.  By reducing duplicative expenses for the two Benefit Plans, Enron, as the benefit plan sponsor, was able to deliver a larger benefit to Benefit Plan participants with no cost increase to Enron.

<blockquote>4. <u>Fiduciary Insurance</u></blockquote>

Consistent with Enron's pre-petition practice of purchasing a fiduciary liability policy for the employee-members of the Administrative Committee, Enron agreed in the FSA to carry fiduciary liability insurance for the independent fiduciary.  However, Enron was unable to obtain such insurance, presumably due to its Chapter 11 status.  Therefore, State Street obtained special fiduciary liability insurance coverage in the amount of $50 million, with respect to its responsibilities to the Benefit Plans.  Pre-petition, Enron carried fiduciary liability insurance with higher coverage and at is own expense on behalf of the employee members of the Administrative Committee.

To the extent that there is a breach of fiduciary duty that gives rise to liability both the plan participants and Enron are assured that there is a source of recovery. As plan sponsor, Enron would not have any responsibility or liability for a breach by the independent fiduciary, and Enron is protected to the extent that claims are made under the insurance policy.

Thus the insurance obtained by State Street protects not only State Street but indirectly the estate. The premium for this insurance is the second component of State Street's request for administrative expenses.

5.     Employee Morale and Retention

Employees, who are also Benefit Plan participants, are assured that their pension plans are being properly administered and their interests protected, which, in turn, bolsters morale and confidence in the Debtor. To the extent that competent and willing employees are terminated or otherwise depart as the Debtor downsizes, State Street fills a void that otherwise could have given rise to serious neglect or omission with respect to the Debtor's duties under ERISA. Additionally, the Debtor's payment of State Street's fees and expenses would ensure that the compensation of Debtor's employees was not effectively reduced because fees and expenses were being charged to the Benefit Plans.

6.     Summary of Benefits

State Street's services have benefited the Chapter 11 estate by enabling Enron to comply with applicable law while operating as the debtor-in-possession, by timely realizing the value of certain Enron securities and thus reducing actual pre-petition claims, by reducing the potential for post-petition claims, and by providing Enron's remaining employees with the assurance that an experienced and independent party is now overseeing their Benefit Plans.

Moreover, an employer's payment of Benefit Plan expenses is a reasonable business expense deductible from income under the Internal Revenue Code. *See* I.R.C. §§ 162 and 212, which are cited in Treas. Reg. § 1.404(a)-3(d). It is respectfully submitted that the Court, as Congress has done, should recognize these post-petition expenses as reasonable expenses of the estate.

C.      Cases about Fiduciary Services in Chapter 11

Courts have recognized that post-petition actions authorized under 11 U.S.C. § 363(b)(1) (the section under which State Street was appointed) can give rise to "administrative expenses" compensable under 11 U.S.C. § 503(b)(1)(A). *In re Primary Health Systems, Inc.*, 275 B.R. 709, 711 (Bankr. D.Del. 2002). This is one of those situations.

1.      Independent Fiduciaries in Chapter 11 Cases

The single reported case State Street has been able to find regarding the precise issue of paying for the post-petition retention of a "named fiduciary" engaged to run an operating debtor's pension plan took for granted that benefit was being conferred on the estate. *In re Bicoastal Corporation*, 149 B.R. 216 (Bankr. M.D. Fla. 1993). A substantial portion of State Street's fees and expenses are similar to those of the fiduciary who was employed by the *Bicoastal* debtor to serve as "Named Fiduciary for Asset Management" and "to manage, administer, and thereby to invest the assets of the [debtor's] pension plans." *Id.* at 218. In the *Bicoastal* case, the fiduciary was deemed in this position to be involved "in the administration of the [debtor's] estate, as the assets under her control certainly played a role in the

reorganization of the Debtor's finances." *Id*. The *Bicoastal* court never questioned the fiduciary's benefit to the estate.[14]

In addition, State Street is serving as an independent fiduciary in two other sizeable Chapter 11 cases, and in both cases, the estate, as opposed to the subject benefit plan, is paying State Street's contractual fees. The two cases are *In re Agway, Inc., et al.*, Nos. 02-65872 through 02-65877 (Bankr. N.D.N.Y. filed October 1, 2002) (Gerling, B.J.), and *In re UAL Corp., et al.*, No. 02-B48191 through 02-B48218 (Bankr. N.D. Ill. filed Dec. 9, 2002) (Wedoff, B.J.). In the former, State Street's pre-petition contract was assumed post-petition; in the latter, State Street's post-petition employment and payment therefor is treated as the ordinary course of business. In *Agway* at least, the benefit plan documents could be read to authorize the employer to allow the expense of an independent fiduciary to be borne by the

---

[14] The *Bicoastal* court said the "Named Fiduciary" would have "a valid claim for a cost of administrative pursuant to §§ 503[b](1) and 507(a)(1)" but for the fact that her employment had not been authorized by the court. *Id*. Implicitly recognizing the benefit that the Named Fiduciary had conferred on the estate, the court went on to say:

> If . . . [the Named Fiduciary] is able by undeniable proof that she was assured that all necessary approvals [had] been sought and obtained, this [court] might favorably consider her recently filed Application to Authorize Her Employment *nunc pro tunc* or allow a claim on a quantum meruit basis.

*Id*. at 219.

State Street's proof of necessary approval is this Court's April 19, 2002 Order. The case of *In re B. B. Walker Company*, 2002 WL 31770849 (Bankr. M.D.N.C. 2002), does not detract from *Bicoastal*. The administrative-expense claim denied in *B.B. Walker* consisted "primarily of attorneys' and accountants' fees... incurred... by the [the plan trustee and plan administrator] in connection with terminating the Employee Benefit Plans." *Id*. at *1. The trustee/administrator was in place pre-petition, long before the two affiliated debtors' bankruptcy, and the decision to terminate the plans had been made "[s]hortly before [the] cases were filed." *Id*. The debtors had ceased their manufacturing operations and laid off their production employees prior to their filing. *Id*. The *B.B. Walker* trustee/administrator was a pre-petition actor giving ministerial effect to a pre-petition termination decision by a non-operating debtor. State Street in this *Enron* case, by contrast, came on the scene post-petition to head off an enforcement proceeding not subject to the automatic stay of § 362(a) (because of § 362(b)(4)) and to discharge the ongoing fiduciary responsibilities that Enron employees could no longer perform for plans that were to be maintained for a going concern in the post-petition period (Enron is now expected to terminate the Cash Balance Plan).

plan itself.  In neither case has such an imposition been attempted or made; rather, the estate is

paying the post-petition expense -- and obtaining the benefit of -- the independent fiduciary.[15]

## 2.      Fundamental Fairness

State Street's request for administrative expenses is buttressed by considerations of

fundamental fairness.  The phrase "fundamental fairness" derives from *Reading Co. v. Brown*,

391 U.S. 471, 88 S.Ct. 1759 (1968), where the Supreme Court held that considerations of

fundamental fairness and logic dictated that a receiver's post-petition tort (negligence) gave rise

to an administrative-expense claim.  "Actual and necessary costs," held the Court, were to

"include costs ordinarily incident to operation of a business, and not be limited to costs without

which rehabilitation would be impossible." *Id*. at 483, 88 S.Ct. at 1766.[16]  Administrative

expense status may flow not only from non-debtor activities that *benefit* the estate but also from

estate activities that *injure* or adversely affect non-debtors.  The inability of the Administrative

Committees that State Street was appointed to replace, to discharge their important fiduciary

duties was an ongoing post-petition violation of law and of Enron's duty, as the Benefit Plans'

sponsor, to its employees.[17]  No matter how large the *pre-petition* claims of the Benefit Plans

---

[15] The Creditors' Committee in the *Agway* case did negotiate certain modifications to the assumed fiduciary-services agreement regarding the fees of State Street's attorneys.  State Street does not in this Motion seek payment of any of its legal fees (although the FSA provided that Enron would pay State Street's legal fees). When State Street does apply for payment of its legal fees as an administrative expense, it is fully prepared to submit such requests for appropriate review (subject to confidentiality safeguards and procedures like those already in place in this case).

[16] State Street does not go so far as to say that "rehabilitation would be impossible" without its independent-fiduciary services, but it flatly submits that the chaos in the Benefit Plans—continued post-petition— would have been a major, if not paralyzing, distraction to reorganization, and the cost of avoiding this should not be imposed on the Benefit Plans alone.

[17] *Reading Co. v. Brown* has been applied beyond the field of torts.  *In re Chicago Pacific Corporation*, 773 F.2d 909, 914 n.6 (7th Cir. 1985).  An ongoing post-petition violation of law was the ground of decision in *In re Brinke Transportation Corp.*, 1989 U.S. Dist. Lexis 17577 (D.N.J. 1989) (involving post-petition violations of the National Labor Relations Act):

may be, such Benefit Plans and their participants were also entitled *post-petition* to the services

of an unconflicted and disinterested fiduciary.  Those who have been injured, or adversely

affected, by the debtors-in-possession's wrongful conduct in the course of its business

operations are entitled to administrative claim priority in the interest of fairness.

> This argument finds [its] basis in [*Reading Co. v. Brown*],
> and the cases which followed which hold that certain costs
> which do not "benefit" the estate, or help preserve the estate
> are nonetheless administrative costs granted priority status
> under § 503(b)(1)(A) if these costs are the costs of harm
> caused by the debtor-in-possession, specifically if the costs
> are incurred by a debtor's continuing a tort post-petition *or*
> *violating a statute post-petition*.

*Kapernekas v. Continental Airlines, Inc.* (*In re Continental Airlines, Inc.*), 148 B.R. 207, 213
(Bankr. D. Del. 1992) (emphasis supplied).

    *See also*, *e.g.*, *Mass. Div. of Employment & Training v. Boston Regional Med. Ctr.* (*In*

*re Boston Regional Med Ctr., Inc.*), 291 F.3d 111, 124 (1st Cir. 2002) "[A] bankruptcy estate

is operated for the benefit of its general creditors, and those injured by the operation of the

estate should be made whole before the creditors receive their own shares."); *Yorke v. NLRB*,

709 F.2d 1138, 1143 (7th Cir. 1983), *cert. denied*, 465 U.S. 1023 (1984) ("[T]hose injured

during administration of estate by Trustee entitled to priority claim as administrative

expense"); *In re American Preferred Prescription, Inc.*, 218 B.R. 680, 688 (Bankr. E.D.N.Y.

1998) ("The common thread running through these cases [interpreting *Reading*] and in the case

at hand is that the debtor in question has caused an injury to a third party for which the estate

must be held responsible.").

---

The [bankruptcy] court below... [properly] determined that the ongoing nature
of the violation subsequent to the filing of the petition afforded the resulting
claims first [i.e., administrative expense] priority.

## Waiver of Memorandum of Law

State Street submits that this Motion raises no novel issues of law and requests that the Court waive the requirement of Local Rule 9013-1(b) of filing a separate memorandum of law.

[Remainder of page left intentionally blank]

III.    Relief Requested

WHEREFORE, State Street requests entry of a order (i) allowing the fees and certain expenses incurred by State Street pursuant to the Court-approved FSA to be paid as administrative expenses of the Debtors' estates pursuant to § 503(b)(1)(A); (ii) authorizing and directing immediate payment of State Street's fees for the period March 14, 2002 through March 13, 2003 in the amount of $1,500,000.00; (iii) authorizing and directing immediate payment of premium expenses of $2,296,575.00 associated with obtaining special fiduciary insurance coverage for the period March 14, 2002 through April 18, 2003, and for the period April 18, 2003 through April 18, 2004; and (iv) for such other and further relief as is just and proper.

Respectfully submitted,

STATE STREET BANK AND
TRUST COMPANY, solely in
its capacity as the Fiduciary and
not in its individual capacity

By its attorneys,

Dated:  August 14, 2003

  /s/ Peter Nils Baylor
Peter Nils Baylor (PB 5248)
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02210-2604
Tel. (617) 439-2390
Fax (617) 310-9390