WEIL, GOTSHAL & MANGES LLP
Attorneys for the Debtors
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
Martin J. Bienenstock (MB 3001)
Brian S. Rosen (BR 0571)
Melanie Gray (*pro hac vice*)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11
                                          :
ENRON CORP., et al.,                      :    Case No. 01-16034 (AJG)
                                          :
                                          :    Jointly Administered
                        Debtors.          :
------------------------------------------------------------x
```

**DEBTORS' RESPONSE AND OPPOSITION TO CLN NOTEHOLDERS' MOTIONS
AND BANK OF NEW YORK JOINDER FOR TEMPORARY ALLOWANCE OF
CLAIMS FOR VOTING PURPOSES**

TO THE HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE:

Enron Corp. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), respond and object to the (i) Motion of the Members of the Vanguard Group and Bear, Stearns & Co. for Temporary Allowance of Claims for Voting Purposes Pursuant to Bankruptcy Rule 3018 (the "Vanguard Motion"), (ii) Motion of the EDO Creditors for Order Granting Temporary Allowance of Claims for Voting Purposes (the "EDO Motion"), and (iii) the Joinder filed by the Bank of New York (the "BNY Joinder" and, collectively with the Vanguard Motion and the EDO Motion, the "Motions"). In support thereof, Debtors respectfully represent as follows:

The Disputed Claims (defined below) should not be allowed to vote on the Fifth Amended Joint Plan of Affiliated Debtors ("Plan") for several reasons. First, because the Bankruptcy Code's clear and unambiguous statutory language provides that only "allowed" claims may vote on a chapter 11 plan, the Bankruptcy Court is without discretion to temporarily allow the Disputed Claims for voting purposes. Second, in light of the Debtors' objections to the Disputed Claims pursuant to section 502(d) of the Bankruptcy Code, the CLN Noteholders are not permitted to vote the Disputed Claims until the underlying voidable transfers are returned. Third, if the Court finds that it has discretion to temporarily allow the Disputed Claims for voting purposes despite the plain language of sections 502 and 1126 of the Bankruptcy Code, equity weighs in favor of not allowing the Disputed Claims for voting purposes. Rather than depriving innocent creditors of their alleged statutory right to vote on the Plan, denying the Motions will ensure that votes of legitimate creditors are not improperly diluted by the votes of creditors holding disputed claims who ultimately may not have an economic stake in the case. For all of these reasons, the Debtors request the Court to deny the Motions in their entirety.

## BACKGROUND

**A.**     **Commencement Of These Chapter 11 Cases**

1.     On December 2, 2001 (the "Petition Date") and periodically thereafter, Enron Corp. and certain of its direct and indirect subsidiaries and affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing one of the largest and most complex chapter 11 cases in United States history. The Debtors continue to be authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' chapter 11 cases have been procedurally consolidated for administrative purposes.

2.     On December 12, 2001 and March 29, 2002, in accordance with section 1102 of the Bankruptcy Code, the United States Trustee for the Southern District of New York appointed a statutory committee of unsecured creditors (the "Creditors' Committee"), and an employment-related issues committee (the "Employee Committee"), respectively, for the Debtors' chapter 11 cases. The Creditors' Committee and the Employee Committee have been reconstituted from time to time.

3.     On April 8, 2002, the Bankruptcy Court entered an order authorizing appointment of an examiner in the Enron Corp. chapter 11 cases pursuant to 11 U.S.C. § 1104(c) to, in part, "inquire into transactions involving . . . (i) special purpose vehicles or entities created or structured by the Debtors or at the behest of the Debtors that are (ii) not reflected on the Enron Corp. balance sheets . . . or that (v) involve potential avoidance actions against any pre-petition insider or professional of the Debtors." On May 22, 2002, the United States Trustee appointed Neal Batson as the Enron Corp. examiner (the "Examiner") pursuant to the April 8, 2002 order. (Docket No. 2838)

B.     **History of the Disputed Claims and Voidable Payments**

4.     The Disputed Claims at issue arise out of a subgroup of a series of so-called prepay transactions (the "Yosemite Prepays"), each structured and designed by Citigroup, Inc. and certain of its affiliates and subsidiaries (collectively, "Citigroup"), including Citibank, N.A. ("Citibank"), that looked like commodity transactions but were in fact loans. The Yosemite Prepays are distinguishable from other Citigroup prepays because of their credit-linked-note feature that allowed Citigroup to transfer its Enron exposure to third parties.

5.     Although the structure varied between the Yosemite Prepays, they always involved a triangular swap arrangement among Citibank, Delta Energy Corporation ("Delta"), an

off-shore SPE created by Citigroup solely for the purpose of serving as a pass-through party, and Enron North America ("ENA"), with Enron guaranteeing ENA's performance. In connection with the Yosemite Prepays, trusts and in one case a limited liability company (collectively, the "Yosemite Trusts"), were established by Citigroup to issue credit-linked notes (the "Credit Linked Notes") to institutional investors in order to generate funds that were effectively loaned to ENA and Enron.[1]

6.      Under the Yosemite Prepays, Citibank, Delta, and ENA executed substantially identical commodity swap agreements at the closing and funds were prepaid (loaned) to ENA. The prepayments made to ENA pursuant to these transactions were routed through a complex series of trusts and off-shore companies in order to disguise their true nature as loans, the proceeds of which were ultimately passed from ENA to Enron. In each case, the commodity price risk moved through the other parties to the transaction and ultimately circled back to ENA and Enron, thus eliminating the risk to Citigroup, Delta, and the Yosemite Trusts that the price of the underlying commodity might change. Over the course of the transactions, ENA and Enron were to repay Citibank the prepaid amount (the principal) plus a specified rate of interest.

7.      The Yosemite Trusts, in which Enron and Citigroup hold controlling equity interests, generated the initial funds that were loaned by Citibank to ENA. Under the

---

[1]      Credit-linked notes are debt securities that have an interest rate or price that is linked to the value of a referenced asset or index that is different from the issuer. Typically, the specified interest rate is higher than the rate that would apply if the note were linked solely to the credit of the issuer. If a credit event involving the referenced asset occurs prior to maturity, repayment of the principal on the credit-linked note occurs on the basis of the price of the referenced asset. Owners of credit-linked notes, like the CLN Noteholders, assume the risk of both the referenced credit (Enron/ENA) and the note issuer.

respective Yosemite Trust indentures, Citibank was empowered as Directing Party to invest the Trusts' assets, which it did by investing in the Yosemite Prepay swap transactions.

8. Post-petition, on February 8, 2002, the Yosemite Trusts executed certain Assignment and Settlement Agreements with Citibank and Delta pursuant to which the purported commodity swap transactions that were at the heart of the Yosemite Prepays were "settled" and Delta and Citibank assigned to the Yosemite Trusts certain Termination Claims (as that term is defined in the respective trust indentures). The Yosemite Trusts still hold the Termination Claims (the "Disputed Claims") against ENA, as primary obligor, and Enron, as guarantor. The holders of the Credit Linked Notes (the "CLN Noteholders") are holders of claims against the Yosemite Trusts. The CLN Noteholders seek to vote these Disputed Claims in connection with the Plan.[2] Notably, the CLN Noteholders do not hold claims against any of the Debtors; their claims are against the Yosemite Trusts.

C.  **The Examiner's Investigation**

9. Following his appointment, the Examiner launched a comprehensive investigation into many aspects of Enron's pre-petition business, including the Yosemite Prepays giving rise to the Disputed Claims. That investigation, which lasted over a year and cost in excess of $100 million, resulted in five reports in which the Examiner detailed his findings. The Examiner's Third Interim Report contains his findings concerning Citigroup's receipt of

---

[2]    On February 17, 2004, the Court entered an Amended Fiduciary Stipulation and Order Regarding Yosemite and Credit Linked Notes (Docket No. 16340) which, among other things, provides, as a matter of administrative convenience only, for the direct solicitation and voting by the noteholders of the Yosemite Trusts and provides that the Debtors and Creditors' Committee reserve all rights to challenge, at or prior to the confirmation hearing, the tabulation of such votes as individual votes for or against the Plan by filing a pleading with the Court setting forth the legal bases for its challenge.

voidable transfers from Enron as part of the Yosemite Transactions.[3]  *See* Examiner's Third Report, Appendix J, Annex 1, p. 7. (Docket No. 11960)  The Examiner concludes that the Debtors will likely prevail in efforts to recover the Yosemite Preferences because defenses under the Bankruptcy Code "will not shield these transfers from avoidance."[4]  *Id.* at 8.

10.     Although the Yosemite Prepays were denominated as prepay commodity transactions, the Examiner found that they were, in fact, disguised debts:

> The prepay transaction provides favorable accounting treatment for the customer [Enron].  Although the deal is effectively a loan, the form of the transaction would allow the customer to reflect it as liabilities from price management activity on their balance sheet and also provide a favorable impact on report cash flow from operations.

Examiner's Second Report, Appendix E, p. 47. (Docket No. 9551).  The Examiner is not the only investigator to conclude that the Yosemite Prepays were disguised loans.  In a separate investigation, Manhattan District Attorney Morganthau concluded that the Yosemite Prepays were really disguised loans.  *See* MegaClaim Litigation Complaint at 74.[5]  Likewise, the PSI Chief Investigator concluded that the Yosemite Prepays were actually disguised loans.  *Id.* at 75.

---

[3]     The Examiner's Report identified more than $30 million in such preference payments. The MegaClaim Litigation, discussed below, seeks to recover almost $53 million in preference payments arising out of the Yosemite Prepays (the "Yosemite Preferences") In addition, the MegaClaim Litigation alleges fraudulent transfers in excess of $300 million arising from the Yosemite Prepays.

[4]     As discussed herein, the fact that the Disputed Claims were transferred from Citigroup to the CLN Noteholders is of no consequence to the effect of the outstanding Yosemite Preferences on the ability to vote the Disputed Claims.  *See* p. 27, *infra*.

[5]     All citations to the MegaClaim Litigation Complaint are to the amended complaint filed on December 1, 2003.

Further, certain of the CLN Noteholders are prosecuting claims against Citibank and Delta, among others, in which they too allege that the Yosemite Prepays were disguised loans.[6]

11.     The Examiner's reports also indicate that Citigroup was not only aware of Enron's use of these pre-petition transactions to disguise debt from market analysts, but it was also directly involved in the development of these suspect transactions specifically for Enron. Examiner's Second Report, Appendix E, p. 47, 52. (Docket No. 9551).   According to the Examiner's findings, the defendants in the MegaClaim Litigation – including Citigroup – developed these financial transactions for their customer Enron with the "primary purpose . . . to transfer Enron credit risk held by Enron's various banks under structured financing transactions to investors in the longer term capital markets." *Id.* at 52.  Indeed, the defendants facilitated Enron's use of these prepay transactions by making their own off-shore entities available to act as conduits for the funds flow. *Id.* at 53.

**D.     Commencement of the MegaClaim Litigation**

12.     On September 24, 2003, the Debtors brought suit against Citigroup, Inc., JPMorgan Chase & Co., Canadian Imperial Bank of Commerce, Barclays, Merrill Lynch & Co., Inc. and Deutsche Bank AG and certain of their subsidiaries and affiliates (collectively, the "MegaClaim Defendants") in Adversary Proceeding Number 03-09266, currently pending in the United States Bankruptcy Court, Southern District of New York, Manhattan Division (the "MegaClaim Litigation").[7]   Based in part on the Examiner's findings summarized above, the

---

[6]     The Vanguard litigation was originally filed in the Chester County, Pennsylvania, Court of Common Pleas on April 9, 2003.  It was removed to the United States District Court for the Eastern District of Pennsylvania on May 14, 2003, and was transferred to the Enron MDL on December 16, 2003.

[7]     The Debtors filed an Amended Complaint on December 1, 2003 to add additional defendants ,including the Yosemite Trusts, and numerous additional counts.

MegaClaim Litigation alleges Citigroup, among others, knowingly participated with a small group of former senior officers and managers of Enron in a scheme to manipulate and misstate Enron's financial condition from 1997 to 2001. Further, the MegaClaim Litigation alleges common law claims of aiding and abetting breach of fiduciary duty, and aiding and abetting fraud. In the MegaClaim Litigation, the Debtors seek on behalf of their estates, among other things, to recover the Yosemite Preferences as avoidable transfers, to equitably subordinate the Disputed Claims, and to recover significant damages.[8]

### E.  The Plan, Disclosure Statement and Voting Procedures

13.     On January 9, 2004, the Court entered an order approving the Debtors' Disclosure Statement (the "Disclosure Statement") as containing sufficient information to solicit votes with respect to the Debtors' chapter 11 plan (the "Plan.) Also on January 9, 2004, the Court entered an order approving the voting procedures (the "Voting Procedures Order") governing the solicitation of votes with respect to the Plan. In addition to the claims in the MegaClaim Litigation, on January 9, 2004, the Debtors filed their Omnibus Objection to Proofs of Claim of Defendants Subject to Previously Filed Adversary Proceedings (the "Omnibus Objection") (Docket No. 15341). In the Omnibus Objection, the Debtors object to the Disputed Claims on section 502(d) and equitable subordination grounds and ask the Court to disallow the Disputed Claims in their entirety. Thereafter, the CLN Noteholders filed the Motions seeking temporary allowance of the Disputed Claims for voting purposes.[9]

---

[8]     As previously discussed, the Debtors also seek to recover substantial fraudulent transfers in the MegaClaim Litigation.

[9]     Two days after the deadline in the Voting Procedures Order for filing temporary allowance motions, the Bank of New York filed the BNY Joinder. Because the BNY Joinder was untimely filed, to the extent the Court believes it has discretion to temporarily allow claims as requested in the Motions, the Court should only consider

14.     On January 29, 2004, the Court held a hearing to consider whether the Debtors' allegations supporting equitable subordination of the Disputed Claims constitute an objection to the claims such that those claims should be precluded from voting on the Plan. At the conclusion of that hearing, the Bankruptcy Court deferred ruling on the equitable subordination issues and directed the parties to submit additional briefing with respect to the section 502(d) arguments on or before March 24, 2004, and set a continued hearing on the issue for March 31, 2004. On March 5, 2004, the Court entered an order providing that the Court will first consider the Debtors' section 502(d) objections to the Motions and, if the Debtors are unsuccessful on their section 502(d) objections, will then consider the Debtors' equitable subordination objections. [10]

### THE CLN NOTEHOLDERS SHOULD NOT BE ALLOWED TO VOTE THE DISPUTED CLAIMS

15.     Applicable law does not permit the CLN Noteholders to vote the Disputed Claims because Congress did not grant bankruptcy courts discretion to temporarily allow disputed claims for voting purposes as evidenced by the clear and unambiguous language of the Bankruptcy Code. Because the Debtors objected to the Disputed Claims under section 502(d), those claims are no longer deemed allowed under section 502(a) and thus cannot vote under the clear language of Bankruptcy Code section 1126(a). However, if the Court finds that it has discretion to allow the Disputed Claims to vote despite the clear language of section 1126(a), the Court should exercise that discretion to temporarily disallow the Disputed Claims for voting

---

exercising that discretion with respect to the timely filed Vanguard Motion and EDO Creditors' Motion.

[10]     This order does not prohibit presentation of evidence or argument simply because it may relate to the Debtors' equitable subordination objection, as long as such evidence or argument is also relevant to the Debtors' section 502(d) defenses.

purposes given the substantial allegations of voidable payments found by the Examiner and alleged by the Debtors in the MegaClaim Litigation. For all these reasons, the Debtors ask the Court to deny the Motions in their entirety.

**A.** **The Bankruptcy Code Does Not Permit Temporary**
**Allowance Of Claims For Voting Purposes**

16.     The CLN Noteholders assert that the Court should temporarily allow the Disputed Claims to ensure the CLN Noteholders are not improperly disenfranchised from voting on the Plan. The CLN Noteholders rely on Bankruptcy Rule 3018, which purports to grant bankruptcy courts discretion to "temporarily allow a claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan." FED. R. BANKR. P. 3018(a). Indeed, the CLN Noteholders have no choice but to point solely to Rule 3018(a), unlike the Bankruptcy Act, the Bankruptcy Code contains no provision permitting temporary allowance of claims for voting on a chapter 11 plan. [11]

17.     Section 1126 of the Bankruptcy Code unambiguously reflects Congress' intention concerning who should be allowed to cast a vote on a chapter 11 plan. Specifically, section 1126(a) of the Bankruptcy Code states that "[t]he holder of a claim or interest allowed under section 502 of this title may accept or reject a plan." 11 U.S.C. § 1126(a), *see also* 11 U.S.C. § 1126(c) (counting only votes regarding allowed claims in determining whether a class has accepted a chapter 11 plan); *In re Miami Trucolor Offset Serv. Co.*, 187 B.R. 767, 768-69 (Bankr. S.D. Fla. 1995). Under section 502, a claim is deemed allowed unless it is the subject of

---

[11]     Under the Bankruptcy Act, Congress expressly gave Bankruptcy Courts discretion to temporarily allow claims for the purposes of voting to accept or reject a plan. *Bankruptcy Act of 1898*, as amended, § 92, *reprinted in Collier on Bankruptcy* App. A, pt. 3, (15th ed. rev. 2003). However, when the Bankruptcy Act was repealed on October 1, 1979 and replaced with the Bankruptcy Code, Congress did not include any such grant of discretion to temporarily allow claims for voting on a chapter 11 plan. *Compare* 11 U.S.C. § 1126(a) to section 92 of the Bankruptcy Act.

an objection.  11 U.S.C. § 502(a).  *First Union Commercial Corp. v. Nelson, Mullins, Riley &*

*Scarborough (In re Varat Enterprises, Inc.)*, 81 F.3d 1310, 1317 (4th Cir. 1996).  Once an

objection is asserted, the bankruptcy court is required to conduct a hearing to determine whether

the claim should be allowed and in what amount.  11 U.S.C. § 502(b); *Katchen v. Landy*, 382

U.S. 323, 330, 86 S.Ct. 467, 473 (1966) ("[W]hen a bankruptcy trustee presents an objection to a

claim, the claim can neither be allowed nor disallowed until the preference matter is

adjudicated.")

      18.    Section 502(d) also unambiguously reflects Congress' intention that

holders of voidable preferences should not be allowed to vote on a chapter 11 plan.  Section

502(d) plainly states provides that "the court *shall* disallow any claim of an entity from which

property is recoverable under section .  .  . 547, 548 .  .  . of this title."  11 U.S.C. § 502(d)

(emphasis added).  The legislative history of section 502(d) also underscores the purpose of this

unambiguous statutory language:  "Section (d) .  .  . requires disallowance of a claim or a

transferee of a voidable transfer *in toto*" if the voidable preference is not returned to the estate.

HR Rep. No. 95-595, at 354 (1977), reprinted in 1978 U.S.C.C.A.N. 5787,6310 (emphasis

added).  Section 502(d) thus does not permit temporary allowance of a claim for voting purposes

when that claim in subject to a preference or fraudulent transfer action.  Thus understood, section

502(d) serves the valuable purpose of not allowing a purported creditor to share in the assets of a

debtors' estate unless or until the voidable preferences or fraudulent conveyances are returned.

      19.    Application of sections 1126 and 502 of the Bankruptcy Code is thus

crystal clear: to vote on a chapter 11 plan, a creditor must hold a claim that is either deemed

allowed pursuant to section 502(a) or has been allowed by the Court pursuant to section 502(b).

The corollary to that rule is equally clear: if a claim is not allowed under either of those methods,

then it is not entitled to vote on a plan. 11 U.S.C. § 1126(a). Although the Bankruptcy Code allows the court to conduct estimation proceedings for the purpose of ultimate allowance of unliquidated or contingent claims under section 502, there is no statutory provision to estimate or temporarily allow disputed claims for voting purposes under section 502(d). 11 U.S.C. § 502(c), (d). Indeed, the Bankruptcy Code makes no reference whatsoever to temporary allowance of claims for voting purposes and the legislative history of section 502(d) counsels against temporary allowance in any amount.

20. Nevertheless, in contravention of he Bankruptcy Code, Bankruptcy Rule 3018(a), promulgated by the Supreme Court in 1987, purports to temporarily allow claims for voting purposes despite the fact that those claims have not been allowed under section 502. FED. R. BANKR. P. 3018(a). Although Congress granted rule-making authority to the Supreme Court, the grant of authority is expressly limited: "Such rules shall not abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2075. Thus, if a bankruptcy rule is inconsistent with the Bankruptcy Code, the statute governs. *Id.; see also In re Gardinier, Inc.*, 55 B.R. 601, 604 (Bankr. M.D. Fla. 1985).

21. Given the straightforward statutory framework contained in Bankruptcy Code sections 1126 and 502, the authority for issuance of Rule 3018(a) is patently lacking. Indeed, at least one bankruptcy court has questioned whether the Rule was improperly issued because it conflicts with the plain language of the Bankruptcy Code:

> This Rule is obviously contrary to the seemingly clear provisions of the Code because it purports to give discretion to a court to permit a claim or interest to vote even though the claim is challenged and the objection is yet to be ruled on. It needs no elaborate citation of authorities for the proposition that the rule-making power granted to the Supreme Court . . . does not authorize adoption of rules which are in conflict with any Act of Congress.

*In re Gardinier*, 55 B.R. at 604. The *Gardinier* court was correct when it observed that Rule 3018 directly conflicts with sections 502(d) and 1126(a) of the Bankruptcy Code. Although Rule 3018 has been employed in countless chapter 11 cases over the years to temporarily allow claims for voting purposes, the fact that the Rule has been put to regular use does not make it any more authorized when the language of sections 502 and 1126 is so clear.[12] Moreover, as discussed herein, although the Debtors have executed voting stipulations with some creditors, those stipulations in no way indicate that the Debtors waived any argument that Rule 3018(a) is inapplicable. *See In re Coral Petroleum, Inc.*, 60 B.R. 377, 382-83 (Bankr. S.D. Tex. 1986) (temporarily allowing only that portion of claim that plan proponent stated was not subject to its objection).

22. Indeed, in a substantially similar circumstance the Bankruptcy Rules were revised to bring them into conformity with the Bankruptcy Code's voting provisions. As is the case with section 1126(a) in the chapter 11 context, section 702(a) of the Bankruptcy Code provides that only creditors holding allowable claims can participate in the election of a chapter 7 trustee.[13] Thus, the same question arises in both chapter 7 and chapter 11: if a claim is objected to by the debtor, should the court permit that claim to vote? *See, e.g., In re Centennial*

---

[12] As is discussed in more detail below, see p. 20 *infra,* the Debtors filed and sought approval of the Voting Procedures Order so that creditors would be put on notice that their disputed claim would not be allowed to vote unless the Court ordered otherwise. In filing the Voting Procedures Motion, the Debtors did not waive any of their defenses to the Motions – including their defense that Rule 3018 is unenforceable.

[13] Because the chapter 11 plan controls how a creditor's claim will be treated, the right to vote on that plan is arguably one of the most important rights granted to creditors in a chapter 11 case. Likewise, because the election of a chapter 7 trustee will often dictate the outcome of a chapter 7 case, the right to participate in the election of that trustee is a similarly important right granted to chapter 7 creditors.

*Textiles, Inc.*, 209 B.R. 31 (Bankr. S.D.N.Y. 1997) (considering whether disputed chapter 7 claims should be permitted to vote when they are the subject of a section 502(d) objection).

23.     In *Centennial Textiles*, the U.S. Trustee refused to certify the chapter 7 trustee's election because votes had been cast by creditors who were recipients of alleged preferential transfers, thus rendering their claims subject to disallowance under Bankruptcy Code section 502(d). *Id.* at 33. In response, the creditors whose votes were challenged asserted two arguments in favor of recognition of their right to vote – arguments that are substantially similar to those presently asserted by the CLN Noteholders. First, the *Centennial Textiles* creditors argued that they should not be disenfranchised based solely on the debtor's unproven accusations in the avoidance action. *Id.* Second, even though their claims were the subject of avoidance actions, the *Centennial Textiles* creditors argued that the court could temporarily allow their claims pursuant to the authority granted by Rule 2003 of the Bankruptcy Rules. *Id.*

24.     In response to the *Centennial Textiles* creditors' first argument, the court noted that for a claim to be disallowed , the avoidance claim must be based on more than a "mere suspicion." *Id* at 33, *citing In re N.Y. Am. & Korean Auction Corp.*, 106 B.R. 42, 47 (Bankr. S.D.N.Y. 1989). Importantly, the court did not hold that the avoidance claim must be fully adjudicated before the creditors' claims could be no longer considered allowed under section 502(d). Instead, after reviewing the pleadings, the *Centennial Textiles* court found that while the creditor may have had valid defenses to the avoidance action, the debtor's allegations were based on more than a mere suspicion and whatever defenses the creditor may have had are "not to be determined in the context of an election controversy." *Id.* Thus, because the claims were the subject of an avoidance action that was based on more than a mere suspicion, those claims were

not allowable and thus not entitled to vote pursuant to section 702(d) of the Bankruptcy Code.[14]

*Id.*

25.     The *Centennial Textiles* court next turned to the creditors' argument that even if the claims are not allowable, Bankruptcy Rule 2003(b)(3) gives the bankruptcy court discretion to temporarily allow those claims for purposes of voting on a chapter 7 trustee.  *Id.* The court began its analysis by noting that the temporary allowance for voting purposes provision in Rule 2003(b)(3) had been deleted in the 1991 amendments to the Bankruptcy Rules. *Id.*  In discussing the reasons for the deletion, the *Centennial Textiles* court cited to the *In re San Diego Symphony Orchestra Association* decision in which the court ruled:

> Temporary allowance of a claim presupposes that the claim is disputed in some manner, whether it is not fixed as to liability, or not liquidated in amount.  Yet, section 702 provides that only undisputed, fixed, liquidated claims may vote.  The statute does not authorize temporary allowance of other disputed claims, although the Congress has demonstrated it knows how to provide for such temporary allowance if it chooses.  11 U.S.C. § 502(c). The statute remains the controlling authority, not a revoked and arguably inconsistent Rule provision.

*In re San Diego Symphony Orchestra Ass'n.*, 201 B.R. 978, 980-81 (Bankr. S.D. Cal. 1996), *cited with approval, In re Centennial Textiles*, 209 B.R. at 33.  Thus, the *Centennial Textiles* court was unwilling to temporarily allow the creditors' claims for voting purposes in the absence of statutory authority to do so.  *In re Centennial Textiles*, 209 B.R. at 34.

26.     Like the predecessor to Rule 2033, Rule 3018 appears to grant the bankruptcy court discretion to temporarily allow claims for voting purposes.  For the same reasons that were discussed in *In re Centennial Textiles* and *In re San Diego Symphony*, Rule 3018 was promulgated in contravention of statutory authority and should be revoked or, at a

---

[14]     As discussed below, the Debtors' objections to the Disputed Claims are likewise based on substantially more than mere suspicion.  *See* p. 29, *infra.*

minimum, the discretion that it purports to provide should not be exercised. *See In re Gardinier*, 55 B.R. at 604; 28 U.S.C. § 2075 (rules promulgated by the Supreme Court shall not abridge, modify, or enlarge any substantive rights under the Bankruptcy Code.)

27.    The right to vote on a chapter 11 plan is a substantive right granted to creditors under the Bankruptcy Code, and Rule 3018(a) purports to expand that right by making it available to a group of creditors that Congress expressly and unequivocally decided would not be permitted to vote.  Thus, the Rule was promulgated in violation of 28 U.S.C.  2075.  For this reason, the Debtors respectfully request that the Court find Bankruptcy Rule 3018(a) unenforceable to temporarily allow the Disputed Claims for voting purposes.

**B.      The Debtors' Section 502(d) Objection
        <u>Precludes The Disputed Claims From Voting</u>**

28.    Even if the Court determines that Rule 3018(a) is valid and enforceable, which it is not, the Debtors' avoidance causes of action in the MegaClaim Litigation and the section 502(d) objections contained in the Omnibus Objection make temporary allowance of the Disputed Claims inappropriate here.   As discussed below, until there has been a final adjudication on the Debtors' section 502(d) objections, the Disputed Claims are not allowed and thus not qualified to vote.  Moreover,  while Rule 3018(a) at most provides the court with a mechanism to temporarily allow the undisputed portion of a claim  that is subject to a partial objection, because the Debtors' section 502(d) objections go to the entirety of the Disputed Claims, such that  the CLN Noteholders cannot establish that any part of their claims are undisputed and will certainly be allowed.  Finally, the CLN Noteholders' contention that they took the Disputed Claims free and clear of the Debtors' defenses is simply not borne out by even a cursory review of applicable case law.  For these reasons, the Motions should be denied in their entirety.

### (1) The Debtors' Section 502(d) Objection to the Disputed Claims is Sufficient to Rebut Any Presumed Validity

29.     In maintaining that the Debtors have not (or will not) produced sufficient evidence to rebut the presumed validity of the Disputed Claims, the CLN Noteholders mistake the nature of the Debtors' 502(d) objection—indeed, any 502(d) objection. Thus, the validity of the Disputed Claims is not an issue in the Debtors' section 502(d) objection, and the presumed validity of a proof of claim under section 502(a) is simply irrelevant when considering a section 502(d) objection. 11 U.S.C. § 502(d); *Katchen v. Landy*, 382 U.S. 323, 330, 86 S.Ct. 467, 473 (1966). Even so, a cursory review of the MegaClaim Litigation and the Omnibus Objection establishes that the Debtors' avoidance claims against Citigroup and the Yosemite Trusts are based upon more than mere suspicion, but the substantial evidence and analysis detailed in the Examiner's full investigation. [15]

30.     Despite the CLN Noteholders' protests, it is well settled that a claim can be neither allowed nor disallowed while an avoidance action is pending regarding that claim. As recognized by the Supreme Court in *Katchen,* "when a bankruptcy trustee presents [an] objection to a claim, the claim can neither be allowed nor disallowed until the preference matter is adjudicated." *Katchen,* 382 U.S. at 330, 86 S.Ct. at 473. By the Supreme Court's express language, the Debtors need not prove that their avoidance actions against the Yosemite Trusts and Citigroup will be successful, *only that they are pending. Id.* This interpretation is congruent with other section 502(d) cases in which courts have similarly barred claimants from voting allowed claims while an avoidance action is pending. *See, e.g., In re Coral Petroleum, Inc.*, 60

---

[15]     The fact that the Disputed Claims were transferred from Citigroup to the CLN Noteholders does not negate the application of section 502(d) to preclude the CLN Noteholders from voting those claims until the Yosemite Preferences are repaid. *See* p. 27, *infra*.

B.R. 377, 382-83 (Bankr. S.D. Tex. 1986); *In re Am. Solar King Corp.*, 90 B.R. 808, 828 (Bankr. W.D. Tex. 1988). Both the *Coral* and *American Solar* courts held that the claims could not be deemed allowed because avoidance actions were pending, but neither court required the objector to produce evidence regarding the likelihood of success on the merits of the preference actions, let alone perform the legally irrelevant task of rebutting the validity or amount of the claimants' proofs of claim.[16] *In re Am. Solar King*, 90 B.R. at 828; *In re Coral Petroleum*, 60 B.R. at 382-83.

31. Therefore, the CLN Noteholders' insistence that the Debtors produce evidence disputing the validity of the Disputed Claims entirely misses the point of the section 502(d) objection. The Debtors' section 502(d) objection does not require the Debtors to challenge, let alone defeat, the validity or amount of the proof of claim itself. *See* 11 U.S.C. § 502(d); *Katchen,* 382 U.S. at 330, 86 S.Ct. at 473; *In re Am. Solar King,* 90 B.R. at 828, *In re Coral Petroleum,* 60 B.R. at 382-83. The validity of the Disputed Claims will not be litigated in connection with the avoidance causes of action in the MegaClaim Litigation, and the Debtors will not need to produce any evidence regarding the Disputed Claims' validity or invalidity in order to prevail on their section 502(d) objection.

32. In arguing the contrary, the CLN Noteholders mistakenly rely on Bankruptcy Rules and case law regarding general objections to the amount and validity of the claimant's proof of claim under Rule 502(a). *E.g.* FED. R. BANKR. P. 3001(f); *In re St. Johnsbury Trucking Co., Inc.*, 206 B.R. 318, 323 (Bankr. S.D.N.Y. 1997). These precedents only apply, however, when the interested party challenges the validity and amount of the claim. *See* FED. R.

---

[16]    Similarly, as previously discussed in the chapter 7 context, while the creditor may have valid defenses to the avoidance action, those defenses are "not to be determined in the context of an election controversy." *In re Centennial Textiles*, 209 B.R. at 33.

BANKR. P. 3001(f) ("Evidentiary effect. A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the *validity* and *amount* of the claim.") (emphasis added). The court in *St. Johnsbury*, for example, outlined the connection between the evidentiary value of a proof of claim and the objector's need to produce evidence to rebut it:

> [A] properly filed proof of claim constitutes prima facie evidence of the claim's validity and amount. FED. R. BANKR. 3001(f). Unless a claim is challenged, it is deemed allowed under 11 U.S.C. § 502(a). Any party objecting to the claim has the burden of putting forth evidence sufficient to negate the prima facie validity of the claim by refuting one or more of the facts in the filed claim.

*In re St. Johnsbury*, 206 B.R. at 323. In connection with these Motions, the Debtors do not challenge the Disputed Claims with regard to their validity or amount, only that they must be disallowed until the Yosemite Preferences and other avoidable transfers are repaid.[17] Thus, the Debtors will satisfy their burden by producing evidence of the only fact relevant to their 502(d) objection: the CLN Noteholders' Disputed Claims are subject to a well-pled pending avoidance action.[18] For that reason, the Debtors' pending section 502(d) objection precludes temporary allowance of the Disputed Claims.

---

[17] Nevertheless, the Debtors do challenge the Disputed Claims on the basis that they should be equitably subordinated, and the Debtors reserve all rights to assert any other objections that may be are identified in the future.

[18] Alternatively, if the Court is inclined to require the Debtors to produce evidence supporting their avoidance action claims, the Debtors note that the avoidance action allegations are based in large part on the Examiner's findings with respect to the Yosemite Preferences. As discussed herein, those findings are the results of over a year's investigation, are well-supported by both factual and legal analysis contained in the Examiner's reports, and properly constitute the kind of evidence that supports the Court's decision to prevent the CLN Noteholders from voting the Disputed Claims.

**(2)    The Disputed Claims Cannot Be Voted
Until Debtors' Section 502(d) Objection is Resolved**

33.    The CLN Noteholders have failed to establish any entitlement to vote the Disputed Claims in light of the Debtors' 502(d) objections because the Bankruptcy Code unequivocally permits only holders of undisputed, allowed claims to vote on a chapter 11 plan and as long as the avoidance action is pending, the Disputed Claims cannot be allowed. 11 U.S.C. §§ 502(a),(d); 1126(a),(c); *see also, In re Miami Trucolor Offset Serv. Co*., 187 B.R. 767, 768-69 (Bankr. S.D. Fla. 1995).    Although the CLN Noteholders assert that they will be disenfranchised, they overlook the reality that it is ultimately their burden to establish that they have an allowed claim against the Debtors' estates.    *Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000) (claimant bears ultimate burden of proof to establish its claim).    The Debtors have satisfied their evidentiary burden by bringing the MegaClaim Litigation and the Omnibus Objection, therefore the Disputed Claims can neither be allowed nor disallowed until either the litigation is resolved or the preferences are repaid. *Katchen,* 382 U.S. at 330, 86 S.Ct. at 473; *see also In re Am. Solar King*, 90 B.R. at 828 ("These parties have not yet surrendered the preference sought to be recovered by the debtor.   They do not therefore hold allowed claims against the estate.   Their votes must therefore be disregarded."); *In re Coral Petroleum,* 60 B.R. at 380 (Bankr. S.D. Tex. 1986).

34.    Nevertheless, the CLN Noteholders ask the Court to disregard the clear and plain meaning of sections 1126(a) and 502(d) to temporarily allow the Disputed Claims because to do otherwise would allegedly allow Debtors to disenfranchise them by asserting unsubstantiated and unproven claims objections.    In support of this request, the CLN Noteholders cite *In re Amarex, Inc*., 61 B.R. 301 (W.D. Okla. 1985), a 1985 case that employed a demonstrably inappropriate reading of the Bankruptcy Code to reach the very result that the

CLN Noteholders seek here – complete obfuscation of the fact that the Yosemite Preferences and other avoidable transfers have not been returned to the Debtors' estates.

35.     In concluding that equity demands allowance of disputed claims for voting on a plan, the *Amarex* court appears to have misunderstood the procedural interplay between section 502(a) and rule 3018.    For example, the court claimed that it was being asked to temporarily disallow unsecured claims that otherwise "are deemed allowed until a final adjudication." *Amarex*, 61 B.R. at 303.   Under the plain language of the Bankruptcy Code, of course, the default is just the opposite: claims are only deemed allowed if no interested party objects, and rule 3018(a) purports to permit a court to temporarily *allow*, not disallow, those disputed claims.   11 U.S.C. § 502(a); FED. R. BANKR. P. 3018(A).   This plainly flawed reading of the Bankruptcy Code and Rules renders the entire *Amarex* opinion suspect.

36.     In another fundamental misreading of the Bankruptcy Code that casts doubt on the validity of the *Amarex* court's overall conclusion, the court claimed that allowing holders of the disputed claims to vote would be more in keeping with the "spirit" of chapter 11. *In re Amarex,* 61 B.R. at 303.     In judging the "spirit" of chapter 11, the court apparently overlooked and did not cite section 1126(a), which expressly limits voting rights to holders of allowed claims.   11 U.S.C. § 1126(a) ("The holder of a claim or interest allowed under section 502 of this title may accept or reject a plan.").   For these reasons, *Amarex* was disapproved by both *Coral Petroleum* and *In re American Solar King*. *In re Am. Solar King*, 90 B.R. at 828 (citing with approval *Coral Petroleum*'s criticism of *Amarex*'s interpretation of Rule 3018, which *Coral Petroleum* alleged was in contravention of the Bankruptcy Code's express language).

37.     One explanation for *Amarex's* flawed reading of the Bankruptcy Code is that the court may have felt pressed to create an extraordinary solution to an extraordinary problem—one that is fundamentally distinguishable from the case at bar.  In *Amarex*, the debtor sought to disenfranchise hundreds of claimants by filing objections to claims on the eve of plan confirmation, and there were no voting procedures in place concerning temporary allowance of those claims for voting on the plan.  *In re Amarex,* 61 B.R. at 303.  Thus, in the absence of any organized procedures and in light of the volume of temporary allowance requests the court was receiving the days immediately before confirmation, the court determined that holding Rule 3018(a) hearings to determine the temporarily allowable amount of each claim before the confirmation hearing would consume nearly all the court's resources on that one case.  *Id.* at 302.  Faced with a unique crisis in the *Amarex* bankruptcy that threatened to bring administration of the case to a near standstill, the court took the extraordinary step of simply allowing all the claims in full for voting purposes.  *Id.* at 303.

38.     According to the CLN Noteholders' logic, this Court should likewise disregard the plain meaning of the Bankruptcy Code in order to temporarily allow the Disputed Claims for voting purposes.  The CLN Noteholders argue that it would be inequitable for them to be excluded from the voting process because the avoidance actions in the MegaClaim Litigation are not fully adjudicated and there is no way they can be adjudicated prior to confirmation.  Setting aside for a moment the fact that this Court is not being called upon to adjudicate hundreds of temporary allowance motions prior to confirmation as was the case in *Amarex,* the possibility that scores of disputed claims being allowed to vote solely because of a lack of judicial resources and time only  underscores the rationale for a strict interpretation of sections 502(d) and 1126(a):

> Envisaging the possibility that the [claimants] . . . could never have a claim against the estate demonstrates the need for disallowance of their claims for voting purposes. Otherwise, the Plan could be defeated by those who never ultimately acquire an economic interest in its outcome.

*In re Coral Petroleum*, 60 B.R. at 383. Indeed, a complete prohibition to voting disputed claims makes sense because otherwise:

> [T]he rights of debtors and the holders of allowable claims could be substantially and irreparably prejudiced . . . The fate of the plan could be left to the will of the holder of a paid, inflated or fabricated claim, while the remaining parties in interest with a legitimate financial stake in the outcome of the balloting would be deprived of a practical remedy.

*In re Orosco*, 77 B.R. 246, 249 (Bankr. N.D. Cal. 1987). Thus, to the extent the CLN Noteholders contend the number of disputed claims is too great for the Court to resolve those disputes prior to confirmation, that contention actually *supports* denial of the Motions because otherwise the Plan's success or failure may be decided by a group of creditors who may ultimately never acquire an interest in the Plan's outcome. *See In re Coral Petroleum,* 60 B.R. at 383.

39.     Nevertheless, the CLN Noteholders' citation to *Amarex* and their proffered fears about the need to adjudicate hundreds of temporary allowance motions prior to confirmation are entirely inappropriate here. In this case, the Debtors sought entry of the Voting Procedures Order to avoid the very results of *Amarex*. Under those voting procedures, creditors are entitled to vote their claims unless the Debtors filed an objection to such claims. Although the Debtors have objected to over 12,000 claims, only 35 claimants filed motions to temporarily allow their claims for voting purposes despite the Debtors' objections. The Debtors have either filed stipulations, negotiated settlements that will be filed with the Court, or anticipate resolving at least 30 of these motions. As of today's date, the Debtors anticipate that except for two or

three creditors – including the CLN Noteholders – the remaining temporary allowance motions will be resolved through settlement.

40.     Therefore, unlike the situation in *Amarex* where the court was flooded with requests to temporarily allow claims for voting purposes, here the Court will be required to conduct at most a few temporary allowance hearings.  *In re Amarex,* 61 B.R. at 303.  Thus, the urgency the *Amarex* court faced that prompted the decision to allow all of the disputed claims for voting purposes is simply not present here. The CLN Noteholders therefore have not established that the *Amarex* case—even if correctly decided, which it is not—provides a precedent that is remotely applicable to the instant case.

41.     The plain language of section 502(d) confirms that creditors who fail to return avoidable preferences should not be entitled to either vote on a proposed chapter 11 plan or receive any distribution to which they might otherwise be entitled.  11 U.S.C. § 502(d). Courts have repeatedly followed this mandate by holding that a creditor holds no claim at all until either the preference action is resolved in its favor, or the preference is disgorged:

> It is undisputed that the [claimants] have not complied with the requirements of section 502(d) of the Bankruptcy Code, which requires that transferees of a preference turn over the preference related funds to the estate in order to have an allowed claim.  These [claimants] deny the debtor's allegations and are vigorously defending them.  Nevertheless  .  .  .  [t]he court concludes that section 502(d) deems the claims disallowed for voting purposes until defendants turn over the funds claimed.

*In re Coral Petroleum*, 60 B.R. at 380; *see also In re Am. Solar King*, 90 B.R. at 828.  The creditor has the choice to retain the transfer until litigation is complete, but only if it is willing to forego its right to vote on any reorganization plans that may be proposed in the meantime.  *In re Coral Petroleum*, 60 B.R. at 383 ("Section 502(d) forces preferential transferees into an economic position consistent with their alleged claim.").  Because Citigroup has chosen to retain

the Yosemite Preferences, the Disputed Claims are disputed and thus ineligible to vote on the Plan as long as the section 502(d) objections are pending. 11 U.S.C. § 502(d), 1126(a). Thus, the Debtors ask that the Court deny the Motions in their entirety.

### (3) Rule 3018(a) Temporary Allowance is Inapplicable Because Debtors Object to the Entirety of the Disputed Claims

42. Even if Rule 3018(a) permits temporary allowance of disputed claims for voting purposes, the Motions should still be denied because that Rule is inapplicable to the Disputed Claims. Because the Debtors' 502(d) objection, if successful, would bar recovery on the Disputed Claims, the CLN Noteholders can identify no undisputed portion of their claims that could be temporarily allowed for voting purposes under Rule 3018(a).

43. A plain reading of Rule 3018(a) shows that it was intended to grant discretion to permit voting in situations where the estate objects to only a portion of a larger claim. *See, e.g., In re Coral Petroleum*, 60 B.R. at 382, 383; *In re Orosco*, 77 B.R. at 251 (declining to temporarily allow claim because the court could not ascertain whether any portion of it was undisputed). Although a plain reading of the Bankruptcy Code bars a claimant from voting any portion of its claim if any part of that claim is subject to a 502(a) objection, courts have used Rule 3018(a) to draw a finer line and temporarily allow the undisputed portion for voting purposes. *See, e.g., In re Orosco*, 77 B.R. at 251 (declining to temporarily allow claim because the court could not identify any portion of it as undisputed). Applied in this manner, Rule 3018(a) helps ensure that the holders of allowed claims—but only holders of allowed claims—will determine the fate of a debtor's chapter 11 plan. Fed. R. Bankr. P.. 3018(a).

44. Here, because the Debtors' section 502(d) objections seek disallowance of the entirety of the Disputed Claims, Rule 3018(a) has no application. Section 502(d) does not state that a claim is disallowed only to the extent that the claimant received voidable preferences.

Rather, section 502(d) simply states that when a creditor is holding a voidable preference, that creditor's entire claims are disallowed – period. 11 U.S.C. § 502(d). Consequently, section 502(d) provides no discretion to allow the Court to split the Disputed Claims into disputed and undisputed portions, nor does it provide discretion for the Court to subtract the amount of the preference from the total claim amount and allow the CLN Noteholders to vote the remainder. *In re Am. Solar King*, 90 B.R. at 828.

45.    The better-reasoned case law is consistent on this point, regardless of whether the claim is subject to a general objection under section 502(a) or a more restrictive section 502(d) objection. For example, in *Am. Solar King*, although the court applied an offset analysis to establish the undisputed value of creditor's claims that was subject to a standard 502(a) objection, the court entirely disallowed a second claim because it was subject to a section 502(d) objection. *In re American Solar King,* 90 B.R. at 828. Similarly, in *Armstrong v. Rushton* (*In re Armstrong*), the Tenth Circuit Court of Appeals held that the claimant bears the burden of proof "to present sufficient evidence that it has a colorable claim capable of temporary evaluation." *Armstrong v. Rushton (In re Armstrong)*, 294 B.R. 344, 354 (B.A.P. 10th Cir. 2003); *see also In re Orosco*, 77 B.R. at 251 (when no portion of a disputed claim can be ascertained as undisputed, the claimant has failed to carry its burden to obtain temporary allowance).

46.    There are generally two ways in which a portion of a claim can be allowed for voting purposes. First, if the parties agree that a certain portion of the claim will be allowed regardless of the outcome of the objection, then the court may exercise its discretion to temporarily allow the creditor's claim in that undisputed amount. *In re Coral Petroleum*, 60 B.R. at 381 (temporarily allowing portion of claim that plan proponent stated was not subject to its objection). Second, if the court itself can ascertain that part of a claim will certainly be

allowed, it may employ Rule 3018(a) to permit voting in an amount the court deems appropriate. *See In re Orosco*, 77 B.R. at 251 (refusing to temporarily allow claim because court could not ascertain what portion of the claim might be undisputed). However, where the debtor's objection goes to the entirety of the claim such that there is no portion of the claim that will clearly be allowed, as is the case with the Debtors' objections to the Disputed Claims, then Rule 3018(a) has no application. *Id.*. To hold otherwise would entirely negate Congress's decision to use the section 502(d) mechanism to force reluctant claimants to repay their preferences. *See*, p. 10, *supra*.

47.    The Debtors' section 502(d) objections to the Disputed Claims seek to disallow the entirety of those claims, thus not leaving any portion that will be certainly allowed. For these reasons, to the extent the Court finds that Rule 3018(a) does grant some discretion to temporarily allow claims for voting purposes in some instances, the Court should nevertheless deny the Motions in their entirety.

### (4)    Transfer of the Disputed Claims to the Yosemite Trusts or the CLN Noteholders Does Not Cleanse Them of the Impact of Citigroup's Receipt of Voidable Preference Payments

48.    The CLN Noteholders suggest the Debtors cannot assert a section 502(d) objection against the Disputed Claims because Citigroup, not the CLN Noteholders, received the Yosemite Preferences. The CLN Noteholders, however, ignore the fact that the Southern District of New York Bankruptcy Court expressly rejected this argument just last year, relying on an Eighth Circuit case that has been standing for more than 100 years. *In re Metiom, Inc.*, 301 B.R. 634, 643 (Bankr. S.D.N.Y. 2003) *citing Swarts v. Siegel*, 117 F. 13, 30 (8th Cir. 1902). In *Metiom*, the debtor objected to a claim pursuant to section 502(d) and sought to prevent that claim from voting because its original holder (the "Transferor") was the recipient of a voidable

preference.  *In re Metiom*, 301 B.R. at 642.  In response, the assignee of that claim (the "Transferee") argued that the  debtor's section 502(d) objection was inapplicable because the Transferor – not the Transferee – actually received the voidable preference.  *Id.*

49.  The *Metiom* court flatly rejected this argument, finding instead that the Transferee of bankruptcy claims takes those claims subject to any objection available to debtors against the Transferor:

> Permitting a claim assignment to destroy a claim defense under section 502(d) in such fashion would be a pernicious result.  The assignment should not, and does not, affect the debtor's rights vis-à-vis the claim.

*Id.*, at 643.  In so holding, the *Metiom* court relied upon the Eighth Circuit's finding that "[t]he disqualification of a claim for allowance created by a preference inheres in and follows every part of the claim, whether retained by the original creditor or transferred to another, until the preference is surrendered."  *Swarts*, 117 F. at 15.

50.  The *Metiom* decision demonstrates that the CLN Noteholders took the Disputed Claims subject to  the Debtors' section 502(d) objections.   Allowing the Disputed Claims to be voted despite the outstanding Yosemite Preferences and other Avoidance Actions, simply because they were transferred to a party who may not have received the benefit of those transfers, would  completely  negate  section  502(d)'s  use  as  a  tool  to  compel  repayment  of avoidable preferences.  *See In re Metiom,* 301 B.R. at 643; *see also* p. 10, *supra*.  The Debtors hold valuable rights to object to the Disputed Claims under section 502(d), and the fact that those claims have been transferred is of no relevance to pursuit of those defenses.  *In re Metiom,* 301 B.R. at 643.  For these reasons, the CLN Noteholders' argument that they took the Disputed Claims free of any section 502(d) objection is without merit.

**(C)    It Would Be Inequitable to Temporarily
Allow the Disputed Claims for Voting
Purposes in these Circumstances**

51.    The CLN Noteholders contend that fundamental fairness requires this Court, as a court of equity, to enter an order allowing them to vote the Disputed Claims despite the fact that the Bankruptcy Code clearly renders those claims ineligible to vote and despite the fact that the Court-appointed Examiner has uncovered significant facts showing that those Disputed Claims are hardly worthy of the Court's equity concerns.  As discussed previously, both the Bankruptcy Code and applicable case law demonstrate that because Citigroup and the Yosemite Trusts have not returned the Yosemite Preferences and other avoidable transfers, the CLN Noteholders are not permitted to vote the Disputed Claims.

52.    The CLN Noteholders argue that the Bankruptcy Court should disregard the clear and unequivocal language of sections 1126(a) and 502(d) because to do otherwise would disenfranchise the votes of significant claim holders based on nothing more than the Debtors' unproven avoidance action claims and allegations in the MegaClaim Litigation. According to this logic, until a final judgment is entered with respect to those claims, the Court should disregard the severity of the allegations entirely and rule in favor of allowing the Disputed Claims to be voted on the Plan.  In so arguing, the CLN Noteholders imply that the Debtors brought their objections to the Disputed Claims for no other purpose other than to deny the CLN Noteholders of an opportunity to vote on the Plan.

53.    However, the Debtors' main concern lies with ensuring that the Disputed Claims – claims which are grounded in deception and the very questionable financial transactions that brought Enron to its knees – are not permitted to dilute the ability of parties with established interests in the estate to cast a meaningful vote in connection with Plan

confirmation. *See In re Coral Petroleum,* 60 B.R. at 383, *In re Orosco,* 77 B.R. at 249. To the extent that the Court desires to fashion an equitable remedy here despite the clear mandates of the Bankruptcy Code concerning voting of claims, equity clearly weighs in favor of ensuring that the CLN Noteholders, who ultimately may have no economic stake in this case, are not permitted to use their suspect claims to overwhelmingly outweigh the voices of the Debtors' other creditors in the Plan confirmation context. *Id.*

54. As previously discussed, the CLN Noteholders acquired the Disputed Claims subject to all objections to those claims. *See* p. 27, *supra.* Thus, although the CLN Noteholders may not have been direct participants in Enron's pre-petition use of the Yosemite Prepays to shield debt from analysts, they are unable to escape the reality that they hold the Disputed Claims subject to those facts. *Id.* In light of the nature and severity of these claims – all of which are substantiated by the Examiner's extensive investigation – it would be extremely inequitable to temporarily allow the Disputed Claims for voting purposes as the CLN Noteholders request. *See In re Coral Petroleum,* 60 B.R. at 383 (the prospect of a plan being defeated by parties who could never hold claims against the estate justifies preventing those claims from voting.) Therefore, to the extent the Court finds that it has discretion under Rule 3018(a) to temporarily allow the Disputed Claims for voting purposes, the Debtors urge the Court to leave that discretion unexercised in order to ensure that the Plan is not "defeated by those who never ultimately acquire an economic interest in its outcome." *Id.*

<u>**CONCLUSION**</u>

WHEREFORE, for all these reasons, the Debtors respectfully request entry of an order denying the Motions in their entirety and granting such other and further relief as is just.

Dated: New York, New York
      March 24, 2004

By: /s/  Martin J. Bienenstock
    Martin J. Bienenstock (MB 3001)
    Brian S. Rosen (BR 0571)
    Melanie Gray (Pro Hac Vice)
    Stephen T. Loden (Pro Hac Vice)
    Weil, Gotshal & Manges LLP
    767 Fifth Avenue
    New York, New York 10153
    Telephone:  (212) 310-8000
    Facsimile:  (212) 310-8007

    ATTORNEYS FOR DEBTORS
    AND DEBTORS IN POSSESSION