Luc A. Despins (LD 5141)
Susheel Kirpalani (SK 8926)
Counsel to the Official Committee of
Unsecured Creditors of Enron Corp., et al.
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------x
                                 :
In re:                           :   Chapter 11
                                 :
ENRON CORP., et al.,             :   Case No. 01-16034 (AJG)
                                 :
              Debtors.           :   Jointly Administered
                                 :
---------------------------------x

**STATEMENT OF OFFICIAL COMMITTEE OF UNSECURED
CREDITORS IN SUPPORT OF CONFIRMATION OF FIFTH
AMENDED JOINT PLAN OF AFFILIATED DEBTORS PURSUANT
TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

The Official Committee of Unsecured Creditors (the ("Creditors' Committee") of Enron Corp. and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby submits this statement in support of the Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan").[1]  In support hereof, the Creditors' Committee respectfully states as follows:

---

[1]  All capitalized terms not otherwise defined herein have the definitions set forth in the Plan.

I.    **PRELIMINARY STATEMENT**

1.    Less than two months after publicly disclosing significant financial losses, Enron Corp. and certain affiliates, forming one of the 10 largest business organizations in this country, filed the chapter 11 petitions that commenced these cases.  Behind the headlines and governmental investigations, the bankruptcy process began in earnest in December 2001 with the goal of maximizing creditor recoveries.  Since that time, the Creditors' Committee has faithfully discharged its duties on behalf of unsecured creditors of all the Debtors' estates.  As the unsecured creditors' fiduciary in the bankruptcy process, the Creditors' Committee has closely monitored and participated in the administration of these cases, investigated critical matters and participated in the formulation of the Plan.

2.    The Plan is premised upon a settlement, rather than litigation, of various inter-Debtor, Debtor-Creditor and inter-Creditor disputes.  The members of the Creditors' Committee unanimously support the Plan.  Such approval was made with the full understanding that a litigated outcome of each of the issues settled in the Plan might differ from the results produced by the global compromise embodied in the Plan.  However, the Creditors' Committee does not believe that litigation is a reasonable and cost effective method of

2

resolving the complex inter-estate issues in these cases. While certain aspects of Enron's unraveling were swift and dramatic, litigation over the issues to be settled in the Plan would be extremely wasteful and detrimental for all parties-in-interest. Accordingly, the Creditors' Committee believes that the resolution of these complex cases pursuant to the Plan is the most efficient and value-maximizing process available.

## II.  **CREDITORS' COMMITTEE APPOINTMENT**

3.  On December 12, 2001, in accordance with section 1102 of the Bankruptcy Code, the United States Trustee for the Southern District of New York (the "Trustee") appointed a statutory committee of unsecured creditors for the Debtors' chapter 11 cases to represent all unsecured creditors of the Debtors. Pursuant to section 1103 of the Bankruptcy Code, the Creditors' Committee has the power to, among other things, investigate the acts, conduct, assets, liabilities, and financial condition of the Debtors, the operation of the Debtors' businesses (including the operations of non-Debtor subsidiaries) and the desirability of continuing such businesses, and numerous other matters relevant to the formulation of one or more chapter 11 plans for the Debtors.

4.  **Creditors' Committee Representation of Unsecured Creditors of All Estates**.  The Creditors' Committee was carefully constituted by the Trustee specifically to ensure that

no single group of creditors (including creditors of particular debtors) would dominate or control the Creditors' Committee. As a result, the Creditors' Committee is a diverse body that includes some of the largest creditors of Enron Corp. ("ENE"), Enron North America Corp. ("ENA") and other Debtors. While some Creditors' Committee members hold claims against multiple Debtors, the Creditors' Committee has included throughout these cases members that hold claims solely (or primarily) against ENA and its subsidiaries. Although members of the Creditors' Committee hold claims against certain Debtors in their individual capacities, in their role as Creditors' Committee members, each member acts as a fiduciary to all unsecured creditors of the Debtors. In fact, when creditors of ENA challenged the adequacy of representation of their interests, the Creditors' Committee members unanimously opposed, and this Court denied such creditors' requests for a separate committee of ENA creditors by finding that the Creditors' Committee was functioning properly and that the Creditors' Committee adequately represented unsecured creditors of ENA. See In re Enron Corp., 279 B.R. 671, 693 (Bankr. S.D.N.Y. 2002) ("there is no question that the ENA creditors are adequately represented on the Creditors' Committee"), aff'd, 02 Civ 6274, 2003 U.S. Dist. LEXIS 18149 (S.D.N.Y. Oct. 9, 2003).

4

### III. CREDITORS' COMMITTEE'S INVESTIGATIONS

5. **Inter-Estate Issues**. The Creditors' Committee has safeguarded the interests of all unsecured creditors of the Debtors from the inception of these cases. In this regard, the Creditors' Committee identified certain inter-estate issues as key matters to address very early in these cases. For example, within the first two weeks of its appointment, the Creditors' Committee negotiated a protocol with the Debtors to escrow proceeds of asset dispositions and contract settlements in an effort to stay the process of asset allocation until due diligence analysis verified which Debtors owned such assets.

6. **Substantive Consolidation Investigation**. In light of the significant inter-estate issues in these cases, the Creditors' Committee exercised its powers early in these cases to investigate whether substantive consolidation of the Debtors' estates would be fair and appropriate to ensure the equitable treatment of all creditors. Due to the complexity and large scale of the Debtors' businesses, the investigation was necessarily protracted and complex. During its investigation, the Creditors' Committee reviewed and considered the Debtors' books and records, public filings, key contracts, and other documents, as well as the facts and legal theories underlying various inter-estate issues. In addition, the Creditors' Committee conducted numerous interviews of current and former

employees, analyzed the relevant legal standards, and evaluated the relationships between certain of the Debtors and their largest creditors.

       7.  **Additional Investigations**.  In addition, the Creditors' Committee employed its investigative powers to analyze various other inter-Debtor, Debtor-Creditor and inter-Creditor relationships.  For example, inter-estate claims were reviewed and remedies such as potential disallowance, subordination and re-characterization were considered.  In addition, the Creditors' Committee analyzed asset ownership disputes over certain claims and causes of action.

       8.  **Consensual Resolution of Investigative Matters Through Settlement**.  The Debtors independently analyzed the issue of substantive consolidation and other key inter-estate issues and coordinated with the Creditors' Committee to discuss and consensually resolve such issues.  After the investigations were completed, both parties reached the conclusion that a compromise of the various inter-estate issues would be far superior to litigation that would likely be very expensive, fractious and time consuming.[2]

---

[2] Summary charts of the Debtors' findings from the substantive consolidation investigations may be found in Appendix "M" to the Disclosure Statement.

### IV. GLOBAL PLAN COMPROMISE

9. Pursuant to the process envisioned by the Court, the Creditors' Committee and the Debtors then shared their framework with the ENA Examiner in connection with his role as a plan facilitator for ENA and it subsidiaries. After addressing certain concerns raised by the ENA Examiner, the Creditors' Committee and the Debtors with the ENA Examiner forged the global compromise embodied in the Plan. The ENA Examiner negotiated significant Plan provisions, and, as a result, the ENA Examiner supported the Plan.

10. **Global Compromise Summary**. As discussed more fully in the Disclosure Statement, there are several components of the global compromise embodied in the Plan; the general provisions include: (i) settlement of the issues of substantive consolidation of the Debtors' estates, (ii) the use of a common currency (referred to in the Plan as Plan Currency) to make distributions under the Plan, (iii) the allowance and treatment of Intercompany Claims and resolution of other inter-estate issues, (iv) the resolution of certain asset ownership disputes between ENE and ENA, (v) the resolution of inter-estate issues regarding rights to certain claims and causes of action, (vi) the treatment of Allowed Guaranty Claims, and (vii) a reduction in the administrative costs post-confirmation (collectively with other provisions in the Plan, the "Global Compromise"). In

01-16034-ajg   Doc 18795   Filed 06/01/04   Entered 06/01/04 13:36:06   Main Document
Pg 8 of 12

connection with the settlement of issues in the Global Compromise, Creditors of the Debtors[3] will receive a distribution equal to the sum of (1) 70% of the distribution such holder would receive if the Debtors were not substantively consolidated, and (2) 30% of the distribution such holder would receive if all of the Debtors' estates were substantively consolidated (the "<u>30/70 Formula</u>").

       11.  **<u>Benefits of the Plan</u>**.  The Creditors' Committee believes that the asset realization strategy and the Global Compromise embodied in the Plan will provide the greatest potential recovery for unsecured creditors of the Debtors as a whole because, among other things, the Plan: (a) maximizes value for Creditors by liquidating the assets of the Debtors or transferring the ownership of certain assets to Creditors, as appropriate, and by providing for the continued prosecution of numerous affirmative causes of action on behalf of the Debtors' estates; (b) resolves the issue of substantive consolidation of the Debtors and substantially all other potential inter-estate disputes without expensive and time-consuming litigation; and (c) facilitates an orderly and expeditious distribution of value to Creditors holding Allowed Claims.  As discussed above, the Creditors' Committee, as a fiduciary for all unsecured creditors

---

[3]    The Global Compromise does not include the debtors Portland General Holdings, Inc. and Portland Transition Company, Inc.

of the Debtors, spent considerable effort to resolve inter-estate issues through the Global Compromise and other Plan terms. As such, the Creditors' Committee's goal was for the Global Compromise to be accepted by the various creditor constituencies as a reasonable non-litigation solution that fairly reflects the risks of litigation, while reducing the duration of these cases and the expenses attendant to protracted disputes.

## V. RESOLUTION OF LEGITIMATE CREDITOR INTERESTS

12. While the Plan has been met with broad support, certain creditors and other parties have objected to the Plan. As demonstrated by the voting results, there is overwhelming creditor support for the Plan. See Affidavit of Jane Sullivan Certifying Tabulation of Acceptances and Rejections of Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, filed May 26, 2004 (Docket No. 18671). Unfortunately, certain creditors disgruntled with issues surrounding allowance of their claims have chosen to disrupt the Plan process in an effort to create leverage. None of the alleged technical deficiencies cited by these parties should stand in the way of distributing billions of dollars of value to holders of Allowed Claims in these cases.

13. **Mutual Concessions Evidence Plan Fairness**. The Global Compromise bridges the gap between diametrically opposed

9

creditor interests.  Perhaps the best indication that the Global Compromise produces fairness is that it does not fully satisfy the demands that have been made, or could have been made, by opposing creditor groups.  Moreover, the Bankruptcy Code and the orders of this Court establish the framework for parties to advocate competing positions, but they do not guarantee complete satisfaction with the resolution.  It is axiomatic that compromises include concessions by all parties.

14.  **Effect of 30/70 Formula is Not One-Sided**.  As discussed in the Disclosure Statement, the 30/70 Formula is not a precise mathematical quantification of the likelihood of substantive consolidation in these cases, but, instead, it is a negotiated resolution of numerous inter-estate issues which provides a fair result, without creditors suffering from the significant expense and time delay that would be caused by protracted inter-estate litigation.

15.  In spite of the ENA Examiner's support for the Plan, certain ENA creditors continue to advocate a separate stand-alone plan for the estate of ENA that does not include the 30/70 Formula.  Their objections appear to be founded on a belief that the 30/70 Formula reduces their recoveries and transfers value to ENE creditors.  This view, however, does not take into account the entire impact of the settlement, including risks particular to ENA and its subsidiaries.  For example,

under the 30% scenario which assumes full consolidation, the risk of yet unresolved claims for alleged energy market manipulation against the estates of ENA or Enron Power Marketing, Inc. ("EPMI") will be shared by all of the Debtors and their respective creditors.  Therefore, this feature of the Plan is actually beneficial to the interests of the creditors opposing the Plan because it mitigates any potential downside for unresolved liabilities that could impair their recoveries.

### VI.    CONCLUSION: THE COURT SHOULD CONFIRM THE PLAN

16.  An overarching principle in chapter 11 cases is that compromises are favored.  Rule 9019(a) of the Bankruptcy Rules provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  A consensual settlement incorporated into a proposed chapter 11 plan should be approved by the Bankruptcy Court under Rule 9019(a) if the settlement is "fair and equitable, reasonable and in the best interests of the debtor's estate."  In re Ionosphere Clubs, Inc., 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994); see Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (finding that compromises are "a normal part of the process of negotiation" and must be "fair and equitable").

17. To approve a settlement, the "responsibility of the bankruptcy judge . . . is not to decide the numerous questions of law and fact . . . but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness'." <u>Cosoff v. Rodman (In re W.T. Grant Co.)</u>, 699 F.2d 599, 608 (2d Cir. 1983)(citation omitted). Thus, this Court must make an independent determination to approve the settlement. <u>See</u> <u>Nellis v. Shugrue</u>, 165 B.R. 115, 122 (S.D.N.Y. 1994). The estate fiduciaries will present evidence and arguments in support of the Global Compromise that is sufficient for the Court to make such determination. For the reasons stated above, the Creditors' Committee requests that the Court confirm the Plan, including the Global Compromise contained therein.

Dated:   New York, New York
         June 1, 2004

                                    MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP

                                    By:   /s/ Luc A. Despins
                                    Luc A. Despins (LD 5141)
                                    Susheel Kirpalani (SK 8926)
                                    1 Chase Manhattan Plaza
                                    New York, New York 10005
                                    (212) 530-5000

                                    Counsel to the Official Committee
                                    of Unsecured Creditors of Enron
                                    Corp., <u>et</u> <u>al.</u>