UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾x

In re ENRON CREDITORS RECOVERY CORP.                    01 Br. 16034 (AJG)
F/k/a/ Enron Corporation, et al.,

       Debtors,

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾x

JPMORGAN CHASE BANK N.A., CREDIT
SUISSE FIRST BOSTON, DEUTSCHEBANK
TRUST COMPANY AMERICAS, FARALLON                        07 Civ. 7757 (CM)
CAPITAL MANAGEMENT, LLC, KING STREET                    07 Civ. 7941 (CM)
CAPITAL L.P., REDWOOD PARTNERS, SILVER
POINT CAPITAL L.P.,

       Appellants,

       -against-

THE BAUPOST GROUP, LLC., ABRAMS CAPITAL,
LLC, ENRON CREDITORS RECOVERY CORP.,
f/k/a Enron Corp., et al.,

       Appellees,

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __1/15/08__

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾x

DECISION AND ORDER AFFIRMING IN PART AND REVERSING
IN PART THE DECISION OF THE BANKRUPTCY COURT

McMahon, J.:

      Before the court are consolidated appeals from a decision and order of the United States

Bankruptcy Court for the Southern District of New York (Gonzalez, J.) entered in the bankruptcy

proceeding of the now-infamous Enron Corporation and its affiliates. In connection with a

challenge mounted by appellees The Baupost Group, LLC and Abrams Capital, LLC

("Baupost/Abrams") to the Amended Schedule S filed by Debtors, Judge Gonzalez held (in

pertinent part) that two sets of claims – the so-called Cherokee Claim and the so-called EFP Claim – did not fall under the definition of "Senior Indebtedness" and so were not entitled to the benefits of subordination under three of Enron's indentures— the two so-called TOPRS Indentures and the 1987 Indenture. Appellants are lenders (individually under Docket No. 07 Civ. 7941, and represented by their agent, JPMorgan Chase Bank N.A. ("JPMC"), under Docket No. 07 Civ. 7757) whose loans were deemed subordinated by virtue of the Bankruptcy Court's decision; they challenge his interpretation of the definition of "Senior Indebtedness" under both indentures.

For the reasons below, this court affirms the Bankruptcy Court's determination insofar as it concerns the 1987 Indenture but reverses its conclusion with regard to the TOPRS Indentures.

## Statement of Facts

At the time of its chapter 11 filing, Enron had approximately $1 billion in debt outstanding under multiple Subordinated Indentures. For purposes of these appeals, however, the only indentures that are relevant are the TOPRS Indentures and the 1987 Indenture.

### The TOPRS Indentures

Enron issued two series of 7.75% Subordinated Debentures due 2016 under two indentures, the first dated November 21, 1996, and the second dated January 16, 1997 (collectively the "TOPRS Indentures"). (AA Tabs 5 and 6.)[1] Article 11 of each of the TOPRS Indentures sets forth their subordination provisions. Under Section 1101, the holders of TOPRS subordinated debt expressly agree that their right to payment is subordinate to the right of holders of "Senior Indebtedness" to

---

[1] "AA" refers to the Appellants' Appendix (No. 07-7757, Dkt. #6 & 7; No. 07-7941. Dkt. #5 & 6).

2

be paid in full in cash or cash equivalents:

> The Company covenants and agrees, and each Holder of a Security, by his acceptance thereof, likewise covenants and agrees, that, notwithstanding anything to the contrary contained herein, to the extent and in the manner hereinafter set forth in this Article, the indebtedness represented by the Securities and the payment of the principal of and premium, if any, and interest on each and all of the Securities are hereby expressly made subordinate and subject in right of payment to the prior payment in full in cash or cash equivalents of all Senior Indebtedness (including any interest accruing after the occurrence of an Event of Default under Section 501(4) or (5)).

(AA Tabs 5 and 6 at 43.)

The TOPRS Indentures define "Senior Indebtedness" to include (i) "all indebtedness of

[Enron] . . . evidenced by notes, debentures, bonds or other securities sold by [Enron] for money

borrowed" and (ii) "all indebtedness of others of the kind described [above that are] assumed or

guaranteed in any manner by [Enron]." (AA Tabs 5 and 6 at 6.)

**The 1987 Indenture**

Pursuant to an indenture, dated February 1, 1987 (the "1987 Indenture"), Enron issued the

8.25% Senior Subordinated Debentures due 2012 and the 6.75% Senior Subordinated Debentures

due 2005. (AA Tab 7.) Sections 1301 and 1302(a) of the 1987 Indenture state, in relevant part,

that payment on the debentures is subordinated to the prior payment in full of all Senior

Indebtedness:

> Section 1301. *Securities Subordinated to Senior Indebtedness.*
>
> The Company agrees, and each Holder of the Securities by his or her acceptance thereof likewise agrees, that the payment of all Obligations on the Securities is subordinated, to the extent and in the manner provided in this Article, to the prior payment in full of all Senior Indebtedness . . . .

3

Section 1302. *Company Not to Make Payments with Respect to Securities in Certain Circumstances.*

(a) Upon the maturity of any Senior Indebtedness by lapse of time, acceleration (unless waived) or otherwise . . . , all Senior Indebtedness then due and owing shall first be paid in full, or such payment duly provided for in cash or in a manner satisfactory to all of the holders of such Senior Indebtedness, before any payment is made on account of any Obligations on the Securities . . . .

(b) Upon the happening of any default in payment of any Senior Indebtedness, then, unless and until such default shall have been cured or waived or shall have ceased to exist, no payment shall be made by the company with respect to any Obligations on the Securities.

(AA Tab 7 at 78-79.)

The 1987 Indenture defines "Senior Indebtedness" as:

the principal of, and premium, if any, and interest on, any indebtedness of the Company (other than the Securities and any Exchangeable Subordinated Debentures issued and to be issued pursuant to the indenture, dated as of June 1, 1983 . . .) outstanding at any time . . . except indebtedness which by its terms is not superior in right of payment to the Securities.

(AA Tab 7 at 8.) The definition, however, expressly excludes "indebtedness of the Company to a

Subsidiary for money borrowed or advanced from such Subsidiary." (Id.) The 1987 Indenture,

in turn, defines "Subsidiary" as:

a corporation all of the voting shares (that is, shares entitled to vote for the election of directors, but excluding shares entitled so to vote only upon the happening of some contingency unless such contingency shall have occurred) of which shall be owned by the Company or by one or more Subsidiaries or by the Company and one or more Subsidiaries.

(AA Tab 7 at 9.)

4

**Appellants' Relevant Schedule S Claims**

The appellants hold claims against Enron arising from certain transactions with Enron, Enron North America Corp. ("ENA") and Enron Power Marketing, Inc. ("EPMI") that are typically referred to collectively as the Choctaw/Zephyrus Transactions.

As set forth in detail in Proof of Claim No. 11132 (the "Cherokee Claim"), which was filed against Enron by JPMC in the name of Cherokee V.O.F. ("Cherokee"), as part of the Choctaw transactions, ENA issued a promissory note, dated November 1, 2001, to Cherokee in the amount of up to $820 million, plus interest. (AA Tab 12 at 4.) Enron guaranteed to Cherokee all of ENA's obligations under the promissory note. (Id.)

Under the terms of a settlement approved by the Bankruptcy Court on or about May 28, 2004 (the "Choctaw/Zephyrus Settlement"), the Cherokee Claim was allowed against Enron in the amount of $796.5 million and assigned by Cherokee to JPMC as agent for the Choctaw lenders. (AA Tab 14 at 10.)

As set forth in detail in Proof of Claim No. 11126 (the "EFP Claims"), which was filed against Enron by JPMC in the name of Enron Finance Partners, LLC ("EFP"), as part of the Zephyrus transactions, ENA issued a promissory note, dated November 1, 2001, in favor of EFP in an amount of up to $508 million, plus interest (the "ENA/EFP Note"). (AA Tab 9 at 5.) Enron guaranteed to EFP all of ENA's obligations under the ENA/EFP Note. (Id.) In addition, Enron issued a promissory note, dated as of November 21, 2000 (the "ECIC Demand Note"), in the amount of $125 million, to Enron Capital Investments Corp. ("ECIC"), which ECIC then assigned to EFP. (Id. at 4.)

As of the Petition Date, Enron and certain of its affiliates owned EFP's Class A and Class

B equity interests while Zephyrus Investments, LLC ("Zephyrus"), an entity wholly unrelated to Enron, owned of all of EFP's Class C interests. (AA Tab 13 at 9-10.) Under the Third Amended and Restated Limited Liability Agreement of Enron Finance Partners, LLC (the "EFP Agreement"), management of EFP was ordinarily within the control of the Class A holders. (AA Tab 8 at 47.) However, upon the occurrence of a "Specified Event," the Class C holders were authorized to appoint two directors to a three member board of directors entitled to manage EFP. (Id.) It is not disputed that certain downgrades of Enron's credit ratings before the Petition Date constituted such a Specified Event and gave Zephyrus, as the Class C holder, voting control of EFP. In re Enron Creditors Recovery Corp., 370 B.R. 64, 76 (Bankr. S.D.N.Y. 2007).

Under the terms of the Choctaw/Zephyrus Settlement, the EFP Claims were allowed against Enron in the aggregate amount of $415.5 million, and were assigned by EFP to JPMC as agent for the Zephyrus Lenders. (AA Tab 14 at 10-11.)

**The Composition of Schedule S and the Resulting Litigation**

On December 2, 2001 and periodically thereafter, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the Bankruptcy Court.

The Debtors filed their Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors (the "Plan"), which was confirmed by the Bankruptcy Court by order dated July 15, 2004 (the "Confirmation Order"). As required by Section 510(a) of the Bankruptcy Code, the Plan enforces the terms of the subordination agreements contained in, among others, the TOPRS Indentures and the 1987 Indenture. 11 U.S.C. § 510(a). Accordingly, Sections 8.1 and 9.1 of the Plan provide that the distributions that would otherwise be made to holders of subordinated debt

6

will be made instead to holders of "Senior Indebtedness," as defined in the Subordinated Indentures (and excerpted in Exhibit L to the Plan). (AA Tab 16.)

Pursuant to the Plan and the Confirmation Order, before making initial distributions under the Plan, the Debtors were required to analyze the Subordinated Indentures and file a final Schedule S identifying the categories of claims qualifying as "Senior Indebtedness" under each Subordinated Indenture. (AA Tab 17 at ¶ 74.) Subsequently, the Bankruptcy Court gave the Debtors until August 1, 2005 to file any modifications or amendments to Schedule S. (AA Tab 18.)

By notice of presentment, dated July 29, 2005, the Debtors submitted a form of order attaching an amended Schedule S ("Amended Schedule S") for approval by the Bankruptcy Court. (AA Tab 19.) Amended Schedule S identified the Cherokee Claim and the EFP Claims as "Senior Indebtedness" entitled to the benefits of subordination under the TOPRS Indentures and 1987 Indenture (as well as other Subordinated Indentures not relevant here).

The only objection to Amended Schedule S was filed by appellees Baupost/Abrams, who were also holders of other senior claims listed on Amended Schedule S. (AA Tab 20.) Baupost/Abrams objected to the inclusion of certain specific claims on Amended Schedule S, including the Cherokee and EFP Claims, which Baupost/Abrams incorrectly described as "intercompany" claims. (AA Tab 20 at 10.)

**The Bankruptcy Court's Decision**

The Baupost/Abrams Objection was litigated in the Bankruptcy Court, and on May 29, 2007, the Bankruptcy Court issued the Opinion granting the Baupost/Abrams Objection in part and denying it in part. With respect to the issues relevant to this appeal, the Bankruptcy Court

7

concluded that the Cherokee and EFP Claims were not entitled to the benefits of subordination under the TOPRS Indentures. The TOPRS Indentures, it noted, defined "Senior Indebtedness," as "all indebtedness of [Enron] . . . evidenced by notes, debentures, bonds or other securities sold by [Enron] for money borrowed" as well as indebtedness of others of a similar kind that are assumed or guaranteed in any manner by Enron. Enron, 370 B.R. at 77-78. Interpreting this definition, the Bankruptcy Court held that the noun "notes" was modified by the last clause of the sentence, "sold for money borrowed." Id. at 79. Thus, under the Bankruptcy Court's construction, to constitute "Senior Indebtedness," "notes" evidencing Enron's indebtedness (and the guarantee claims backed by such notes) must have been "sold," rather than issued, "for money borrowed." Id. Because the Bankruptcy Court concluded that the promissory notes underlying the Cherokee and EFP Claims were not "sold for money borrowed," it held that those claims were not "Senior Indebtedness" and therefore not entitled to the benefits of subordination under the TOPRS Indentures. Id. at 80.

In reaching this conclusion concerning the definition of "Senior Indebtedness" under the TOPRS Indentures, the Bankruptcy Court expressly declined to apply a rule of contract construction called the "rule of the last antecedent," under which, the appellants argued, the clause "sold for money borrowed" would apply only to the antecedent immediately preceding it in the definition (i.e., "securities") and not to all other nouns in the sentence. Id. at 78. Although the Bankruptcy Court conceded that the appellants' "application of the last antecedent rule is consistent with the [Bankruptcy] Court's view of the rule," it nonetheless concluded that the rule was not applicable to the TOPRS Indentures because the word "other" preceded the word "securities" in the definitional phrase. Id. at 78-79.

The Bankruptcy Court recognized that the construction it adopted – that to qualify as "Senior Indebtedness," "notes" had to be "sold for money borrowed" – was unusual. Id. at 80-81. Indeed, the Bankruptcy Court acknowledged that its interpretation would exclude virtually all bank debt and other debt that is "issued" from the definition of "Senior Indebtedness" under the TOPRS Indentures— a result it acknowledged was not common, id. at 80-81 & n.8, and one that no party-in-interest had ever suggested.

The Bankruptcy Court also held that the EFP Claims were not entitled to the benefits of subordination under the 1987 Indenture. Id. at 72-77. The 1987 Indenture, it held, expressly excludes from the definition of "Senior Indebtedness" "indebtedness of [Enron] to a Subsidiary for money borrowed or advanced from such Subsidiary." Id. at 73. Under the 1987 Indenture, a "Subsidiary" is defined as a "corporation" all of whose voting shares are owned directly or indirectly by Enron and/or its affiliates. Id. at 74. Although Enron, as a Class A member of EFP, generally had the right to appoint and remove directors, upon a default, the Class C interests – which were held by Zephyrus (an entity controlled by JPMC and not Enron) – became entitled to appoint or remove a majority of the board of directors. Id. at 76. Accordingly, the Bankruptcy Court found that, as a result of certain downgrades of Enron's credit ratings in 2001, EFP was not a "Subsidiary" on the Petition Date. Id. However, the Choctaw/Zephyrus Settlement in May 2004 resulted in the redemption and cancellation of the Class C shares and a termination of Class C voting rights. Id. This transaction left Enron and its affiliates with all of the voting power in EFP and so rendered EFP a Subsidiary of Enron for purposes of the 1987 Indenture as of May 2004. Id. at 77. The Bankruptcy Court specifically and emphatically rejected the appellants' contention that EFP, which was organized as a limited liability company, did not qualify as a

9

"corporation" for purposes of the definition of "Subsidiary" under the 1987 Indenture. Id. at 74-75.

The Bankruptcy Court next held that the relevant date upon which to determine the status of an entity as a "Subsidiary" was the date the subordination obligation of the subordinated debtholders to the senior creditors arose. Id. at 77. The Bankruptcy Court concluded that the subordination obligations under the 1987 Indenture arose at the time of distribution, because that was the moment when the subordinated noteholders would have received the money owed to them but for the subordination provisions. Id. The effective date of the Plan was the earliest date at which distributions could be made to creditors. Id. Since EFP qualified as a "subsidiary" of Enron on that date, the EFP Claim was not entitled to the benefits of subordination.

**The Motion for Clarification and the Order Further Amending Schedule S**

Shortly after the Bankruptcy Court issued its Opinion, the Reorganized Debtors filed a motion seeking clarification of that Opinion. (AA Tab 22.) Because the Bankruptcy Court's interpretation of "Senior Indebtedness" arguably excluded from the definition of Senior Indebtedness under the TOPRS Indenture essentially *all* debt issued under bank credit agreements, *see* Enron, 370 B.R. at 81 n.8, the Reorganized Debtors asked Judge Gonzalez to clarify whether he intended his Opinion to apply to claims that were not the subject of the Baupost/Abrams Objection (AA Tab 22 at 4-5). The Bankruptcy Court clarified that because no party-in-interest had objected to the inclusion of such claims on Amended Schedule S, the Opinion would reach only those claims specifically objected to in the Baupost/Abrams Objection. (AA Tab 23.)

On July 24, 2007, the Court entered the Order, which sustained in part and overruled in

10

part the Baupost/Abrams Objection, and attached a final Schedule S (the "Second Amended Schedule S"), subject only to this Appeal. (AA Tab 1.)

On August 3, 2007, JPMC (as agent on behalf of the Choctaw and Zephyrus lenders) filed a timely notice of appeal from the Order which was docketed in this Court as Case No. 07-7757. (AA Tab 3.) On August 13, 2007, the Choctaw/Zephyrus Appellants also timely filed a notice of appeal from the Order which was docketed as Case No. 07-7941. (AA Tab 4.) The two appeals are collectively referred to herein as the "Appeal."

## Conclusions

Section 510(a) of the Bankruptcy Code, 11 U.S.C. § 510(a), provides that a "subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." The learned Bankruptcy Judge's Opinion includes an extended discussion of the legal standard for construing subordination clauses; it is not necessary for this court to reiterate those settled legal principles here. Suffice it to say that this court agrees that the subordination clauses here at issue are unambiguous on their face, and that the words contained therein should be given their plain, ordinary and usual meaning. Under that standard, the Bankruptcy Court's decision with respect to the relative rights of the EFP Claims under the 1987 Indenture should stand, while the decision with respect to the relative rights of the Cherokee and EFP Claims under the TOPRS Indentures should be reversed.

### The 1987 Indenture

Appellants challenge two aspects of Judge Gonzalez's ruling that the EFP Claims were not "Senior Indebtedness" within the meaning of the 1987 Indenture, and so should not appear on

11

Debtor's Amended Schedule S or enjoy the benefits of subordination, because they were claims held by an Enron "Subsidiary." They object to his conclusion that EFP, as a limited liability company, could qualify as a "Subsidiary" of Enron, and to his conclusion that the relevant date for determining whether EFP was in fact an Enron "Subsidiary" is the Effective Date of the Plan. Both of the learned Bankruptcy Judge's rulings were correct.

### *Is EFP a "Corporation" within the meaning of the 1987 Indenture?*

EFP is a limited liability company. Appellants argue that the EFP Claims were not held by an Enron "Subsidiary" because limited liability companies are not "corporations" as that term is defined in the 1987 Indenture, and so cannot be "subsidiaries" of Enron. Judge Gonzalez rejected this argument. This court does as well.

The 1987 Indenture defines the word "corporation" to include, not only duly incorporated entities, but also other types of entities that share certain characteristics with corporations, such as "voluntary associations, joint stock companies and business trusts." (AA Tab 4 at 3.) Judge Gonzalez correctly concluded that, by defining the term "corporation" to *include* entities that shared certain attributes with corporations, the drafters of the 1987 Indenture intended (1) that the term "corporation" reach more broadly than its literal definition (which extends only to incorporated entities), and (2) that the term not be limited to the specific types of entities listed in the Indenture (i.e., not limited to voluntary associations, joint stock companies and business trusts). Enron, 370 B.R. at 74-76. After analyzing the characteristics of corporations, voluntary associations, joint stock companies, business trusts and limited liability companies, the Bankruptcy Court determined that limited liability companies ought to be encompassed within

12

the term "corporation" as used in the 1987 Indenture, because an LLC shared the key "corporate" attributes of the other entities. Id. at 75-76.

The learned Bankruptcy Judge was correct in concluding that limited liability companies have the sort of attributes of corporations that makes them "corporations" for purposes of the Indenture. An LLC combines the limitation on liability available to shareholders of a corporation with the pass-through income taxation available to the partners of a general or limited partnership. 16 N.Y. Jur. 2d Business Relationships § 1995 (2007). LLCs enjoy "the attributes of a voluntary association with corporate limited liability protection." Monte Carlo, LLC v. Yorro, 195 Misc. 2d 762 (N.Y. Dist. Ct. Nassau Co. 2002). Since both corporations and voluntary associations are specifically listed among the business structures that qualify as "corporations" for purposes of the 1987 Indenture, it follows that a limited liability company – which combines the most attractive features of both corporations and voluntary associations – should be deemed a "corporation" under the Indenture.

The fact that a limited liability company has features of a partnership does not disqualify it from being deemed a "corporation" under the Indenture, as appellants contend. The most salient partnership features of an LLC – lack of incorporated status and pass-through income taxation – are also characteristics of some voluntary associations, as well as joint stock companies and business trusts. Nonetheless, all of those business structures are included in the Indenture's definition of "corporation." Moreover, the feature that an LLC shares with a corporation – a limitation on personal liability – is the single most important characteristic of a corporation. The fact that LLCs limit the liability of members/principals makes it far more closely analogous to a corporation than to a partnership, whose members ordinarily do not enjoy

13

limited liability.

Both Judge Gonzalez and appellees have a ready answer for why limited liability companies were not listed along with the other business structures that were included as "corporations" for purposes of the Indenture. At the time the Indenture was drafted, limited liability companies did not exist. Texas law governs the interpretation of the 1987 Indenture, and Texas did not recognize limited liability companies until 1991— four years after the 1987 Indenture was drafted. TEX. REV. CIV. STAT. ANN. art. 1528n (Vernon 1992). The learned Bankruptcy Judge mistakenly alluded to New York law in his opinion, rather than to Texas law, but he correctly observed that New York's Legislature did not adopt legislation permitting limited liability companies to exist under the laws of this State until 1994. *See* Enron, 370 B.R. at 75 n.3; 16 N.Y. Jur. 2d Business Relationships § 1994 (2007). Thus, the fact that limited liability companies are not specifically listed among the enterprises with corporate attributes that can qualify as "corporations" is perfectly understandable.

I therefore conclude that Judge Gonzalez was correct on this point; the fact that EFP was a limited liability company did not disqualify it from being an Enron "Subsidiary." Therefore, EFP was a "Subsidiary" of Enron within the meaning of the 1987 Indenture at any time when Enron had the voting power to elect EFP's directors.

In that regard, all parties agree on the following facts: Originally, Enron, as holder of EFP's Class A shares, had the power to control the company's board of directors. Shortly before Enron filed its petition under Chapter 11, its credit rating was downgraded. Pursuant to Section 7.01 under the Third Amended and Restated Limited Liability Company Agreement of EFP, upon the occurrence of a "Specified Event" – including the downgrading of Enron's credit rating

14

– Zephyrus, as holder of EFP's Class C stock, would acquire the right to elect two of EFP's three directors. Therefore, as of the moment Enron's credit rating was downgraded, Enron no longer controlled the Board of EFP and EFP ceased to be a "Subsidiary" of Enron within the meaning of the 1987 Indenture. That situation persisted until Judge Gonzalez approved the Choctaw/Zephyrus Settlement, which resulted in the redemption and cancellation of the Class C voting shares and the extinguishment of all the rights and obligations of the Class C shareholders. At that point, board members appointed by Zephyrus were deemed to have resigned, Enron regained power to elect the Board, and EFP once again became a "Subsidiary" of Enron within the meaning of the 1987 Indenture. The Choctaw/Zephyrus Settlement and the redemption of Zephyrus' membership interest in EFP occurred in May 2004, shortly before the July 15, 2004 Effective Date of the Plan. (AA Tabs 13-15, 17.)

Because EFP's status as a subsidiary of Enron shifted over time, the determination of whether the EFP Claims are Senior Debt – or whether they are indebtedness held by an Enron "Subsidiary," and therefore subordinated debt – is entirely a function of the date on which EFP's status as a subsidiary becomes relevant.

### *What is the relevant date for determining EFP's subsidiary status?*

Appellants argue that the relevant date was the date when Enron originally defaulted on its payments of the ENA Note and the ECIC Demand Note. On that date, they argue, subordination obligations arose under Sections 1302(a) and (b) of the 1987 Indenture, which provide (in relevant part):

> (a) Upon the maturity of any Senior Indebtedness by lapse of time,
> acceleration (unless waived) or otherwise . . . , all Senior

15

> Indebtedness then due and owing shall first be paid in full, or such
> payment duly provided for in cash or in a manner satisfactory to all
> of the holders of such Senior Indebtedness, before any payment is
> made on account of any Obligations on the Securities . . . .
>
> (b) Upon the happening of any default in payment of any Senior
> Indebtedness, then, unless and until such default shall have been
> cured or waived or shall have ceased to exist, no payment shall be
> made by the company with respect to any Obligations on the
> Securities [i.e., the Securities issued pursuant to the 1987
> Indenture].

(AA Tab 7 at 79.) When the payment default occurred, which was shortly before and on the
Petition Date (December 2, 2001), Zephyrus (an entity controlled by JPMC and not Enron) was
in control of EFP's Board, so EFP was not a "Subsidiary" of Enron within the meaning of the
1987 Indenture. Thus, if appellants were correct about the relevant date, the EFP Claims would
be senior debt, entitled to the benefits of subordination.

Appellees concede that, as of the date when Enron defaulted in the payment of its Senior
Debt, Enron's obligation to pay on the securities issued pursuant to the 1987 Indenture was
subordinated to its obligation to pay its Senior Indebtedness. At oral argument, appellees
conceded that at no time prior to the Effective Date of the Plan did Enron cure the default that
initially triggered the subordination rights conferred by Sections 1302 (a) and (b).

Nonetheless, appellees argue that the relevant date for determining EFP's "Subsidiary"
status is the Effective Date of the Plan, which is the date on which the rights to payment pursuant
to Enron's Plan of Reorganization were fixed. They contend that Section 1303 of the 1987
Indenture – not Section 1302 – governs subordination rights in the event of Enron's
reorganization in bankruptcy, and that under Texas contract law, this specific provision relating
to bankruptcy trumps the general provision relating to subordination rights outside of bankruptcy.

16

Section 1303 of the 1987 Indenture provides as follows:

> Upon any distribution of assets of the Company in any . . . reorganization
> for the benefit of creditors of the Company (whether in bankruptcy,
> insolvency or receivership proceedings . . . or otherwise):
>
>> (a) the holders of all Senior Indebtedness shall first be entitled
>> to receive payments in full of all Senior Indebtedness (including
>> without limitation interest accruing after the commencement of
>> any such proceeding . . .) in cash or in a manner satisfactory to
>> all of its holders before the Holders of the Securities [issued
>> pursuant to the 1987 Indenture] are entitled to receive any
>> payment on account of any Obligations on the Securities;
>
>> (b) any payment or distribution of assets of the Company of any
>> kind or character . . . to which the Holders of the Securities or
>> the Trustee on behalf of the Holders of the Securities would be
>> entitled except for the provisions of this Article Thirteen . . . shall
>> be paid by the liquidating trustee or agent or other person making
>> such payment or distribution directly to the holders of the Senior
>> Indebtedness or their representative . . . to the extent necessary to
>> make payment in full of all Senior Indebtedness remaining
>> unpaid . . . .

Judge Gonzalez concluded that the appellees' argument was correct because:

> Pursuant to the 1987 Indenture, the subordinated noteholders are
> obligated to allow any distributions that they otherwise would have
> been entitled to receive from Enron to be paid to the holders of Senior
> Indebtedness until the latter are paid in full. Thus, the obligation of the
> subordinated noteholders to the senior creditors arises when they are
> entitled to receive payment, it is at that time that they are obligated, under
> the Indenture, to forgo receipt of any payments in favor of the holders of
> the Senior Indebtedness. The effective date of the Plan was the earliest date
> at which distributions could be made to creditors and, therefore, the Court
> will determine whether a company was a Subsidiary as of that date.

Enron, 370 B.R. at 77.

Judge Gonzalez did not specifically mention Section 1303 in his decision, but it is clear

from his ruling that he found it to be the controlling provision. Again, I agree with his

conclusion.

As appellees point out, Texas contract law honors the maxim that, when a contract contains both a general and a specific provision dealing with the same subject (in this case, subordination of debt), the specific provision controls the general. San Antonio v. Heath & Stich, Inc., 567 S.W. 2d 56, 60 (Tex. App. 1978) (citing authorities); *see also* Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 133-34 (Tex. 1994). Had Enron not gone into bankruptcy, the relevant date for determining EFP's status as a "Subsidiary" within the meaning of the 1987 Indenture would indeed be the date of its original default, because as of that date, Enron was commanded not to pay out on the Securities, pursuant to Section 1302(b), unless and until it cured the default. It is undisputed that Enron never cured the default. However, Enron did go into bankruptcy. At that point, the general Section 1302 of the Indenture ("Company Not to Make Payments with Respect to Securities in Certain Circumstances") necessarily took a back seat to the more specific Section 1303 ("Securities Subordinated to Prior Payment or All Senior Indebtedness on Dissolution, Liquidation or Reorganization for the Benefit of Creditors of the Company").

Appellants argue that Section 1302(b) ought to be the controlling provision of the 1987 Indenture because the subordination rights created by Section 1302(b) were never extinguished by Enron's curing the payment default. However, this misconstrues the relationship between Section 1302(b) and the operation of the bankruptcy laws. Once Enron filed its petition under Chapter 11, it lost the ability to cure its default. It was forbidden to make *any* payment to *any* creditor without the approval of the Bankruptcy Court and constrained from preferring particular creditors over others. So from the moment the Petition was filed, Section 1302(b)'s bar on Enron's making payments (which is all Section 1302(b) does - it bars Enron from making

payments to holders of notes under the 1987 Indenture) was effectively superseded by federal bankruptcy law's bar on making any payments whatever to creditors. Section 1303, which was included in the terms of the Indenture to deal specifically with subordination rights in the context of distributions during reorganization, spells out the subordination rights applicable to those distributions. Therefore, the relevant date for assessing the "Subsidiary" status of EFP is the distribution date under Enron's Plan of Reorganization – which, for our purposes, falls on the Effective Date of the Plan. On that date, as explained above, EFP was once again an Enron "Subsidiary."

The Bankruptcy Court's conclusion that the EFP Claims constitute indebtedness of Enron held by a Subsidiary of Enron, and so cannot qualify as "Senior Indebtedness" under the 1987 Indenture, is affirmed.

**The TOPRS Indentures**

I cannot reach the same result in the case of the TOPRS Indentures. Here, the learned Bankruptcy Judge failed to interpret the relevant and unambiguous language of the Indentures in accordance with their plain meaning under settled rules of English grammar.

The relevant language of the TOPRS Indentures is the phrase "all indebtedness of [Enron] . . . evidenced by notes, debentures, bonds or other securities sold by [Enron] for money borrowed," which appears in the definitions of "Senior Indebtedness." (AA Tabs 5 & 6, at 6.)

There exists a common rule of English grammar known as the "rule of the last antecedent." The rule provides that, where no contrary intention appears, a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately

follows. 2A NORMAN J. SINGER, SUTHERLAND STATUTES & STATUTORY CONSTRUCTION § 47:33

(7th ed. 2007). As no less a grammarian than Justice Scalia recognized in Barnhart v. Thomas,

540 U.S. 20, 26 (2003), the rule of the last antecedent is not an absolute; it can be overcome by

indicia of contrary intent. However, in line with the maxim that contract language is to be

interpreted pursuant to the plain, ordinary and usual meaning of the words used, Hong Kong

Export Credit, Inc., v. Dun & Bradstreet, 414 F. Supp. 153, 158 (S.D.N.Y. 1975), a court should

apply settled rules of grammatical construction unless it clearly appears that the parties intended

otherwise.

Applying the rule of the last antecedent, the limiting clause "sold by [Enron] for money

borrowed" modifies only the immediately preceding phrase "other securities." Put otherwise, if

the rule applies, then the definition of Senior Indebtedness is "all indebtedness of [Enron]" that is

evidenced by:

> (1) notes
> (2) debentures
> (3) bonds
> (4) any other securities that were sold by [Enron] for money borrowed.

The Bankruptcy Court recognized that this was the ordinary, grammatical way to construe

the phrase. Enron, 370 B.R. at 78. However, Judge Gonzalez concluded that because the phrase

reads "notes, debentures, bonds or *other* securities sold by [Enron] for money borrowed," the rule

of the last antecedent did not apply to the TOPRS Indentures, and the limiting clause "sold by

[Enron] for money borrowed" modified not only "other securities" but also "notes, debentures

[and] bonds." He ruled:

> The use of the term 'other' indicates that what follows "other" is a
> more general term that includes the preceding specific items. Thus,

> the terms notes, debentures and bonds are other types of securities.
> Were the term "other" omitted, then the modifier, as applied solely
> to securities, would not relate to the previous items. However,
> because the type of securities that are similar to the previous
> enumerated items are "securities sold for money borrowed," the
> Court concludes, based upon the inclusion of the word "other"
> preceding the term "securities sold for money borrowed," that the
> item that follows "other" is similar to the items that precede it.
> Therefore, notes, debentures and bonds [within the meaning of the
> TOPRS Indentures] are securities that are sold for money
> borrowed. The enumerated terms notes, debentures and bonds are
> subsets of the set "securities sold for money borrowed."

Enron, 370 B.R. at 78-79 (citing Texas Sav. & Community Bankers Ass'n v. Federal Housing

Finance Bd., 1998 WL 842181 at *6 (W.D. Tex. June 25, 1998)).

A construction requiring that the notes evidencing Enron's indebtedness had to be "sold"

to qualify as Senior Indebtedness arguably removed the Cherokee and EFP Claims from the

ambit of "Senior Indebtedness" within the meaning of the TOPRS Indentures because the

promissory notes evidencing those Claims were not "sold for money borrowed," but were instead

"issued" or "given" for money borrowed, as is customary when the transaction involves only a

single borrower or a single lender.[2] Technically, the construction adopted by the Bankruptcy

Court also removed a number of other items ordinarily considered to be senior debt from the

ambit of "Senior Indebtedness" under the TOPRS Indentures – Enron's bank loans, for example,

were evidenced by notes that were "given" rather than "sold" – but, as noted above, Judge

---

[2] I say "arguably" because I see no real distinction between the terms "sold" and "issued"
for purposes of this dispute. A "sale" is "[t]he transfer of property . . . for a price," and the
"monetary worth or price of something" is its "value." BLACK'S LAW DICTIONARY 1337, 1549
(7th ed. 1999). Therefore, the significant point is that the notes underlying the Cherokee and
EFP claims were issued for something of value, i.e., for consideration. Indeed, in explaining
whether an instrument is "issued or transferred for value," Article 3 of the Uniform Commercial
Code – which governs negotiable instruments – uses the terms "issued" and "transferred" in
conjunction with one another. *See* UCC § 3-303.

Gonzalez declined to take his construction to its logical conclusion, because no party-in-interest had ever objected to the presence of the bank debt on the Amended Schedule S. *See* id. at 80-81.

It is beyond peradventure that the one and only reason that Judge Gonzalez refused to construe the relevant phrase in accordance with the rule of the last antecedent is the presence of the word "other" before the word "securities." In so doing, he gave that word far too much weight.

Twice in the last half century, the United States Supreme Court has reversed the Third Circuit for falling into this same grammatical trap. In the aforementioned Barnhart case, the Court interpreted a provision of the Social Security Act which provides that an individual is deemed disabled if his impairments are so severe that "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 540 U.S. at 23 (quoting 42 U.S.C. § 423(d)(2)(A)). The Third Circuit, in contrast to four other Circuits, had refused to construe the limiting phrase "which exists in the national economy" as applying only to the phrase "kind of substantial gainful work," as would be required by the rule of the last antecedent. *See* id. The reason was the insertion of the word "other" in front of "kind of substantial gainful work." The Third Circuit held that the use of the word "other" means that "his previous work" was, in effect, a subset of "other kinds of substantial gainful work," and so was necessarily modified by the limiting clause "which exists in the national economy." *See* id. at 26. Justice Scalia made short shrift of this argument:

> An example will illustrate the error of the Third Circuit's perception
> that the specifically enumerated "previous work" "must" be treated the
> same as the more general reference to "any other kind of substantial

22

gainful work." . . . Consider, for example, the case of parents who, before
leaving their teenage son alone in the house for the weekend, warn
him, "You will be punished if you throw a party or engage in any other
activity that damages the house." If the son nevertheless throws a party
and is caught, he should hardly be able to avoid punishment by arguing
that the house was not damaged. The parents proscribed (1) a party, and
(2) any other activity that damages the house. As far as appears from
what they said, their reasons for prohibiting the home-alone party
may have had nothing to do with damage to the house – for instance, the
risk that underage drinking or sexual activity would occur. And even if
their only concern was to prevent damage, it does not follow from the
fact that the same interest underlay both the specific and the general
prohibition that proof of impairment of that interest is required for both.
The parents, foreseeing that assessment of whether an activity
had in fact "damaged" the house could be disputed by their son, might
have wished to preclude all argument by specifically and categorically
prohibiting the one activity – hosting a party– that was most likely to
cause damage and most likely to occur.

Id. at 27-28.

So in this case, it is obvious that the phrase "all indebtedness . . . evidenced by notes,

debentures, bonds or other securities sold . . . for money borrowed" means that all the different

types of securities that *evidence* (a word they used) debt were to qualify as Senior Indebtedness.

There are, under the Indentures, four types of securities that evidence indebtedness. They are

notes, debentures and bonds – the three standard forms of debt securities – and a fourth, catch-all

type of security, which is any other type of security that is sold in exchange for money borrowed.

The Bankruptcy Court's failure to focus on the phrase "indebtedness . . . evidenced by" various

types of securities, rather than on the word "other," led it to make the same sort of error that

Justice Scalia criticized in his inimitable way in Barnhart.

Almost a half century earlier, in FTC v. Mandel Brothers, Inc., 359 U.S. 385 (1959), the

Supreme Court, applying the rule of the last antecedent, recognized that the use of the word

23

"other" in the phrase "purchaser, consignee, factor, bailee, correspondent, or agent, or any other person who is engaged in dealing commercially in fur products or furs" did not cause the limiting clause ("who is engaged in dealing commercially in fur products or furs") to modify anything other than the last antecedent ("any other person"). Id. at 390. The Seventh Circuit in Mandel Brothers had ruled otherwise, but just like the Third Circuit in Barnhart, it was reversed. The high court concluded that the Seventh Circuit's construction constituted a "partial mutilation" of the statutory language. Id.

The Supreme Court has often held that it is "quite sensible as a matter of grammar" to construe *statutes* in conformity with the rule of the last antecedent, *see* Nobelman v. American Savings Bank, 508 U.S. 324, 330 (1993), and both Mandel Brothers and Barnhart involved the construction of statutory language, not contracts. Appellees seize on this to argue that, under New York law (which governs the interpretation of the TOPRS Indentures), there is no precedent for relying on the rule of the last antecedent in contract construction. This is simply wrong. Within the last fifteen years, the New York Court of Appeals has relied on the principles underlying the rule of the last antecedent in resolving an insurance contract dispute. Maurice Goldman & Sons, Inc., v. Hanover Ins. Co., 80 N.Y. 2d 986 (1992). Of great significance, the New York Court of Appeals in Goldman specifically announced that the United States Court of Appeals for the Second Circuit had erred as a matter of New York law when it interpreted the identical clause in another insurance policy in a way that caused the limiting clause to modify more than the last antecedent. Id. at 987 (criticizing McCormick & Co., Inc. v. Empire Ins. Group, 878 F.2d 27 (2d Cir. 1989)).

Moreover, New York does not have any special rules of interpretation for subordination

24

agreements; its courts apply general principles of contract law. *See, e.g.,* Finest Invs. v. Sec. Trust Co. of Rochester, 96 A.D.2d 227, 229-30, 468 N.Y.S. 2d 256, 257-58 (4th Dep't 1983). Under ordinary contract construction rules, the rules of English grammar apply. The rule of the last antecedent is such a rule.

Of course, the rule of the last antecedent does not apply if there is evidence on the face of the contract that the parties did not intend for it to apply. Here there is no such evidence. But there is powerful contrary evidence that the parties did not intend to stray from the usual and customary rules of grammar. As noted above, if the construction adopted by the Bankruptcy Court were applied consistently to all of Enron's indebtedness – not just to these few challenged items of indebtedness – it would lead to a commercially absurd result: Enron's secured bank debt, which is evidenced by standard promissory notes, would cease to be Senior Indebtedness, because the notes were "given" rather than "sold." Judge Gonzalez recognized as much in his decision. *See* Enron, 370 B.R. at 81 n.8.

Appellees nonetheless argue that other canons of contract construction make it likely that the parties did not intend for the rule of the last antecedent to apply. But their argument that the interpretive principles of *ejusdem generis* and *noscitur a sociis* compel the result reached by the Bankruptcy Court fails because, when those principles are applied correctly, they actually favor appellants' position.

The principles of *ejusdem generis* and *noscitur a sociis* require that the meaning of a general term in a series is determined "by the company it keeps." People v. Illardo, 48 N.Y.2d 408, 416, 399 N.E. 2d 59, 63 (1979); Popkin v. Sec. Mut. Ins. Co. of New York, 48 A.D.2d 46, 48, 367 N.Y.S.2d 492, 495 (1st Dep't 1975). Terms in a provision are construed in accordance

25

with the meaning of the words that are associated with them. Thus, under *ejusdem generis*, where several specific terms are followed by a more general term, the general term is deemed to share the characteristics of the specific terms that precede it. Norton v. S. Utah Wilderness Assn., 542 U.S. 55, 63 (2004) (*ejusdem generis* attributes to the last item in a sequence of items the same characteristic of discreteness that is shared by all the preceding items). The canon of *ejusdem generis* is employed to limit "broad catch-all terms" in a manner consistent with other listed terms that are more specific. Johnson & Johnson v. Guidant Corp., 2007 U.S. Dist. LEXIS 64114, at *17-18 (S.D.N.Y. Aug. 29, 2007).

Application of the doctrine of *ejusdem generis* requires a court to apply a characteristic or characteristics of the preceding general terms (notes, debentures, bonds) to the last, more general term (other securities sold for money borrowed). The one characteristic that the last, general term has in common with the three preceding, specific terms is that they all constitute evidence of indebtedness. Therefore, that characteristic of the words "notes, debentures, bonds" must be attributed to the general term "other securities sold . . . for money borrowed." Appellees get it exactly backward when they argue that a characteristic of the last, general term – "sold for money borrowed" – should be attributed to the specific preceding terms, which do not necessarily share that characteristic. That is not how *ejusdem generis* works.

Appellees fare no better when they focus on the fact that there is no comma separating the word "bonds" from the phrase "or other securities sold by [Enron] for money borrowed." Here they have waded into one of the longest-standing and most hotly contested disputes in the English language— whether it is grammatically correct or incorrect to insert a comma (often referred to as "the Harvard comma," I assume because of some practice followed at that august institution)

26

between the penultimate and ultimate entries in a list of three or more entries. Strunk & White and the Chicago Manual of Style notwithstanding, this court was taught by the Sisters of Charity of Nazareth, Kentucky, that insertion of such a comma in a list of any length was error. I am, therefore, unimpressed by any argument that relies for its force on the absence of a comma before the conjunction "or." I recognize that many authorities, including the distinguished authorities named above, believe that it is appropriate to insert a comma before the conjunction that separates the ultimate and penultimate terms in a list. But the fact that the propriety of placing a comma at that point is hotly disputed means one cannot read anything at all into its absence— at least not without knowing where the draftsman learned his or her comma-lore.

Finally, there is no force in appellees' argument that the separate inclusion of a fifth form of evidence of indebtedness ("capitalized lease obligations") – an evidence of indebtedness that cannot be sold – from the phrase "notes, debentures, bonds or other securities sold . . . for money borrowed" demonstrates an intent to have the limiting clause modify "notes, debentures and bonds" in violation of the rule of the last antecedent. But unlike notes, debentures, bonds and other securities sold for money borrowed, capitalized lease obligations are not *securities* that evidence indebtedness; therefore, it is appropriate that they stand alone. And because notes, debentures and bonds are all *securities*, it is appropriate to add the catch-all form of "securities" together with them, rather than after an evidence of indebtedness that is not a security.

In short, there is no objective reason to conclude that the parties did not intend for the ordinary rules of grammatical construction to apply. Therefore, the Bankruptcy Court's conclusion that the notes underlying the Cherokee and EFP claims are not Senior Indebtedness within the meaning of the TOPRS Indentures is erroneous and must be reversed.

27

## Conclusion

This constitutes the decision and order of the Court.

Dated: January 14, 2008

_____

U.S.D.J.

BY ECF TO ALL COUNSEL

BY FAX TO The Hon. Arthur J. Gonzalez, U.S.B.J.